IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WINDHAM TODD PITTMAN AND )
RHONDA LEE PITTMAN, )
                                 )
         Plaintiffs, )
                                 )
vs. )
                                 )
                                 )      CASE  NO: 1:11-CV-0202-MEF
STATE FARM FIRE AND CASUALTY )
COMPANY, )
                                 )
         Defendant. )

# EXHIBIT C

## TO

# STATE FARM FIRE AND CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT

```
 1        IN THE UNITED STATES CIRCUIT COURT OF THE

 2              MIDDLE DISTRICT OF ALABAMA

 3                 SOUTHERN DIVISION

 4    WINDHAM TODD PITTMAN        )

 5    and RHONDA LEE PITTMAN,     )

 6                                )

 7            Plaintiffs,  )

 8    v.                          )      1:11-CV-202

 9                                )

10    STATE FARM FIRE AND         )

11    CASUALTY CO., et al.,       )

12                                )

13            Defendants.  )

14

15            S T I P U L A T I O N

16                IT IS STIPULATED AND

17    AGREED, by and between the parties through

18    their respective counsel, that the deposition of

19    *******************************************

20                 PAT CRAIG

21    *******************************************

22                may be taken before Paul Moore,

23    Commissioner, at the offices of Haskell,
```

Page 2

1  Slaughter, Young & Gallion, LLC, 305 South
2  Lawrence Street, Montgomery, Alabama 36104,
3  on the 5th day of October, 2011.
4           IT IS FURTHER STIPULATED
5  AND AGREED that the signature and reading
6  of the deposition by the witness is waived, the
7  deposition to have the same force and effect as
8  if full compliance had been had with all laws
9  and rules relating to the taking of depositions.
10           IT IS FURTHER STIPULATED
11  AND AGREED that it shall not be necessary for
12  any objections to be made by counsel to any
13  questions, except as to form or leading
14  questions and that counsel for the parties may
15  make objections and assign grounds at the
16  time of trial or at the time said deposition is
17  offered in evidence.
18           IT IS FURTHER STIPULATED
19  AND AGREED that notice of filing of the
20  deposition by the Commissioner is waived.
21
22
23

Page 4

1           A P P E A R A N C E S
2  APPEARING ON BEHALF OF THE PLAINTIFF:
3        Jeffery Kirby
4        Kirby Johnson, P.C.
5
6
7        REDACTED
8
9
10
11
12  APPEARING ON BEHALF OF THE DEFENDANTS:
13        Bert S. Nettles
14  Haskell, Slaughter, Young & Rediker, LLC
15
16
17
18        Felicia A. Long
19  Haskell, Slaughter, Young & Gallion, LLC
20
21
22        REDACTED
23

Page 3

1
2           I N D E X
3
4  EXAMINATION BY                    PAGE
5  Mr. Kirby                          5
6
7
8
9  EXHIBITS:
10  Plaintiff's 1 - Letter            158
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1  EXAMINATION BY MR. KIRBY:
2     Q    Would you give me your name, please,
3  sir?
4     A    It's Pat Craig.
5     Q    And Mr. Craig, have you given a
6  deposition before?
7     A    Yes.
8     Q    How many occasions do you think
9  you've done that?
10     A    Ten, twelve times.
11     Q    Okay.  Those ten or twelve times,
12  obviously you know what a deposition is about.
13  I merely ask if you need to stop or take a
14  break, just let me know and I'll do that.
15     A    Yes, sir.
16     Q    Would you tell me a little bit about
17  yourself?  I've got your name.  What's your
18  date of birth?     REDACTED
19     A
20     Q    And are you currently employed?
21     A    Yes.
22     Q    With whom are you employed?
23     A    State Farm Insurance Company.

Page 6

1    Q    A little bit about your background,
2  where you were born and raised?
3    A    Mobile, Alabama.
4    Q    Did you go to high school in Mobile?
5    A    Yes.
6    Q    Which high school?
7    A    McGill Institute.
8    Q    After McGill, did you go to college?
9    A    Yes, sir.
10   Q    Where did you go to college?
11   A    Springhill College.
12   Q    And did you graduate from college?
13   A    Yes.
14   Q    What year did you graduate?
15   A    1973.
16   Q    And what was your degree in?
17   A    Business administration.
18   Q    In 1973, did you go on for any formal
19  schooling, or did you go into the workforce?
20   A    Went into the workforce.
21   Q    And where did you first go to work?
22   A    I was employed with a department
23  store, C.J. Gayfers in Mobile.

Page 7

1    Q    All right.  How long did you do that?
2    A    As I sit here today, a couple years.
3    Q    Bring me up to when you first started
4  in the insurance business, the kind of jobs you
5  held?
6        MR. NETTLES: Do you mean before?
7    Q    (BY MR. KIRBY) Before the insurance.
8  You worked at Gayfers, and then what would be
9  the next one?
10   A    Oh, okay.  So, okay.  So, after Gayfers,
11  I was employed with - - and it's an insurance
12  field, in the General Adjustment Bureau.
13   Q    General - - GAB?
14   A    Yes, sir.
15   Q    And you were - - were you adjusting
16  claims at GAB?
17   A    Yes, sir.
18   Q    What kinds of claims?
19   A    All type of claims.
20   Q    Property, all kinds of property claims.
21  Did you ever do life - - claims for life
22  insurance?
23   A    No.

Page 8

1    Q    Okay.  And you say GAB Adjusting, how
2  long did you remain there?
3    A    My best judgment, a couple years.
4    Q    Okay.  After GAB?
5    A    Was with Allstate Insurance Company.
6    Q    Were you adjusting claims with
7  Allstate?
8    A    Yes.
9    Q    What kind of claims?
10   A    Property and auto.
11   Q    Property and auto.  After Allstate - -
12  you were with them how long?
13   A    Year, year-and-a-half.
14   Q    Allstate, then where?
15   A    State Farm.
16   Q    What year did you first go to work for
17  State Farm?
18   A    1978.
19   Q    Have you been continuously employed
20  with State Farm since 1978?
21   A    Yes, sir.
22   Q    And is the correct name State Farm Fire
23  and Casualty Company?

Page 9

1    A    That's correct.
2    Q    Some thirty-three years you've worked
3  for them?
4    A    It's thirty-two, yes, sir.
5    Q    Thirty-two this past year?
6    A    Yes, sir.
7    Q    Take me through, if you would, the
8  various jobs you've held, and let me ask you:
9  Did all the jobs you've held at State Farm, did
10  those deal with claims handling?
11   A    Yes, sir, they did.
12   Q    And just bring me the duration up to
13  today, the jobs you've held dealing with
14  claims?
15   A    Well, I mean, they've all been related
16  to claims.
17   Q    Okay.
18   A    I'm currently a claim representative.
19  So, all of them have been in claims since I've
20  been with State Farm.  Is that - -
21   Q    Yeah, that's - - I mean, I was just kind
22  of wondering if you started out handling a
23  certain type of claims, got a promotion to head

Page 10

1    of the claims department? I'm just trying to
2    follow your progression, how you progressed
3    there.
4        A    Okay. I started as a - - I think they
5    called it a claim representative back in 78
6    with The Fire Company back then. So, I was
7    handling homeowner claims with State Farm
8    then, and I was transferred up here to
9    Montgomery to a claims management position
10   here in Montgomery for a few years. And I'm in
11   the current position now with the Special
12   Investigative Unit.
13       Q    Okay. And that's - - is that called SIU?
14       A    Yes, sir.
15       Q    And so, what would your job title be,
16   Claims Management in SICU?
17       A    No, I'm a Claim Representative in
18   Special Investigative Unit.
19       Q    Claim Representative in SIU?
20       A    Yes, sir.
21       Q    How many folks are in SIU, claims
22   representatives?
23       A    Well, I mean we're - -

Page 11

1        MR. NETTLES: You mean in the - - out in
2    his - - what area are you speaking of?
3        Q    (BY MR. KIRBY) Your area of SIU, Special
4    Investigative Unit; is that just here in
5    Alabama?
6        A    Well, I mean, we're all over the
7    country.
8        Q    Right.
9        A    I mean, are you talking about just
10   Alabama?
11       Q    Yeah, that's all I'm worried about is
12   Alabama.
13       A    You want the number?
14       Q    Or let me narrow it down. Where is
15   your office?
16       A    Montgomery.
17       Q    How many are in your office in
18   Montgomery?
19       A    Just me.
20       Q    Okay. And is that generally the way it
21   works in SIU, there is generally one in every
22   part of Alabama where you have claims
23   representatives?

Page 12

1        A    I'm trying to - - yeah, yeah, I think
2    that's correct, yeah.
3        Q    It could be more?
4        A    It could be more than one but you may
5    have a present in a claims office.
6        Q    It wouldn't be less than one? I'm just
7    kidding.
8        A    Okay.
9        Q    Do you have a written job description?
10       A    Yes. I believe there's one, yes.
11       Q    Do you happen to have that with you
12   today?
13       A    No, sir.
14       Q    The written job description, I know you
15   haven't memorized it, but in general what does
16   it say your job is in SIU as a claims
17   representative?
18       A    I mean generally to handle and
19   evaluate and review claims that are assigned to
20   me.
21       Q    All right. And being in SIU, is there a
22   certain claim that is assigned to you? Does it
23   - - are you triggered by a dollar amount? Does

Page 13

1    something cause special investigative unit to
2    be involved in a claim?
3        A    Yes.
4        Q    What triggers your involvement?
5        A    Well, it's what we - - we call it the NICB
6    indicator.
7        Q    What does that stand for?
8        A    The National Information Crime
9    Bureau. If any indicators are present during a
10   claim, that could generate my involvement.
11       Q    An NICB indicator?
12       A    Yes, sir.
13       Q    Did that get you involved in this case?
14       A    Yes.
15       Q    And tell me what the NICB indicator
16   was in this case that got you involved?
17       A    Well, the - - there was a new policy
18   issued in regards to the jewelry about a week
19   before the - - a new policy issued very recently
20   before the reported theft.
21       Q    Right.
22       A    The company had received a call from
23   the Deputy J. Solomon with the Geneva County

Page 14

1   Sheriff's Department advising our claims office
2   that he had some concerns about this loss.
3   And then, there was some information about
4   some lawsuits or financial problems, pending
5   lawsuits.
6       Q    Anything else?
7       A    As I sit here today, that's all I can
8   recall - -
9       Q    Okay.
10      A    - - at this point.
11      Q    At any time you need to refer to any
12  documents, feel free to do so.
13      A    Yes, sir.
14      Q    And NICB, tell me again, NICB stands
15  for what?
16      A    National Information Crime Bureau.
17      Q    And Information Crime Bureau.  And
18  where is that located?
19      A    I'm not sure where their home office
20  is.
21      Q    Okay.  But how does State Farm
22  interact with the National Information Crime
23  Bureau?  How do y'all communicate with each

Page 15

1   other?  Through the internet, telephone?  How
2   do they get involved with your group, is it a
3   service you hire?
4       A    Well, it's my understanding this
5   organization is supported by the insurance
6   industry and law enforcement, and they have
7   put out these indicators.  I don't, you know, I
8   don't personally communicate with them on a
9   daily basis.  This is indicators that they have
10  that, you know, we utilize.
11      Q    Okay.  And do you know who makes up
12  the NICB, who pays for it, who funds it?
13      A    No, sir.  As I sit here today, no, sir.
14      Q    Do you know if it's insurance
15  companies?
16      A    I don't - - I don't know how that works.
17  No, sir, I'm sorry.
18      Q    But the way you would have gotten
19  involved would have been they would have
20  contacted you?
21      A    No.
22      Q    How did they figure into your getting
23  involved?

Page 16

1       A    Are you talking about the NICB?
2       Q    Correct.
3       A    Well, there's just this list of NICB
4   indicators that we have.  And then, if we - -
5   then we would identify those, and that's the
6   extent.  I don't - - they didn't call me, I don't
7   communicate with them.
8       Q    Okay.  So, the NICB has a list of
9   indicators that you have available to you?
10      A    The company does, yes, sir.
11      Q    Company does.  And have you seen that
12  list?
13      A    Yes, sir.
14      Q    Do you have a copy of that list?
15      A    No.
16      Q    Did the list - - it would have other
17  things on it, other than a new policy was
18  purchased.  The list, you've seen the list?
19      A    Yes, sir.
20      Q    It's exhaustive?
21      A    It is quite extensive, yes, sir.
22      Q    And it has many things on it that would
23  be what you referred to as an indicator?

Page 17

1       A    That's what they call them, yes, sir.
2       Q    And tell me, what is an indicator?
3       A    Well, it's just a - - it's just kind of a
4   tool that "this is a, you know, a possible
5   indicator of fraud".  It doesn't mean it's fraud,
6   but it's a tool that could be a possible
7   indicator .
8       Q    A possible indicator of fraud?
9       A    Right.
10      Q    And do you have - - in this particular
11  case, as a member of the SIU, what was your
12  role in the case?  By that I mean, were you
13  adjusting the claim?
14      A    Yes.
15      Q    Were you also investigating the claim?
16      A    Yes.
17      Q    And as far as State Farm, is there a
18  claims adjusting manual that you can reference
19  or go by, or you're taught how to go about
20  adjusting claims?
21      A    There is an Operations Guide Manual.
22      Q    An Operations Guide.  That also would
23  have fraud indicator guidelines in it too, would

Page 18

1 it not?
2    A   I believe so, yes, sir.
3    Q   And as far as adjusting the claim, that
4 would be the operational manual you would
5 utilize?  It gives you various instructions and
6 various directions how to actually adjust a
7 claim?
8    A   It just gives some guides, if we need to
9 refer to them on a particular issue.
10    Q   Right.  Are there other guides provided
11 to you by State Farm, other than that one?
12    A   That's all I'm aware of.
13    Q   Okay.  Now, you were adjusting the
14 claim.  Was it a separate function of yours to
15 actually investigate the claim also, or is that
16 part of the adjusting procedure?
17    A   It's all combined - -
18    Q   Okay.
19    A   - - in the claim process.
20    Q   Now, as far as adjusting this claim and
21 doing the investigation that you were doing, as
22 far as having the authority to actually come in
23 and "say this claim is going to be denied" or

Page 19

1 "this claim is going to be paid", did you, Mr.
2 Craig, have that authority?
3    A   What do you mean by "authority"?
4    Q   Could you say "this claim should be
5 paid" or "this claim shouldn't be paid"?
6        MR. NETTLES:  You mean a decision or a
7 recommendation?
8        MR. KIRBY:  Well, a decision first.
9    A   No, I don't have that authority to make
10 that decision.
11    Q   (BY MR. KIRBY)  But you do have
12 authority to make a recommendation?
13    A   I have.  I made a recommendation.
14    Q   And as far as the recommendation, who
15 has the authority to make the decision as we're
16 going to pay the claim or deny the claim?
17    A   The company.
18    Q   Okay.  And anybody in particular at the
19 company?
20    A   Well, the facts are submitted - - I
21 mean, the claim is submitted to what we call a
22 claim committee.
23    Q   Right.  Right.  And in this particular

Page 20

1 instance, the claim committee, and I can show
2 you and you probably have your own copy of
3 this, this is the claim committee report.  And I
4 showed that to you and ask you: In this case,
5 would the actual denial letter have come from
6 Mr. Nix?
7        MR. NETTLES: You're asking now about
8 the denial letter?
9        MR. KIRBY:  Yeah, the denial.
10        MR. NETTLES:  Which was separate?
11        MR. KIRBY:  Yes.
12        Mr. NETTLES:  The question was about
13 the denial letter.
14    A   Okay.  Can you repeat the question?
15    Q   (BY MR. KIRBY)  Sure.  The denial
16 letter, do you know who signed the denial
17 letter in this instance?
18    A   I understand it was Mr. Nix.
19    Q   And Mr. Nix, what was his role in the
20 adjusting of this claim or the determination of
21 this claim?  Was he the team manager?
22    A   Yes.
23    Q   And Pat Craig was the claim

Page 21

1 representative?
2    A   Correct.
3    Q   I see where you, as claim
4 representative, made a recommendation and
5 he, as team manager, made a recommendation?
6 And that's the last sheet, 41 of 42.  Actually,
7 it's not the last sheet.  It's 41 of 42.
8        (Off the record)
9    A   Yes.
10    Q   (BY MR. KIRBY)  All right.  Now, let me
11 say that, if I'm looking at the claim committee
12 report from the start, I'm seeing Ferguson,
13 Fisher, Hatch, Nix, Renfroe, L. Smith, Stephens
14 and Butler as far as the participants on the
15 front page right here?
16    A   You mean Sutter?  Did you say Butler?
17    Q   Yeah.
18    A   Okay.
19    Q   You're right. Sutter is the one.
20    A   I thought you were - - all right.
21    Q   Are those - - is that the committee?
22 I'm just trying to figure out how this decision
23 was made.  You made the recommendation.  Pat

Page 22

1  Craig made a recommendation as well as Mr.
2  Tony Nix.  Was the committee these people
3  that I just read to you?
4      A   Yes, sir.
5      Q   Do they vote on your recommendation,
6  as well as Mr. Nix's recommendation?
7      A   I mean, you use the word "vote", I
8  mean - -
9      Q   I mean does the committee sit down
10  and listen to y'all's recommendations, and
11  then make a decision based upon y'all's
12  recommendations?
13      A   That's' my understanding of how it
14  works.
15      Q   Okay.  Do you get a say so in the vote,
16  or is it this committee right here, Ferguson,
17  Fisher, Hatch, Nix, Renfroe, L. Smith,
18  Stephens, and who did you say, Sutler?
19      A   Sutter.
20      Q   Sutter.
21      A   I'm not involved in this process.
22      Q   But Mr. Nix would be involved?
23      A   Yes, sir.

Page 23

1      Q   Were there anybody making any other
2  recommendations, other than Pat Craig and
3  Tony Nix to the committee?
4      A   If I understand your question, anyone
5  else that was making any recommendations?
6      Q   Right.
7      A   For these - -
8      Q   For that committee.
9      A   - - committee, to - - no.
10      Q   Okay.  And so, would I be fair in saying
11  that with the committee decision on to deny
12  the claim would have been made upon the
13  recommendations of either you or Tony Nix?
14      A   You said "recommendation"?
15      Q   Right.  I mean the Claims Committee
16  would have had a copy of your report?
17      A   Correct.
18      Q   And then, you would have made
19  recommendations.  And based upon the
20  recommendations of you, Tony Nix and your
21  report, they would have made their decision?
22      A   Yes, they would have reviewed the
23  facts and circumstance of the claim and

Page 24

1  rendered a decision.
2      Q   Okay.  Would there be as formal as a
3  vote where you cold look and see which - - how
4  each member voted to either pay the claim or
5  deny the claim; is that recorded in any form or
6  fashion?
7          MR. NETTLES: If you know.
8      A   I don't know that.
9      Q   (BY MR. KIRBY)  Okay.  Do you know
10  how that works?
11      A   No, sir.
12      Q   Okay.  Let me then look at your
13  recommendation on the last page.  Actually,
14  it's not the last page, but it's the last page
15  that I have, 41 of 42, it's Bates 5729.  And if
16  you would, I'm looking at your
17  recommendation.  "Claim representative, Pat
18  Craig, recommends denial, both homeowners
19  and personal articles policy claim based on the
20  insured breach of the concealment or fraud
21  provision in the policies.  In addition, the
22  policy should be rendered void as of the date
23  of the loss."  That is your recommendation to

Page 25

1  the committee?
2      A   Yes, sir.
3      Q   And then, I see the recommendation of
4  team manager, "Tony Nix, recommends denial
5  of both the homeowners and personal articles
6  policy claim, based on the insured's breach of
7  the concealment or fraud provision of the
8  policies and because a loss has not occurred as
9  defined in the policy.  In addition, the policy
10  should be rendered void as of the date of
11  loss."  Now, going with your claim
12  representative recommendation, it says you
13  recommend "denial of both homeowners and
14  personal articles policy claim based on the
15  insured's breach or concealment or fraud
16  provision in the policies", correct?
17      A   Correct.
18      Q   That's one provision?
19      A   Yes.
20      Q   Okay.  And the provision that you're
21  talking about is a provision that are in both
22  those policies, that being the policy - -
23  homeowner's policy, as well as personal

Page 26

1  articles.  And if I'm looking at that provision,
2  that provision is contained on 5725, is it not?
3       MR. NETTLES:  5725.
4       Q    (BY MR. KIRBY) The Bates Number at the
5  bottom right hand.  The provision that you're
6  talking about would be that provision called
7  "concealment or fraud", correct?
8       A    Let me review it.
9       Q    Okay.  Go right ahead.
10      A    Okay.  Could you repeat the question?
11      Q    What I want to do is the - - your
12  recommendation of a denial says, "Pat Craig
13  recommends denial of both the homeowners
14  and personal articles policy claim based on the
15  insured's breach of concealment or fraud
16  provision in the policies".  And what I'd like
17  for you to do is now that you've been able to
18  find that provision, would you read the
19  provision for me in both those policies?
20      A    Okay.
21      MR. NETTLES:  Here it is.
22      THE WITNESS:  No, this is the
23  homeowner's here.

Page 27

1       MR. NETTLES:  But he said both
2  policies.
3       A    Both policies?
4       Q    (BY MR. KIRBY) Right.  Homeowners is
5  the first one, and I think it's Number 2 under
6  Section 1 and Section 2 "conditions"; is it not?
7       A    Correct.
8       Q    Okay.  Would you just read that to me?
9       A    Okay.  "Concealment or fraud.  This
10  policy is void as to you and any other insured
11  if you or any other insured under this policy
12  has intentionally concealed or misrepresented
13  any material fact or circumstance relating to
14  this insurance, whether before or after a loss."
15      Q    All right.  And that is the policy
16  provision that you're talking about, correct?
17      A    Correct.
18      Q    And then, it goes on, the personal
19  articles policy also contains a provision.
20  Would you read that provision to me?
21      A    In Paragraph 2, "concealment or fraud".
22  "This entire policy will be void if, whether
23  before or after a loss, you have intentionally

Page 28

1  concealed or misrepresented a material fact or
2  circumstance relating to this insurance."
3       Q    Okay.  Now, have we covered the - -
4  and, by the way, the insurance policy is the
5  contract between the insured and State Farm?
6       A    Correct.
7       Q    That sets out the obligations of the
8  insured and the obligations of the State Farm
9  Insurance Company?
10      A    Yes.
11      Q    And in order to deny a claim on behalf
12  of an insured, it has to be pursuant to a
13  portion of the insurance policy?
14      A    Yes.
15      Q    And based upon your investigation,
16  and I'm just talking about you, Mr. Craig, that
17  is the provision you say, the reason coverage
18  should be denied?
19      A    I mean, that's one of the reasons, yes,
20  sir.
21      Q    Okay.  But - - and when I see your
22  recommendation though, I only see one reason
23  in your recommendation?

Page 29

1       A    Yes, that's the - - correct, but there
2  are other reasons as well.
3       Q    Well, I only see in your
4  recommendation where you recommended
5  denial on one provision.
6       A    Yeah, based on the concealment or
7  fraud provision.
8       Q    Okay.  And I don't see your
9  recommendation as being any other provisions,
10  other than that one in the report.
11      A    That's correct.
12      Q    Okay.  Now, what I want to do with you,
13  Mr. Craig, is this, simply this, and you can
14  refer it to anything you feel necessary to refer
15  to as far as in this particular case.  But what I
16  would like you to do is first tell me: As far as
17  the insured, as an adjuster adjusting an
18  insurance claim on behalf of an insured, are
19  you representing the best interest of the
20  insured?
21      A    Yes, sir.
22      Q    It is your responsibility as an adjuster
23  for State Farm to look after the best interest of

Page 30

1 the insured as you representing them; is it
2 not?
3       MR. NETTLES: I object to the form of
4 the question.
5       Q    (BY MR. KIRBY) You can answer.
6       A    I mean, my job is to, you know, review
7 and evaluate and investigate the claim on it's
8 - - each claim is different, on it's own merits.
9       Q    But who is your client?  Who are you
10 working to see gets prompt, adequate service,
11 as far as you adjusting the claim, being fair
12 and diligent?
13       MR. NETTLES: I object to the form of
14 the question.  You've got several or multiple
15 questions within one there.
16       Q    (BY MR. KIRBY) Let me back up.  I did
17 have a bunch of questions in one.  Are you
18 looking out for the insured as an adjuster, as
19 the adjuster in the claim?
20       A    I would say so, yes, sir.
21       Q    That's what you're supposed to be
22 doing as an adjuster, is it not?
23       A    I'm to - - each individual claim, to

Page 31

1 handle a claim on it's own merits and
2 circumstances that - - and facts that are
3 related to the claim.
4       Q    Well, then aren't you assisting the
5 insured in seeing that their claim gets paid?
6       MR. NETTLES: I object to the form of
7 the question.
8       A    I don't understand that question.
9       Q    (BY MR. KIRBY) Yeah.  As an adjuster,
10 isn't it your ethical responsibility to do
11 everything you can for the insured to see that
12 their claim gets paid?
13       MR. NETTLES: I object to the form of
14 the question.
15       A    My job is to handle each claim on the
16 individual merits that are involved in the
17 claim, to evaluate and investigate the claim.
18       Q    (BY MR. KIRBY) Well, who's your client?
19 Who are you representing in adjusting the
20 claim?
21       MR. NETTLES: I object to the form of
22 the question.
23       A    Well, I mean, I'm representing State

Page 32

1 Farm as well as the policyholder.
2       Q    (MR. KIRBY) You're representing both
3 sides, right?
4       A    Yeah.  Yes, sir.
5       Q    Okay.  Now, in this particular instance
6 though, one of your responsibilities is to work
7 with the insured to obtain as much information
8 that you can to see that a claim is paid?
9       MR. NETTLES: I object to the form of
10 the question.
11       A    Again, my job is to handle each
12 individual claim on it's own merits, to
13 determine investigation, adjustment, coverage
14 issues, whatever.  And then, based on the facts
15 and circumstances on a particular claim, you
16 know, a decision is made, whether it's a
17 covered loss or not.
18       Q    (BY MR. KIRBY) Well, as an adjuster, is
19 it your goal from the outset to get a claim
20 paid, if possible, or is it your goal to see that
21 the claim is denied?  What's your goal as an
22 adjuster when you first open a file?
23       A    It's to properly handle the claim on it's

Page 33

1 own merits, investigate and evaluate the claim
2 and determine if we do have a covered loss,
3 then what is the value of the items and what
4 we would owe the homeowner under the policy.
5       Q    Without any loyalties to either the
6 insured or State Farm?
7       MR. NETTLES: I object to the form of
8 the question.
9       A    Again to just look at the individual
10 facts and circumstances that are involved in
11 each individual claim and make - - and make a
12 determination as to, you know, if this is a
13 covered loss, not a covered loss, and then
14 determine, you know, items will be covered
15 under, the damages and determine the
16 damages.
17       Q    (BY MR. KIRBY) Would you agree with
18 me, as an adjuster, the first thing that you try
19 to do if you can do it, is to have coverage
20 under the inclusions, try to get coverage for
21 your insured if you can?
22       MR. NETTLES: I object to the form of
23 the question.

Page 34

1    A    I mean, the contract speaks for itself.
2    Q    Sure it does.
3    A    So, I have to go by the contract.
4    Q    I understand.  But it's the first thing
5  you do is, you look at the contract and say,
6  "I've got an insured here that has suffered a
7  loss.  The first thing I'm going to do is look at
8  this  policy and see it is included if he does
9  have coverage for the loss", or do you say, "I'm
10 going to look at this policy and the first thing
11 I'm going to do is go to the exclusions and see
12 if I can get no coverage".  What's the first
13 thing you do?
14    A    Well, I mean, the first thing would be,
15 when a claim was reported, to determine if the
16 event is covered.  In other words, fire, theft,
17 lightening, wind storm, tornado.
18    Q    Right.  You see if there's coverage to
19 start with?
20    A    Yes.
21    Q    And so, in this case theft is coverage
22 - - there is coverage for theft?
23       MR. NETTLES: Object to the form of the

Page 35

1  question.
2    A    Yeah.  Theft is covered in the policy
3  with certain - - with certain stipulations.
4  Maybe I'm using the wrong word, or
5  exclusions.
6    Q    (BY MR. KIRBY)  Sure.  And who wrote
7  the policy?
8    A    State Farm.
9    Q    All right.  Now, as far as in this case
10 though, when you're there as an adjuster
11 working on a claim, for instance in this case,
12 did you tell the Pittman's, "look my name is Pat
13 Craig.  I'm with Special Investigative Unit with
14 State Farm and I'm here to adjust your claim",
15 did you tell them that information up front?
16    A    I may have told him "I'm here to handle
17 your claim".  That's my terminology, right.
18    Q    To handle your claim?
19    A    Right.
20    Q    And did you tell them that you would
21 be the contact for State Farm, as far as the
22 handling of their claim?
23    A    Yes, sir.

Page 36

1    Q    And would you have told them, "look,
2  I'll be handling your claim if you have any
3  questions, if you have any concerns, I'm the
4  person that you are to contact that can answer
5  those questions or concerns"?
6    A    Yes.
7    Q    And did you tell them that "what I am
8  going to do is, I'm going to diligently work on
9  this claim with you and that together we'll
10 need to get together certain information to
11 make sure the claim is documented and
12 processed"?
13       MR. NETTLES: I object to the form of
14 the question.
15    A    I mean, I didn't use the word
16 "diligently".
17    Q    (BY MR. KIRBY)  Okay.  Well, maybe you
18 skipped diligently.  Did you tell him "I'm going
19 to work with you, I'll need information from
20 you, and we're going to work through this
21 claim and get it handled for you"?
22       MR. NETTLES: Or words to that effect,
23 is that what you're saying?

Page 37

1       MR. KIRBY:  Yeah.
2    A    Yeah, I told him I would be the contact
3  person, the adjuster that would be handling
4  their claim and, you know, what was needed
5  from them to move forward with the claim.
6    Q    (BY MR. KIRBY)  And you had many
7  conversations with them, with the Pittmans?
8    A    More with Mr. Pittman than Mrs.
9  Pittman.
10    Q    Right.  But you had conversations with
11 both of them?
12    A    Yes.
13    Q    Met with them in person?
14    A    Yes.
15    Q    Corresponded with them?
16    A    Yes.
17    Q    Over a period of months?
18    A    Yes.
19    Q    And during this period of months, if
20 they had questions or concerns, they would
21 come to you and ask you questions, or ask you
22 what you needed?  And on the other hand you
23 would tell them, "look, I need you to get this

Page 38

1  information to me"?
2      A   Generally, yes, sir.  That's correct.
3      Q   And at no time did they ever say - - for
4  instance, at times you would go to them and
5  say "we need to go in your house", or "we need
6  to look around", they allowed you to do that?
7      A   Yeah.  I set up an appointment to meet
8  with both of them.
9      Q   Right.  And you actually went in their
10  house and took as many photographs as you
11  wanted to take?
12     A   Yes.
13     Q   And you actually asked them if they
14  minded if you hired engineers to come in the
15  house and look at their alarm system, and
16  actually I think they may even have taken some
17  of it out?
18     A   That's correct.
19     Q   And during all this period of time, you
20  were working with the Pittmans to adjust the
21  claim and to get the claim handled, correct?
22     A   Yes, we were moving forward to
23  determine damages.  Yes, sir.

Page 39

1      Q   And in this particular instance, we've
2  read the sections that you say you recommend
3  the claim be denied.  And you say that it was
4  the concealment of fraud and that the policy
5  was void because of concealment and fraud.
6  "Under this policy, if anyone has intentionally
7  concealed or misrepresented any material fact
8  or circumstance relating to the insurance,
9  whether before or after a loss", and the actual
10  personal articles policy says, "concealment or
11  fraud, the entire policy would be void whether
12  before or after loss you have intentionally
13  created or misrepresented a material fact or
14  circumstance relating to the insurance".  Now,
15  would you agree with me that the concealment
16  or fraud that you're talking about, if there is
17  an intentional concealment or
18  misrepresentation, it has to relate to the
19  insurance?
20     A   And what do you mean by "insurance"?
21     Q   What do you mean by it?
22         MR. NETTLES:  Well, I'm going to object
23  on the basis that the policy language speaks

Page 40

1  for itself.
2      Q   (BY MR. KIRBY) It sure does.  And I'm
3  asking you about the policy limits, you would
4  agree - - the policy itself.  It says that "this
5  intentional concealment or misrepresentation
6  of any material fact or circumstance relating to
7  the insurance".  And what I'm telling you, or
8  what I'm asking you to agree with me is, is this
9  concealment or fraud that you're talking about
10  must relate to the insurance; that's what the
11  policy says, isn't it?
12     A   That's what it says, yes, sir.
13     Q   Now, I want you to tell me what that
14  means, that the concealment or fraud has to
15  relate to the insurance?
16         MR. NETTLES:  I'm going to object to
17  the form of the question.
18     A   Well, that is, you know, relating to the
19  insurance, as well as - - as well as any claims.
20     Q   (BY MR. KIRBY) Well, I'm going to ask
21  you:  It doesn't say "as well as any claims" in
22  the policy, does it?
23         MR. NETTLES:  Object as argumentative.

Page 41

1      Q   (BY MR. KIRBY) Question mark.  It does
2  not say relating to any claims in the policy,
3  does it?
4          MR. NETLES:  Object.
5      A   No, it does not say "claims".
6      Q   (BY MR. KIRBY) It says "relating to the
7  insurance", correct?
8      A   Yes.
9      Q   What does that mean to you, adjusting
10  this claim, recommending that it be denied for
11  concealment or fraud; what does that term
12  mean to you?
13     A   Relating to the insurance and, of
14  course, any claims involving the insurance.
15  That's how I interpret that, relating to that.
16     Q   Is it defined in the policy?
17     A   What is defined?
18     Q   "Relating to the insurance", is that
19  defined in the policy?
20     A   I don't believe so.
21     Q   Okay.  Tell me then, what I want to do
22  now is, you take your time, review anything
23  that you would like to review.  I know - - and

Page 42

1  I'm going to ask you in a minute what you have
2  reviewed.  But I want you to tell me the
3  intentional concealment or misrepresentation
4  of a material fact or circumstance that were
5  made in this case by either Todd Pittman or
6  Rhonda Pittman.
7       MR. NETTLES: If you want to use your
8  pad - -
9       Q    (BY MR. KIRBY) Anything you need to
10 use.
11      A    Okay.  The claim file is quite
12 extensive.  But as I sit here today, as far as the
13 material misrepresentation would be in regards
14 to the alarm system.
15      Q    The alarm system.  And what
16 misrepresentation as to the alarm system?
17 Which individual are you talking about, Todd
18 Pittman or Rhonda Pittman?
19      A    Both of them.
20      Q    Let's start with Rhonda Pittman.  What
21 were her misrepresentations?
22      A    She indicated when they were leaving
23 for their trip on the date they were leaving, in

Page 43

1  regards to the alarm system, she, and I'm
2  trying to recall from memory, but she punched
3  in her code and punched "away".
4       Q    Okay.  So, she punched "away".  All
5  right.
6       A    And that's all she did.
7       Q    And that punching "away" was her
8  concealment or fraud?
9       A    Yes.
10      Q    And you say that's a concealment or
11 fraud.  Why do you say that is a concealment or
12 fraud?
13      A    Because the information we have on
14 the alarm is that that is not what occurred.
15      Q    What do you have on the alarm that is
16 what did occur?
17      A    It's my understanding, the gentleman
18 who looked at the alarm indicated that the
19 alarm was set for "stay" and a door, a rear door
20 was by-passed or taken out of the system.
21      Q    Okay.  Do you have that expert's
22 report here with you today?
23           (Off the record)

Page 44

1       MR. KIRBY: What I'm looking at is the
2  Forensic and Scientific Testing, it's SF001137.
3  And I think that it actually goes through
4  SF001283.  And then, of course, there is a - -
5  also a - - and that's the report right there.
6       MR. NETTLES: Right.  I got it.
7       Q    (BY MR. KIRBY)  Let me give it to you.
8  And then, you had someone come behind this
9  engineering report and also do a peer review of
10 this work, correct?
11           (Off the record)
12      Q    (BY MR. KIRBY)  Okay.  Now, making
13 sure I understand what you're saying.  The
14 misrepresentation of Ms. Pittman was - - the
15 misrepresentation was that it was - - the alarm
16 was coded "away", your expert said it was
17 coded "stay" and had a bedroom bypass?
18      A    Correct.
19      Q    Anything else?  Any misrepresentation
20 - - any other misrepresentation of Ms. Pittman?
21      A    The report also indicates that on - - as
22 best as I recall today, that- -
23           MR. NETTLES:  You can go ahead and

Page 45

1  look at the reports.
2       A    Okay.  On July 4th - -
3           MR. NETTLES: Could you identify the
4  page?
5       A    Oh, page, Page 4.
6       Q    (BY MR. KIRBY)  Okay.
7       A    That the alarm was disarmed and Zone
8  11 was restored.
9       Q    On July the 4th?
10      A    Yes, sir.
11      Q    Okay.  Does it give you a time?
12      A    Mr. Hopkins' report that he gave is
13 10:50 p.m.
14      Q    Okay.  And what about that is a
15 misrepresentation, the fact that at that time
16 the system was reactivated and the Zone 11
17 was included in the reactivation, what is the
18 misrepresentation that you are talking about?
19      A    Mr. and Mrs. Pittman both indicated
20 they did not turn the alarm off when they got
21 home.
22      Q    You mean turn it on?
23      A    Excuse me, turn it off.

1    Q    Okay.  Now, let me, let me be straight.
2  The expert report indicates at what time, ten?
3    A    Fifty.
4    Q    It indicates what happened with the
5  alarm system?
6    A    Well, there's two entries, disarm the
7  system, and then restore Zone 11.
8    Q    Okay.  Disarmed - - the system was
9  disarmed or cut off, right?
10    A    The report indicates it was disarmed,
11  "disarm system".
12    Q    Do you know what "disarm" means?
13    A    I would say turning the system off.
14    Q    Okay.  And turned off.  And then, if the
15  system was turned off, you're saying that the
16  system was turned off and Zone 11 was
17  restored?
18    A    Well, again, there are two activities on
19  July 4th.
20    Q    Okay.
21    A    And the report says, Number 8,
22  "restore Zone 11", and then Event 7, "disarm
23  the system".

1    Q    So, Zone 11 was restored, and then the
2  system was disarmed?
3        MR. NETTLES:  I think it was the other
4  way around.  He had 7 as being disarmed, and
5  8 as being - -
6        THE WITNESS:  Oh, did I miss - - I'm
7  sorry.
8        MR. NETTLES:  No, you said it.  You just
9  said 8 first, and then you went back and said
10  7.  But the sequence listed in the report - -
11  that's noted in the report.
12        THE WITNESS:  Okay.
13    Q    (BY MR. KIRBY)  At 10:50 p.m., it says
14  "disarm system", you see that in the report?
15    A    Yes.
16    Q    What did you understand that to mean
17  from your conversations with the expert and
18  your reading of his report?
19    A    I interpret that as the alarm was
20  turned off.
21    Q    Okay.  And then, if the alarm is turned
22  off, the next event that happens at the very
23  same time is "restore Zone 11", what did that

1  mean to you?
2    A    I mean, you'll need to ask Mr. Hopkins
3  about that.  But if you ask - - I mean I did - -
4  they restored Zone 11.
5    Q    Okay.  So, the system was disarmed
6  and then restored Zone 11.  What about that is
7  a misrepresentation on behalf of Mr. and Mrs.
8  Pittman?
9    A    That they both indicated during their
10  examination under oath, upon arriving back at
11  the house, they did not turn the alarm off.
12    Q    Right.  So, that's the
13  misrepresentation?
14    A    Yes, sir.
15    Q    Okay.  Because the records of your
16  expert seem to indicate that it was disarmed or
17  turned off?
18    A    His report indicates an activity, and it
19  says "disarmed".
20    Q    Okay.  Now, let me make sure I
21  understand this - - I do understand what you're
22  saying.  Any other concealment or fraud that
23  you are aware of on behalf of Todd Pittman or

1  Rhonda Pittman?
2    A    In the - - they submitted a sworn
3  statement in proof of loss form, both on the
4  homeowner's, as well as the personal articles
5  policy.
6    Q    A sworn statement - -
7    A    In proof of loss.
8    Q    - - proof of loss form.  What about that
9  was fraudulent or was a concealment?
10    A    Well, in that document, which they
11  presented to the company, they're swearing to
12  under oath that they did not cause or procure
13  this loss, "nothing has been done by or with my
14  consent or agreement to violate the provisions
15  of the policy as to render it void.  I have not
16  concealed or attempted to deceive State Farm
17  as to the extent or cause of this loss in any
18  manner."
19    Q    Okay.  So, they signed a proof of loss
20  and made that statement, correct?
21    A    They were swearing under oath.
22    Q    Right.  And they made that statement
23  under oath, and you say that that's

Page 50

1  concealment or fraud?
2      A   That's correct.
3      Q   And what do you say about that, saying
4  that under oath constitutes a concealment or
5  fraud?
6      A   Because they're swearing under oath
7  that they did not cause or procure this loss.
8      Q   Okay.  Now, causing or procuring a
9  loss, you say causing or procuring the loss by
10 them saying they did not cause it or procure it
11 is a fraud or concealment?
12     A   I mean, there's more to that paragraph
13 than that, and there I stopped.
14     Q   Well, just tell me everything?
15     A   Well, I'm going to - - it said - - the
16 paragraph is, "I did not cause or procure this
17 loss".
18     Q   Right.
19     A   "Nothing has been done by or with my
20 consent or agreement to violate the provisions
21 of the policy as to render it void.  I have not
22 concealed or attempted to deceive State Farm
23 as to the extent or cause of this loss in any

Page 51

1  manner."
2      Q   Okay.  What about those statements
3  you just read to me was a fraud or
4  concealment?
5          MR. NETTLES: I object to the form of
6  the question.  Go ahead.
7      A   Okay.  Would you repeat your question?
8      Q   (BY MR. KIRBY) Sure.  You just read a
9  statement to me that you said constituted
10 fraud or concealment on behalf of the
11 Pittmans.  I'm just asking you:  What are you
12 saying was a fraudulent statement, or a
13 concealment out of those statements that you
14 read to me about causing or procuring, or
15 nothing that they have done, or nothing they
16 concealed.  What are you talking about?  What
17 are you talking about that that statement
18 means they committed fraud?
19     A   Well, there is - - in the totality of the
20 facts and circumstances involved in this loss.
21 Of course, we've got the alarm system, their
22 swearing under oath as to the - - how the alarm
23 was set when they left; there are financial

Page 52

1  difficulties, severe financial difficulties at the
2  time of the loss.
3      Q   But I mean, they told you about their
4  financial difficulties, didn't they?  You had
5  access to the bankruptcy records, you were in
6  touch with their bankruptcy attorney, you were
7  furnished credit reports, Mr. Todd Pittman told
8  you he was having financial difficulties?  You
9  knew all about that, didn't you, it's in your
10 report?
11     A   Yes, I obtained that during the claim
12 process.
13     Q   Are you saying he did something
14 fraudulent about that, his bankruptcy, his
15 financial condition, he concealed that to you?
16     A   No, I'm just making a comment as to
17 the totality of the facts.
18     Q   I don't care about the totality of the
19 facts.  I'm just concerned about your
20 recommendation that this be denied because
21 there was concealment or fraud, and I'm just
22 asking you what that concealment or fraud
23 was?

Page 53

1      A   In relation to the alarm system.
2      Q   Yes.
3      A   Okay.  They told us under oath as to
4  what the situation was or how they set the
5  alarm.
6      Q   Right.
7      A   The expert says that that's not the
8  case.  And the facts are, as in relation to the
9  alarm, them taking the rear door out of the
10 system - -
11     Q   Right.
12     A   - - they participated in this loss.
13     Q   Okay.  And that's how you say they
14 participated in the loss is they did not tell the
15 truth about the alarm system setting and Zone
16 11 was not in service?  That's - - you're saying
17 that proves they participated in the loss?
18     A   Yes, sir.
19     Q   Okay.  Anything else that you say was
20 concealment or fraud?
21     A   And just generally them signing the
22 document, swearing under oath, as I read the
23 paragraph.

Page 54

1    Q   Yes.  But that would relate back to the
2  alarm system too, would it not?  That's what
3  you're talking about there?
4    A   Generally, yes, sir.
5    Q   Okay.  And I'm beginning to have a
6  clear picture of what your recommendation
7  was.  Was it not be covered because, as you
8  stated in your recommendation, because "Pat
9  Craig recommends denial of the homeowners
10  and the personal articles policy, the claim
11  based on the insured's breached the
12  concealment or fraud provision in the
13  policies".  And I think you've explained to me
14  what you thought was concealed or fraud.
15  Everything you have told me about the alarm
16  system, correct?
17    A   Yes.
18    Q   And that's why you said the claim
19  ought to be denied?
20    MR. NETTLES: I object to the form of
21  the question.
22    A   No, there were other - - there were
23  other factors that were involved in the claim

Page 55

1  that we considered to make a decision on the
2  claim.
3    Q   (BY MR. KIRBY) Okay.
4    A   There were more than just the alarm.
5    Q   All right.  Then I'll ask you those, but
6  I'm just asking if that was - - I've read your
7  recommendation and - -
8    A   Right.
9    Q   - - you make your recommendation it
10  ought to be denied because of the insured's
11  breach of the concealment or fraud provision.
12  That's what your recommendation is, correct?
13    A   Yeah, and there are other issues
14  involved too.
15    Q   Well, I understand.  But that's you're
16  representation in your report that you made?
17    MR. NETTLES: Represent - - the
18  recommendation, you mean?
19    Q   (BY MR. KIRBY) Claims representative
20  recommendation.  That's in the report.  The
21  recommendations you made, correct?
22    A   Yes.
23    Q   All right.  And you've told me the

Page 56

1  concealment or fraud, everything that you
2  thought was a concealment or a fraud, correct?
3    A   I mean, as I sit here today, that's the
4  best I can recall.
5    Q   Well, the best I can - - you're the only
6  person I can ask, you're Pat Craig, you're the
7  one that made the statement.  If you need to
8  review anything, I need you to do it because I
9  won't get another chance to ask you these
10  questions til we get in trial.  If that's all you
11  can think of?
12    A   Well, again, I mean there were other
13  factors.
14    Q   I'm going to - -
15    A   All right.  Just so you understand.
16    Q   I understand.  I understand, but those
17  other factors aren't in your recommendation in
18  the report?
19    A   But - - okay.  But the claim committee
20  report speaks for itself.
21    Q   Well, I'm going to - - I'm not going to
22  accept your word at that, but I'm going to - - I
23  know what your recommendation is in the

Page 57

1  report because I've read it.  Now, there's other
2  factors, and let's go through the other factors
3  starting at the top.  Let's go through every
4  other - -
5    MR. NETTLES:  How long are you going
6  to - - I'd like to take a break if that's okay.
7    MR. KIRBY: Sure.  We're going to be a
8  long time, so we'll take a break.  As long as
9  you want.
10    (Short break)
11    Q   (BY MR. KIRBY)  Mr. Craig, before I
12  move to the other things, and before I leave
13  the alarm system, is it my understanding that
14  based upon your expert's findings and his
15  reporting to you and his analysis, that the
16  findings relative to the security system, the
17  alarm system, indicated to you that the
18  insureds either committed the theft themself
19  or procured the theft; is that what you're
20  saying?
21    A   And you're relating - - you're talking
22  about Mr. Hopkins' report?
23    Q   Right.

Page 58

1    A    If I may refer to that?
2    Q    Sure.
3    A    I mean the report should speak for
4    itself, I mean, and need to ask Mr. Hopkins,
5    but his conclusion was the alarm was set for
6    "stay" on June 16th, 2010 until July the 4th,
7    2010 with Zone 11 bypassed from the system
8    and the motion detector turned off.  And he
9    also states in the conclusion that "no alarms
10   were detected on the system during that same
11   period".
12   Q    All right.  I see that's his finding, but
13   what conclusion did you draw from that, that
14   these insured's had something to do with the
15   theft?
16   A    With his findings, and based on the
17   sworn testimony of Mr. and Mrs. Pittman
18   stating what the situation was on the alarm.
19   Q    Yes.
20   A    I had some major concerns.
21   Q    Okay.  Well, I mean, are you saying
22   that your concerns were because of these
23   findings on the alarm system it made you

Page 59

1    think, "well, the insureds had something to do
2    with these items being stolen, either they were
3    the ones that had stolen them, or they got
4    somebody else to do that".  Did you draw that
5    conclusion?
6    A    Yes.
7    Q    All right.  Now, other things.  Let's
8    start looking at your committee report,
9    anything you need to look at.  Let's go through
10   the other things that you mentioned to us.
11   What other things were you talking about?
12   A    In relation to what?  I don't remember
13   your last - -
14   Q    Yeah.  I'm asking you why you made
15   recommendations that the claim be denied.  We
16   went through concealment and fraud of the
17   security system and then you said, and there
18   were other things.  That's what I'm wanting to
19   ask about is those other things?
20   A    Okay.  As far as the totality of the
21   facts.  I mean, the alarm system, and then
22   there was the financial condition, severe
23   financial condition, the purchase of the jewelry

Page 60

1    policy shortly before they left on their trip,
2    and there's no indication that there was any
3    prior problems in the neighborhood, any prior
4    break-ins.  The, I guess, selected theft of
5    certain items, not everything of value was
6    taken.  And I mean, the bankruptcy, which
7    would go to financial; there was a pending
8    bankruptcy.
9    Q    Right.
10   A    I believe the, you know, the house was
11   for sale.  There had been no offers made on
12   the house.  The two responding Geneva County
13   sheriff's deputies, they had some concerns
14   about the theft, or the reported theft.  Then
15   there was some information supplied by
16   William Webb.
17   Q    William Webb?
18   A    Yes, sir.
19   Q    Yes.  And let me  - - you're pretty far
20   over in the - - what page are you on, please?
21   A    Oh, I'm sorry.  17 of 42.
22   Q    Okay.  Well, let me - - before I get all
23   the way to that page.  I understand what you

Page 61

1    told me about you've got various sections in
2    your report.  You've told me about Jay
3    Solomon, the sheriff's deputy; Linda Simmons,
4    real estate agent; you've told me the house
5    was for sale, correct?
6    A    Correct.
7    Q    And then Charles and Jenia Holmes,
8    those were neighbors.  Did anything they said
9    factor into your recommendation of a denial?
10   A    Well, they had indicated that either Mr.
11   or Mrs. Pittman didn't come over to their
12   house.  There was only three houses in the
13   neighborhood and, you know, advise them of
14   the theft or ask did they see anybody or see
15   anything.
16   Q    Okay.
17   A    And again, the Holmes indicated - - I
18   can't remember how long they had lived there,
19   but they had never had any problems with
20   vandalism, thefts, car broken into.  It was a
21   very quiet area.
22   Q    Okay.  What about Ken and Nita Pace.
23   Anything they told you factor into your

Page 62

1 recommendation the claim be denied?
2     A    Again, Mr. Pace said he lived in the
3 area for ten years and had no problems with
4 any type of crime.  He said he leaves his
5 vehicles unlocked, his boat in the yard, neither
6 item has been touched in over ten years.  Both
7 Mr. Pace, and Charles and Jenia Holmes
8 indicated they did not, during that period of
9 time, did not see anything unusual or
10 suspicious or anything during that period of
11 time around the Pittmans' home.
12     Q    All right.  We've talk about Ken and
13 Nita Pace.  I need to know everything Mr. Lee
14 - - I believe it's Lee McRae would have told you
15 or you found out about Mr. Lee McRae that
16 factored into your denial of this claim?
17     A    Well, I'm just listing, you know, these
18 are people that I talk to.
19     Q    Right.
20     A    And I interviewed Mr. McRae.  He was
21 - - he knew Mr. - - he's employed by Mr. and
22 Mrs. Pittman is my understanding, and he
23 comes by there periodically.  He said every

Page 63

1 other day, no set time to check on the horses
2 or something of that nature and he had done
3 that during their absence.  He did not see
4 anything out of the ordinary or anything
5 suspicious when he was there, or any problems
6 with the house or anything.
7     Q    So, you understand my question is, is
8 I'm asking based on your conversations with
9 these people how that factored into your
10 recommendation of a denial; you understand
11 that's the question, correct?
12     A    Yeah, I understand the question.  This
13 report, it just lists, you know, witnesses that I
14 talked to, interviewed and what information
15 they provided.
16     Q    Right.  Then let's go to Jessica Pittman
17 Barron.  What information obtained from
18 Jessica Pittman Barron factored into your
19 recommendation to deny the claim?
20     A    Well again, the report, it's just listing
21 people we talked to and what information they
22 provided or did not provide.
23     Q    Okay.

Page 64

1     A    Mrs. Barron would not - - she would not
2 meet with our claim representative Carol
3 Taylor in Florida.
4     Q    Okay.  How did that factor, what she
5 said or did, or didn't do, didn't say; what did
6 she say that influenced your recommendation
7 that this claim be denied?
8     A    Nothing.  She just - - the report just
9 speaks for itself.  She just would not - - she
10 would not talk to Ms. Taylor.
11     Q    Okay.  Can I say it had nothing to do
12 with your recommendation of the denial of the
13 claim, or did it?
14     A    And you're saying her failure to talk to
15 us was - -
16     Q    No.  I've got Jessica Pittman Barron
17 here in your report.
18     A    I understand your question, I mean,
19 her failure or refusal to talk to us was a
20 consideration?
21     Q    No, I'm talking about anything she said
22 or didn't say, anything she did or didn't do,
23 any information she gave you that factored

Page 65

1 into your recommendation this claim be
2 denied?
3     A    That she said or didn't say?
4     Q    Either one.
5     A    No, there was no factor.
6     Q    How about Teresa Spence?  Did
7 anything she told you or anyone else at State
8 Farm, anything she said that factored into or
9 was it a determinative factor in your
10 recommendation that the claim be denied?
11     A    Again, this is just a list of people
12 we've talked to and what they told us.  So - -
13     Q    Maybe I'm not being clear, Mr. Craig.  I
14 know it's a list of people you talked to.  It's a
15 summary of the conversations that y'all had
16 with these people that you all decided to talk
17 to that may have some knowledge of this claim.
18 I know that's what this list is.  I'm just asking
19 you, you said other things were here that
20 caused you to deny this claim.  I'm just asking
21 you, based upon your conversations and your
22 report, what each of these individuals had to
23 say that influenced your recommendation this

Page 66

1   claim be denied?  And now we're talking about
2   Teresa Spence.
3       A    I mean, there was a consideration as to
4   the information that she provided during our
5   telephone interview of December 29th and to
6   the facts and circumstances that were obtained
7   later during the claim investigation.
8       Q    Well, tell me what those facts and
9   circumstances were that influenced your
10  decision to deny the claim - - recommend
11  denial of the claim?
12      A    Well, it - - again the totality of the
13  facts.  But her, as I said, what she initially told
14  me appeared not to be correct.
15      Q    So, I don't need the totality.  I need
16  what you say she said to you that influenced
17  your opinion to deny the claim, facts she told
18  you that were not true; what facts?
19      A    Okay.  She had indicated to me in
20  December that she did not have any
21  information as to Mr. Pittman's business or
22  possibly having any financial problems, and
23  indicated that, you know, that even if he did,

Page 67

1   you know, he was a very private man and would
2   not discuss those - - his business or their
3   financial concerns.  She said that he was
4   paying his child support on time, was meeting
5   his obligations and was a good father to
6   Hayden.
7       Q    Okay.  And what I understood you to
8   say is you say she made a misrepresentation
9   that she did not have any knowledge of his
10  business affairs?
11      A    Yes.
12      Q    What business?
13      A    Well, information was developed later
14  concerning the property on Coy Burgess that
15  was sold to Thomas Kirkpatrick by Mr. Pittman.
16  I believe that was in April of 2010.  Mr.
17  Kirkpatrick indicated Ms. Spence attended the
18  closing of the property.  And then, when Mr.
19  Pittman had called Mr. Kirkpatrick and wanted
20  the property back, in that conversation or into
21  - - Mr. Kirkpatrick said Ms. Spence had called
22  him after Mr. Pittman called, as well as his
23  fianc,, and was insisting that Mr. Kirkpatrick

Page 68

1   give the property back to Mr. Pittman, that he
2   stood to lose a substantial amount of money if
3   the property was not given back to him.  And
4   she was very insistent, according to Mr.
5   Kirkpatrick, that - - and I think she called
6   several times and there was - - Mr. Webb had
7   indicated that Mrs. Spence was involved in the
8   - - I guess the Luverne property, that
9   development.  She was out there.  She was, you
10  know, paying contractors out there on the job
11  site, and paying contractors and suppliers for
12  Mr. Pittman during that process.
13      Q    Okay.  So. it's the involvement with Mr.
14  Kirkpatrick's closing on his house and the
15  Geneva Properties.  Do you say that Ms. Spence
16  had anything to do, or was anyway involved in
17  this loss; do you think she had anything to do
18  with it?
19      A    I don't know.
20      Q    You have no information that she did,
21  do you?
22      A    No, I have no evidence as I sit here
23  today that she was involved, no.

Page 69

1       Q    Okay.  And so, the knowledge that she
2   has that you say caused you, in part, to
3   recommend denial of the claim was the
4   Kirkpatrick closing knowledge and the Geneva
5   Property development, as I understand it?
6   You're saying she lied about that?
7       A    I mean she did not - - she
8   misrepresented, according to information they
9   got from Kirkpatrick, about her not having any
10  knowledge of Mr. Pittman's business or his
11  financial condition.
12      Q    So, this is specifically what the
13  misrepresentation - - because this is what it
14  says in the statement for Teresa Spence.  "Ms.
15  Spence stated Mr. Pittman was a very private
16  man.  He did not discuss his business matters
17  with her.  C.R. Craig asked her if she had any
18  information that Mr. Pittman may be having
19  financial problems.  She advised she had no
20  knowledge of his finances and again stated he
21  would not discuss these matters with her if he
22  was having financial problems."  You say that's
23  the misrepresentation?

Page 70

1    A    Yes, based on information from Mr.
2  Kirkpatrick, her showing up at closing and
3  then calling and wanting him to give the house
4  back and telling him that Mr. Pittman, if he
5  didn't give the house back, was going to lose a
6  - - could lose a substantial amount of money.
7    Q    Okay.  Is that it?  Is there anything
8  else?
9    A    And I mentioned the Luverne Property?
10   Q    You did mention Luverne.
11   A    Okay.
12   Q    Who is - - who are the insured  - -
13       MR. NETTLES:  Excuse me.
14       MR. KIRBY:  Yes?
15       MR. NETTLES:  You had kept saying
16  Geneva County.  Luverne is in Crenshaw
17  County, so - -
18       MR. KIRBY:  Sorry.
19       THE WITNESS:  Oh, okay.
20       MR. KIRBY:  But I should have
21  remembered that.  Thank you, Bert.
22       THE WITNESS:  Okay.
23   Q    (BY MR. KIRBY)  Okay.  Now, let me kind

Page 71

1  of ask you:  Under this policy, who are the
2  insureds?
3    A    The named insureds are Todd and
4  Rhonda Pittman.
5    Q    Okay.  And do you know if you had paid
6  this policy, if you had allowed this claim to
7  have been paid for any amount that was
8  determined to have been satisfactory to State
9  Farm, do you know who would have gotten the
10  money?
11   A    If the claim was determined to be a
12  covered loss - -
13   Q    Right.
14   A    - - any payment would be made jointly
15  to Todd and Rhonda Pittman.
16   Q    Do you know if they would get the
17  money?
18   A    I don't understand.
19   Q    Do you know if that money would have
20  to go to the bankruptcy court?
21       MR. NETTLES:  Which bankruptcy court
22  are we speaking of?
23       MR. KIRBY:  The bankruptcy court that

Page 72

1  he has told me about that he was involved
2  with.
3    A    It's my understanding that probably
4  not, because this was - - this was related to
5  personal property and not real property or
6  homes.  So, it would be personal property in
7  the home.
8    Q    (BY MR. KIRBY)  Do you know that as a
9  fact, or do you know this money would be paid
10  straight out to the bankruptcy court?  Do you
11  know one way or another?
12   A    I mean, I'm not exactly sure.  I'm not a
13  lawyer, but the claim would involve personal
14  property, not - - I would think if you had real
15  property, the homes, but personal property, I
16  would say - -
17   Q    Did you even inquire as to whether or
18  not Mr. Pittman would get any proceeds if this
19  claim were adjusted and he received proceeds;
20  did you even ask that question?
21   A    No.
22   Q    Nobody at State Farm asked that
23  question, did they?

Page 73

1    A    I mean, based on the facts and
2  circumstances of the loss, I mean, that was not
3  necessary.
4    Q    Well, that's true.  All right.  Now, let's
5  go to Mr. Kirkpatrick.  What did Mr. Kirkpatrick
6  have to say, or what information did you obtain
7  from him that caused you to recommend this
8  claim be denied?
9    A    Okay.  Mr. Kirkpatrick again purchased
10  the home in Coy Burgess - -
11   Q    Right.
12   A    - - from Mr. Pittman in April of 2010.
13  He indicated he provided a $10,000 down
14  payment and Mr. Pittman was going to carry
15  the note.  Mr. Pittman contacted Mr.
16  Kirkpatrick later and wanted the house back.
17  And then, there was a conversation that Mr.
18  Kirkpatrick - - he said he would agree to give
19  - - or deed the house back over to him, but he
20  wanted - - he wanted Mr. Pittman to return the
21  $10,000.  Then Mr. Pittman said he didn't have
22  the money and he was not going to return the
23  $10,000.

Page 74

1    Q    So, how did that factor into your
2  recommending a denial?
3    A    Well, consideration there would be
4  financial problems, difficulties.  He had just
5  sold the house and he says he didn't have the
6  money or will not - - not going to return the
7  money to Mr. Kirkpatrick.
8    Q    Did Mr. Kirkpatrick tell you that he got
9  all his money back, plus some money in this
10  transaction?
11    A    Yes.  Well, he - - all that I'm aware of,
12  he said he had filed a claim with some title
13  insurance carrier.  And in my interview with
14  him, he had - - he had gotten his $10,000 back.
15    Q    So, do you know if it was even his
16  $10,000?  Do you know who the check was
17  payable for?
18    A    No, sir.
19    Q    Did you know it was his mother-in-law
20  that wrote the check?
21    A    Wrote the check for what?
22    Q    The down payment on the house.
23    A    No, sir.

Page 75

1    Q    Do you know if he ever made one
2  payment?
3         MR. NETTLES:  Which "he" are you
4  speaking of?
5         MR. KIRBY:  Mr. Kirkpatrick.
6    A    He had indicated to me that when Mr.
7  Pittman told him that the house that was
8  involved in his bankruptcy that he had some
9  concerns about, you know, moving forward,
10  that the house was going to be tied up in a
11  bankruptcy and he was not going to - -
12    Q    (BY MR. KIRBY)  Did he tell you he still
13  has the deed to the house?
14    A    I'm not aware of that, no.
15    Q    Okay.  And as far as being involved in
16  the bankruptcy, if he had made his payments
17  to Mr. Pittman, do you know where the
18  payments would go, into what account?
19    A    No.
20    Q    And do you know if the payments that
21  would be made on the house, if they would go
22  into the bankruptcy court?
23    A    No.

Page 76

1    Q    Do you know if Mr. Pittman, when there
2  was a down payment made at the closing, do
3  you know whether or not Mr. Pittman got any
4  money whatsoever?
5    A    You mean he kept the money or where
6  the money went?
7    Q    Do you know whether or not Mr.
8  Pittman got one penny from the closing?
9    A    No.
10    Q    Okay.  Now, I'm - -
11    A    No, the $10,000 down payment made at
12  closing is my understanding.
13    Q    Well, actually there wasn't a $10,000
14  payment.  Have you seen the check for the
15  down payment?
16    A    Was it $9,000 something?
17    Q    Uh-huh (indicating yes).
18    A    Okay.  $9,000 and some change.  Right.
19  Okay.
20    Q    And you know he got his money back,
21  Mr. Kirkpatrick, if it was his money, he got
22  back - - was it $10,000 or $15,000?
23         MR. SMITH:  $15,000.

Page 77

1    Q    (BY MR. KIRBY) Did you know he got
2  back $15,000, Mr. Kirkpatrick?
3    A    All that he informed me the last time I
4  talked with him, that he had made a claim with
5  the title insurance carrier.
6    Q    Right.  Were you aware that he was
7  claiming he was - - lost a credit on his taxes he
8  would get for a first time home buyer; did he
9  tell you about that?
10    A    No, sir.
11    Q    And did he also tell you he had
12  suspicions at the closing because he said that
13  the Naylor Realty owner, Mr. Naylor, and the
14  title person, Lisa Mitchell, were boyfriend-
15  girlfriend and that he was suspicious of them
16  at the closing; did he tell you that?
17    A    I remember some concerns he was
18  indicating.
19    Q    Well, an 18-page statement was taken
20  from him; are you aware of that?
21    A    Yes.
22    Q    An 18-page statement taken by Carol
23  Taylor.  Who is Carol Taylor?

Page 78

1    A    She is a State Farm claim
2  representative in Florida.
3    Q    Okay.  And the reason she would have
4  taken the statement of Mr. Kirkpatrick is
5  because he's located in Florida; is that
6  correct?
7    A    Yes.
8    Q    All right.  And I want to talk to you,
9  you've read her statement that was taken over
10  the telephone?
11    A    It's been a long time ago.
12    Q    But you have read it?
13    A    Yeah, a long time ago.
14    Q    Okay.  And she talked to Mr.
15  Kirkpatrick about several things in the
16  statement.
17        MR. NETTLES: Do you have a copy of
18  that?
19        MR. KIRBY: Bert, I don't.
20        MR. NETTLES: Did y'all give it to us?
21        MR. KIRBY: Yeah.
22        MR. NETTLES: I didn't - - well, let's just
23  see.

Page 79

1    Q    (BY MR. KIRBY)  And so, anything else
2  in your report that would have caused you any
3  concerns, any information Mr. Kirkpatrick had
4  that resulted in your denial of the claim?
5    A    Just in relation to the actual sale.  I
6  understood there was a sworn document
7  submitted by Mr. Pittman at closing concerning
8  - - or stating there is no liens, bankruptcies,
9  this house is not involved in, and it was
10  submitted at closing.
11    Q    So, that factored into your
12  recommendation of a denial?
13    A    That was all of the facts in relation to
14  the house, yeah.
15    Q    Okay.  That factored into your
16  recommendation?
17    A    I considered that, yes, sir.
18    Q    Okay.  Is that everything with Mr.
19  Kirkpatrick that you can think of?
20    A    As I sit here today, that's all I can
21  think of here today.
22    Q    How about Mr. William Webb?  Let's
23  talk about Mr. Webb.  You knew Mr. Webb when

Page 80

1  you talked to him was a convicted felon?
2    A    Yes.
3    Q    You knew about the armed kidnapping?
4  You knew he had been in the state
5  penitentiary, didn't you?
6    A    Not initially, no.
7    Q    When did you find out?
8    A    This summer.
9    Q    Who told you that?
10    A    He did.
11    Q    He told that he had been convicted of
12  - - he was - - had been to prison?
13    A    He had been to prison, yes, sir.
14    Q    Where did he tell you he had gone to
15  prison?
16    A    Somewhere in Florida, where he lived
17  in Florida.
18    Q    And you say he told you that this
19  summer.  When did you first start talking to
20  Mr. Webb?
21    A    If I can refer to the log - -
22    Q    Sure.
23    A    - - to get a date, the exact date.

Page 81

1    Q    Here you go.
2    A    All right.  I met with Mr. Webb on
3  February 17th, 2011.
4    Q    Okay.  Got it.  February 17, 2011, that
5  was the first time you met with him, correct?
6    A    Yes, sir.
7    Q    And you met with him other occasions?
8    A    Yes.
9    Q    How many occasions did you think that
10  you met with him?
11    A    As I sit here today, I'm - - three times.
12    Q    Met with him three times?  Would you
13  have notations or a log where you would have
14  met with him three times?  We know you first
15  met with him February 17 of 2011, and you met
16  with him this summer.
17    A    No, the only - - because the other
18  additional meetings were after the decision
19  was made on the claim.
20    Q    So, you made the - - you've had
21  meetings with him after the decision was made
22  on the claim?
23    A    Yes.

1    Q   When were those?
2    A   It would have been this summer.
3    Q   Okay.  And would you have a note or a
4  log of when you would have met with him this
5  summer?
6    A   I don't believe so.  I didn't use these
7  documents here.
8    Q   Would there be any notation anywhere
9  when you would have met with him this
10  summer, to your knowledge?
11    A   I don't remember.
12    Q   Why did you meet with him after the
13  claim had been denied this summer?
14    A   To talk to him about - - of course, I had
15  met with him previously and the information
16  that he had provided, just to talk to him about
17  that information.
18    Q   Well, I mean, you had already gotten
19  information from him in February and you went
20  back in the summer to talk to him about it
21  again after the claim had been denied?
22    A   Yes.
23    Q   And why was that necessary?

1    A   I mean, a lawsuit had been filed and I
2  went back to talk to him about his testimony.
3    Q   About his testimony?  Because a
4  lawsuit had been filed?
5    A   Yes.  Just following up with him, yes.
6    Q   Okay.  And tell me what you followed
7  up with him, his testimony that you followed
8  up with him with?  I mean, were you telling him
9  - - did you tell him "a lawsuit has been filed, I
10  need to go over your testimony with you"?
11    A   Yeah, I eventually told him a lawsuit
12  had been filed.  But I just met with him and
13  went over his - - the information he had
14  previously provided to me.
15    Q   His previous information, you re-
16  hashed that with him, went over it again with
17  him?
18    A   Yes.
19    Q   And why did you do that?
20    A   I just wanted to do that.
21    Q   I mean, it had nothing to do with
22  denying the claim or awarding, or granting the
23  claim, did it?

1    A   Yeah, the information he had provided,
2  we - - or I did consider that in the outcome of
3  the claim.
4    Q   Sure, but I mean after the claim had
5  been denied, it had nothing to do with the
6  denial of the claim?  The claim had already
7  been denied, you went back out to meet with
8  him?
9    A   That's correct.
10    Q   I'm saying, why did you do that?
11    A   I just wanted to talk to him about his
12  information.
13    Q   Okay.  Let me just go through it.  We
14  see here William Webb, and you're the one that
15  actually talked to Mr. Webb, aren't you?
16    A   I'm sorry.  What?  I'm sorry.
17    Q   You're the person that actually talked
18  to William Webb?
19    A   Correct.
20    Q   Go through with me about Mr. Webb,
21  the facts that you discovered from him that
22  influenced your recommendation the claim be
23  denied?  What information did Mr. William

1  Webb provide you that caused you to say, I
2  think this claim should be denied?
3    MR. NETTLES:  I'm going to object to
4  the form of the question.  As I understand
5  what you are asking "anything that influenced
6  you", and then towards the end of the
7  question, you say, "what did Mr. Webb say that
8  caused you to deny this claim".  I object to the
9  form of the question.  I find that confusing.
10    Q   (BY MR. KIRBY)  Well, here's the - - it's
11  the same question I ve been asking you all
12  along.  I've given you these peoples' name and
13  I'm saying, "what information did these people
14  provide to you that caused you to recommend
15  this claim be denied"?
16    MR. NETTLES:  Or that influenced, or
17  caused?
18    Q   (BY MR. KIRBY)  Influenced, caused,
19  anything to do with you saying this claim being
20  denied, and we're talking about Mr. Webb now?
21    A   Okay.  Mr. Webb had indicated that he
22  was hired by Mr. and Mrs. Pittman to ride with
23  them up to their house in Bonnieville,

Page 86

1  Kentucky. That while on this trip in 2010, or
2  - - yeah, July of 2010, in the ride up there to
3  Kentucky, he had seen some jewelry in the
4  possession of Mrs. Pittman. One particularly,
5  as he describes a very large stone, possibly the
6  size of his thumbnail, that she had in her
7  possession with other jewelry.
8         The Pittman's were arguing about the
9  jewelry. Mrs. Pittman indicated she, you know,
10 wanted to get the jewelry in a safe location to
11 get it away from Mr. Pittman. They were
12 arguing about it on the trip up. And while they
13 were in Kentucky, they were in a town near
14 Bonnieville and they were again arguing about
15 the jewelry. And Mrs. Pittman mentioned, you
16 know, "put this - - put the jewelry in a bank".
17 They left where he was and then within thirty,
18 thirty-five minutes, they come back and Mrs.
19 Pittman does not have the pouch or the
20 jewelry, or didn't mention it any further.
21    Q   Okay. Let me back up a minute.
22 You're talking about Mr. Webb saw some
23 jewelry and you've described about seeing the

Page 87

1  jewelry. Is it your reasoning that the jewelry
2  Mr. Webb was seeing was jewelry that was
3  claimed to have been lost in the theft? Was
4  that what you were surmising?
5     A   Yes.
6     Q   Okay. And I understand what you're
7  saying about that. You're saying you made a
8  claim for jewelry that was lost, yet here's a
9  witness, Mr. Webb, that saw some jewelry and
10 you surmised it's the same jewelry in this
11 claim; am I correct?
12    A   Yes. Because Mrs. Pittman had advised
13 in her examination under oath that after the
14 theft occurred, she did not have any
15 substantial jewelry left.
16    Q   Okay.
17    A   They just - - basic cosmetic. Mr. Webb
18 is indicating that he saw a very large stone in
19 her possession after the theft would have
20 occurred.
21    Q   All right. I understand what you're
22 saying about that.  Up at the top, it says
23 "Webb recalls unloading the vehicle and trailer,

Page 88

1  which were full of boxes". This is Page 5683,
2  or at the top 18 out of 42. It's "Mr. Webb" at
3  the top. "He recalls unloading the vehicle and
4  trailer which were full of boxes. While inside
5  the house in Kentucky, Webb looked in one of
6  the boxes and saw artwork wrapped in bubble
7  wrap." Did that have any significance to you,
8  whether to recommend to deny the claim?
9     A   I mean that was a consideration, the
10 artwork was being moved to Kentucky.
11    Q   You felt like that was artwork that had
12 been claimed to have been lost or stolen?
13    A   No, I did not know that.
14    Q   Okay. What was your reasoning on the
15 artwork?
16    A   Just that there was - - right after the
17 theft, there was artwork being moved to
18 Kentucky.
19    Q   Okay. Do you have any idea where the
20 artwork was coming from?
21    A   Well, Mr. Webb indicated that it was on
22 a trailer, or the boxes were on a trailer at the
23 house in Daleville before they left to Kentucky.

Page 89

1     Q   Okay. Anything else Mr. Webb told you
2  that factored into your recommendation the
3  claim be denied? Factored into it or had
4  anything to do with it?
5     A   Again, a consideration, Mr. Webb
6  advised that, you know, Ms. Spence was, you
7  know, involved in Mr. Pittman's business. He
8  had worked out at the property on Luverne and
9  had seen her out there, you know, paying
10 contractors and participating in that
11 development. Mr. Webb was familiar with the
12 failure of Mr. Pittman's daughter, Jessica - -
13    Q   Right.
14    A   - - to give her father the money that
15 she had mortgaged the - - that he had, I think
16 he had given to her the one time. So, again, he
17 said Mr. Pittman was very upset about that
18 event.
19
20         MR. NETTLES: You want to go until
21 about 12:30?
22         MR. KIRBY: That would be great.
23    A   As I sit here today, that's all I can

Page 90

1   think of.
2      Q   (BY MR. KIRBY)  Was that - - in your
3   mind, was he an important witness from the
4   standpoint of he had claimed to have seen
5   items that were described as lost or stolen?
6   Was that significant to you after the theft was
7   claimed, is what I'm talking about?
8      A   It was just one factor among many that
9   we considered.
10     Q   But it would be a significant factor
11  among the many?
12     A   It was just one factor that we
13  considered among many.
14     Q   That he saw jewelry that was claimed
15  to have been stolen?
16     A   That he saw a large stone in Ms.
17  Pittman's possession, and based on her sworn
18  testimony she had indicated she did not have
19  any - - after the theft did not have any
20  substantial jewelry in her possession.
21     Q   Okay.  And you understand Mr. Webb
22  was telling you that this trip he made was after
23  the claim of the theft, after July the 4th?

Page 91

1      A   In 2010, yes, sir.
2      Q   But you did know Mr. Webb had been in
3   the penitentiary, he told you that this past
4   summer, right?
5      A   Yes, sir.
6      Q   Tell me how that came up, what he told
7   you?
8      A   We were just talking about his, you
9   know, where he came from, and he mentioned
10  that he had been in - - he had served some time
11  in Florida.
12     Q   Did you ask him what for?
13     A   No, I think he told me.
14     Q   What did he tell you?
15     A   Something of - - I'm not a lawyer.
16  Accessory after the fact; is that - -
17     Q   To armed kidnapping, armed robbery;
18  did he tell you that?  Accessory to armed
19  robbery and armed kidnapping?
20     A   No.
21     Q   He told you accessory after the fact of
22  what?
23     A   Okay.  The best I recall today, there

Page 92

1   was some - - he was with someone who went
2   into a house and there was some altercation,
3   maybe a firearm was involved and he was
4   outside.
5      Q   And so, he went to the penitentiary for
6   being outside because there was an altercation
7   in a house?
8      A   I'm not a lawyer, Mr. Kirby, I just - -
9      Q   I mean, I'm not asking you to be a
10  lawyer or anything like that.  I'm just asking
11  you what he told you, and it sounds like he
12  told you he was outside a house, there was a
13  altercation in the house, and he got convicted
14  as being an accessory to something?
15     A   That's my understanding.
16     Q   Okay.  Did he tell you that he had been
17  convicted of battery?
18     A   I don't recall that.
19     Q   Did he tell you he'd been convicted of
20  robbery without a gun?
21     A   I don't recall that.
22     Q   Did he tell you that he had been
23  convicted of burglary of a construction site?

Page 93

1      A   Is this in Florida?
2      Q   Uh-huh (indicating yes).
3      A   No, I don't recall that.
4      Q   Did you happen to check his criminal
5   record?
6      A   Here in Alabama, yes, sir.
7      Q   You didn't check it in Florida?
8      A   No, I was unaware that he had lived in
9   Florida until this summer.
10     Q   Well, the statement that Ms. Taylor
11  took was taken in Florida because she was a
12  Florida State Farm agent, correct?
13     A   Is this Mr. Kirkpatrick?
14     Q   I understand it's Mr. Kirkpatrick.
15  Didn't she talk to him also, Mr. Webb?
16     A   No.
17     Q   You didn't know where he lived?
18         MR. NETTLES: At what point in time?
19     Q   (BY MR. KIRBY) When you talked to him.
20     A   When I met with Mr. Webb?
21     Q   Right.
22     A   He lived in Hartford, Alabama.
23     Q   Hartford, Alabama.  And you never

Page 94

1  knew that he lived in Florida?
2      A    No.
3      Q    Did you ever know that he was
4  convicted of burglary of an unoccupied
5  structure?
6      A    And this is in Florida?
7      Q    In Florida.
8      A    No.
9      Q    Robbery with a firearm?
10     A    No.
11     Q    Eluding the police in Alabama; did you
12  know about that, in Alabama?
13     A    Yeah, we were able to locate some - -
14  well, some cases involving some arrests in
15  Alabama.
16     Q    Reckless endangerment; did you know
17  about that?
18     A    Okay.  The claim committee reports
19  said Mr. Webb was arrested for second-degree
20  theft by the deception in August 2009, pled
21  guilty to third-degree theft.  His jail sentence
22  was suspended pending payment of restitution
23  and fines.  He was arrested again for failure to

Page 95

1  pay restitution, monies were paid in
2  September,   10, and the motion to revoke was
3  withdrawn.
4      Q    So, my question is, did you know about
5  his reckless endangerment charges?
6      A    Yeah, I'm just - - let me review.
7      Q    Sure.  Take your time.
8      A    There is some information.  The claim
9  committee said Mr. Webb was also arrested in
10  2007 and 2008, but no convictions were
11  obtained.  So, I don't know whether that's the
12  reckless endangerment.  I mean, as I sit here
13  today, I don't recall that.
14     Q    Yes.  Did you know about his
15  conviction of reckless endangerment?
16     A    I don't believe so.
17     Q    How about, did you now about his
18  conviction of negotiating a worthless
19  instrument?
20     A    As I sit here today, I don't remember
21  that.
22     Q    But you did know about his theft by
23  deception?

Page 96

1      A    Yes.
2      Q    What was the theft by deception?  What
3  were the circumstances of that?
4      A    I don't know the particulars.  This was
5  just the history that you pull up on the
6  Alabama Court System, and just the basic
7  information concerning the arrest.
8      Q    Right.  Did you know about his
9  receiving stolen property conviction?
10     A    I believe I've been aware of that.
11     Q    And what was the - - do you know the
12  circumstances of his receiving stolen property,
13  what was stolen that he received?
14     A    No, sir.
15     Q    What about, did you know that he was
16  convicted of home repair fraud?
17     A    As I sit here today, I'm not aware of
18  that.
19     Q    Did you check to find out whether or
20  not there had been any kind of complaints
21  sworn out against him in the county in which
22  he lived and worked?  Did you know Mr. Todd
23  Pittman had sworn a complaint out against him

Page 97

1  one year prior to the theft for stealing items
2  from his barn?
3      A    Yes.
4      Q    Okay.  So you knew about that?
5      A    Yes.  Because Mr. Pittman told us about
6  that.
7      Q    Did you check to see - - look at the
8  complaint, see what the circumstances were?
9      A    Yes.
10     Q    And did you read the complaint?
11     A    Yes.
12     Q    Okay.  And during these conversations
13  with Mr. Webb - - I've seen other conversations
14  you've had with people.  Were these
15  conversations with Mr. Webb, were they
16  recorded?
17     A    No.
18     Q    Why were they not recorded?
19     A    My meeting with him in February of
20  2011, I had asked could I record the
21  conversation and he preferred not to be
22  recorded.
23     Q    Okay.  Did he tell you why he didn't

Page 98

1  want to be recorded?
2     A    No.
3     Q    Okay.  And you did not record the
4  conversation?
5     A    No, I did not.
6     Q    Okay.  Now, he also told you several
7  things in addition to what we've talked about.
8  You've talked to me about the jewelry and the
9  safe deposit box, those sort of issues.  But he
10  says, Mr. Pittman approached him about
11  growing marijuana on his property; did you
12  take that serious?
13    A    I mean, I considered, you know, all the
14  information that he gave me.
15    Q    I mean, did you think that really was
16  true, that Mr. Pittman asked him to grow
17  marijuana on his property, and did that have
18  anything to do with your denial - -
19  recommendation of the denial of this claim?
20    A    Can you repeat the first part of the
21  question?
22    Q    Sure.  Did the fact Mr. Webb told you
23  that Mr. Pittman wanted him to grow marijuana

Page 99

1  on his property, did that factor into your
2  denial of this claim in any form or fashion?
3     A    I mean, we considered all, you know,
4  all the information that Mr. Webb provided.
5     Q    You considered all of it, I understand.
6     A    Yeah.
7     Q    But I mean, did you think, him telling
8  you Mr. Pittman had asked him about growing
9  marijuana on his property, did you use that to
10  form a basis of your denial - - recommendation
11  of denial of the claim?
12    A    Well, again, we considered, you know,
13  all the information concerning all the facts and
14  circumstances.
15    Q    Well, see, that just - - that doesn't - -
16  Mr. Craig, that doesn't help me one bit.  I
17  mean, there is 42 pages of facts here, and
18  what I'm trying to find out is what made you
19  recommend the denial of this claim.  And I've
20  gone through each of these individuals and
21  asked you specifically what they said that had
22  to do with your decision to recommend the
23  claim not being paid?

Page 100

1         MR. NETTLES: And he's already
2  testified, concluded his testimony of Mr. Webb.
3  Now, you're asking him other things - -
4         MR. KIRBY: Correct.
5         MR. NETTLES:  - - as to - - he said he's
6  considered everything, but then he reviewed it
7  and gave you the - - what he considered the
8  significant items.
9         MR. KIRBY: The significant items?
10        MR. NETTLES: As I understood it.
11    Q    (BY MR. KIRBY) Well, was marijuana a
12  significant item in your mind?
13    A    Not really.
14    Q    Okay.
15        MR. KIRBY:  Good place to stop, Bert?
16        MR. NETTLES: Suits me.
17         (Short break)
18    Q    (BY MR. KIRBY) Mr. Craig, Randy will be
19  here in a minute.
20    A    Okay.  All right.
21    Q    Let me show you what's previously
22  been marked 1611 through, it looks like 3359.
23  It's several photographs that have various

Page 101

1  Bates numbers.  They're stapled together.  Are
2  these photographs that you had taken of the
3  Pittman premises?  Are those photographs that
4  you had taken?
5     A    I didn't take all of these, no.
6     Q    Okay.  Can you identify for me which
7  ones you did take?
8     A    Yes, sir.
9     Q    Just by the Bates Number on the right-
10  hand bottom.
11    A    Okay.  1611, 1613, 1615, 1617, 1619,
12  1619-B, in boy, 1621, 1623, 1625, 1627,
13  1629, 1631, 1633.  Okay.
14    Q    Through 1633, right?  Now, on over in
15  the report on Page 38 of 42, it says, "Mr. Webb
16  told Mr. Craig during his trip to Kentucky after
17  this loss occurred, he saw a large stone as
18  large as his thumbnail and other pieces of
19  jewelry in Ms. Pittman's possession.  He stated
20  the large stone was not in a ring setting, but
21  was in a setting to be attached to a necklace.
22  At the time of the investigation there has been
23  no other information received that supports or

Page 102

1   contradicts the information provided by Webb".
2   Is that still true, Mr. Craig?
3       A   Okay.  Could you repeat that question
4   for me, sir?
5       Q   Sure.  You make the statement, "at this
6   time in the investigation there has been no
7   other information received that supports or
8   contradicts the information provided by Mr.
9   Webb".  Is that still your understanding?
10      A   Yes, sir.
11      Q   Okay.  Now, we've talked about Webb,
12  we just went through and had finished talking
13  about Webb and what you found to be
14  significant to you in your recommendation of a
15  denial.  Let me just refer you now to the next
16  individual that you mention, and that is Lee
17  McRae.  You did talk to Lee McRae.  Did
18  anything he have to say to you, did it have any
19  significance to you, or impact on your
20  recommendation that the claim be denied?
21      A   Give me that page.  I'm sorry, what
22  page was that on?
23          MR. NETTLES:  Back on 1139.  I thought

Page 103

1   you had covered that before.
2           MR. KIRBY:  Right.  But he had said "Lee
3   McRae and a guy named Ben are growing
4   marijuana on Todd's property now.  He
5   indicated Todd Pittman is funding the growing
6   of the marijuana".  On Page - - top of 19 of 42,
7   actually it's the last thing Mr. Webb said, but
8   he said that about Lee McRae.
9           (Off the record)
10      Q   (BY MR. KIRBY) It's 19 of 42 at the top.
11  I know you talked to Lee McRae, but did that
12  statement, Mr. Webb, made to you have any
13  significance in your mind as to the - -
14          MR. NETTLES:  Mr. Craig.
15      Q   (BY MR. KIRBY) I'm sorry.  The
16  statement to you, "Lee McRae and a guy named
17  Ben are growing marijuana on Todd's property
18  now."  Did that have any significance to you in
19  your recommending the claim be denied?
20      A   I mean, that was just one of the many
21  factors that were considered.
22      Q   Did you believe that?
23      A   I mean, that's what Mr. Webb told me.

Page 104

1       Q   Okay.  But I mean, obviously you
2   thought Mr. Webb was a believable person.
3   You considered the things that he said in your
4   denial of the claim, some of the things he said,
5   correct?
6       A   We considered, you know, all of the
7   information that Mr. Webb provided.
8       Q   Because you found him to be credible,
9   credible enough that you considered his
10  information he provided to you, correct?
11      A   I mean, I believed it.
12      Q   Okay.  Then you talked about, you
13  know, you mentioned some things about the
14  police, but the next thing is Mr. Eugene
15  Campbell.  And this "Deputy Campbell is lead
16  investigator concerning the theft, reported
17  theft, with the Geneva County Sheriff's
18  Department and Deputy Campbell indicated he
19  has known William Webb for years and knows
20  that Mr. Webb has been involved with the court
21  system over some prior minor thefts.  Deputy
22  Campbell indicated in the past contacts and
23  dealings with Mr. Webb he's never known Mr.

Page 105

1   Webb to lie to him about anything."  Why are
2   you talking to Deputy Campbell about Mr.
3   William Webb and him being a liar or not?
4       A   Deputy Campbell was now the lead
5   investigator - -
6       Q   Okay.
7       A   - - on the case.  As a result of Mr. and
8   Mrs. Pittman, during their examination under
9   oath, brought up the name of Mr. Webb, and a
10  report, or theft of items from the barn.  I
11  obtained a copy of that report through Mr.
12  Campbell and Mr. Campbell offered that
13  information.
14      Q   So, you were talking to Eugene
15  Campbell about the report of theft on behalf of
16  Mr. Webb?  And Mr. Campbell, the deputy, is
17  offering you this information voluntarily?
18      A   Yes, sir.
19      Q   After you showed him the theft report?
20      A   I obtained the theft report through Mr.
21  Campbell.
22      Q   Right.
23      A   And I wanted to - - I asked did he know

Page 106

1  Mr. Webb, because I wanted to attempt to
2  contact Mr. Webb, and he offered this
3  information. Said he knew him, had known him
4  for years, has had some past dealings with
5  him, and Mr. Campbell offered that
6  information.
7      Q   Okay. Then it says "Investigator Gillis
8  was asked by Deputy Campbell of the Geneva
9  County Sheriff's Department to assist him in
10 the investigation. It is our understanding his
11 investigation is ongoing." You knew Deputy
12 Campbell is heading up the ABI, he's the one
13 that's heading up this investigation of this
14 theft, correct?
15          MR. NETTLES: I object to the form of
16 the question. I don't understand your
17 reference to the ABI. Is Mr. Campbell heading
18 that up?
19     Q   (BY MR. KIRBY) Deputy Campbell
20 contacted the ABI and asked for assistance,
21 correct?
22     A   That's my understanding, yes.
23     Q   And that Deputy Campbell is the lead

Page 107

1  investigator for this theft, correct?
2      A   For the Geneva County Sheriff's
3  Department.
4      Q   Well, that's who is investigating the
5  theft, isn't it?
6      A   And it's my understanding that Deputy
7  Campbell contacted the Alabama Bureau of
8  Investigation to assist him in the
9  investigation.
10     Q   Right. What's the status of the
11 investigation?
12     A   It's still ongoing.
13     Q   When is last time you checked?
14     A   I probably talked to Campbell, Deputy
15 Campbell, before a final decision was made on
16 the claim.
17     Q   And the final decision was made on the
18 claim on what date?
19     A   April 5, 2011.
20     Q   So, April the 5th of 2011. Where did
21 you get that date?
22     A   From the Claim Committee Report, the
23 facing sheet.

Page 108

1      Q   So, show me on the page if you would,
2  Mr. Craig, I'm looking - - I'm seeing April - - I
3  think I see an April 5 at "chairperson
4  participants"; is that what I'm looking at?
5      A   Yes. If I may correct, the next date, to
6  be accurate, a final decision was made on April
7  6th, 2011.
8      Q   April 6th, okay. Final decision to turn
9  down the claim.
10     A   To deny the claim to Mr. and Mrs.
11 Pittman
12     Q   Right. And you would have talked to
13 the sheriff sometime before that date?
14     A   Yes, sir.
15     Q   And do you know what's going on right
16 now, some six months later with the
17 investigation?
18     A   No.
19     Q   Have you told this Deputy Campbell or
20 anyone with the ABI that you have information
21 which you believe indicates that the insureds
22 either caused the theft or performed the theft
23 themselves; have you told him that?

Page 109

1      A   No.
2      Q   Do you intend to do that?
3      A   No, not necessary.
4      Q   I'm sorry.
5      A   No.
6      Q   It's not necessary?
7      A   No.
8      Q   Then Melanie Garner. I'm looking at
9  Melanie Garner. She is a State Farm agent,
10 staff person, right?
11     A   Agent.
12     Q   Agent. Ms. Garner says during 2007
13 Mr. Pittman came in her office. They talked
14 about the artwork and coverage, quoted a
15 personal articles policy with an annual
16 premium of $1,200. She knows in her
17 discussion of the PAP for the art, she would
18 have used jewelry and furs as an example of
19 limitations of coverage. Doesn't recall Mr.
20 Pittman indicating he had expensive jewelry
21 that needed coverage. Decided to increase the
22 Coverage B limit of the homeowner's policy to
23 allow coverage for the artwork. Mr. Pittman

Page 110

1  testified he considered Ms. Garner a good
2  friend and a good agent. She stayed in contact
3  with him about his policy. I would take it none
4  of that information, in your mind, factored into
5  recommending the policy be - - the claim be
6  denied?
7        MR. NETTLES: I object to the form of
8  the question.
9     Q   (BY MR. KIRBY) I mean, if it did, tell me
10  how in the world that had an influence on you
11  to deny this claim?
12    A   Well, again, we considered all of the
13  factors concerning the claim.
14    Q   What factor from Melanie Garner did
15  you consider important in your decision to
16  recommend that the claim be denied?
17    A   Well, one of the factors, among many,
18  is in relation to the jewelry, and the purchase
19  of the new policy just prior to the trip.
20    Q   I know. I know about that, Mr.
21  Pittman. I'm talking about Melanie Garner, is
22  who I'm talking about. He went there the
23  summer of 2007 about the artwork?

Page 111

1     A   In relation to the artwork.
2     Q   Nothing?
3     A   Nothing.
4     Q   Okay.
5     A   Okay. At that time, no.
6     Q   Okay. The one that you're having
7  concern with is staff person agent - - well it's
8  Audrey Grice, is who - - you're talking about
9  the application for the jewelry, correct?
10    A   No. If I can back up.
11    Q   Sure.
12    A   I mean, in relation to the jewelry and
13  the policy, there was, as Ms. Garner was
14  explaining, you know, possible limitations of
15  coverage in the personal articles policy. Using
16  her example, she uses the word jewelry and
17  furs and the limitations in the policy. And Mr.
18  Pittman does not indicate to her that "oh I've
19  got some expensive jewelry, I need to insure
20  that as well". That never came up.
21    Q   So what. How did that figure into your
22  denying - - wanting to deny the claim, the fact
23  that he didn't bring up jewelry?

Page 112

1     A   Well, in the - - taking that factor into
2  consideration with the new policy, Mr. Pittman,
3  I believe, had owned this stone for several
4  years and would have had the stone at the time
5  he was talking to Ms. Garner in 2007, and he
6  didn't mention anything about "I need to
7  insure my jewelry". But then he - - then he
8  comes in, you know, a week before the trip and
9  he then wants to insure some expensive
10  jewelry.
11    Q   Okay. I think I see what you're saying.
12  You're saying that he has expensive jewelry
13  and he did not want to insure it in 2007, to
14  you had some bearing on the reason you
15  denied the claim, the fact that he had it in
16  2007 and didn't insure it? But you don't know
17  why he didn't want to insure it, do you?
18    A   Well, I mean, first he didn't mention it.
19  Second, he's coming in a week before. He's
20  had this stone for some time and he comes in a
21  week before the trip and wants to insure it.
22  Again, this is just one of the many factors that
23  State Farm considered in regards to this claim.

Page 113

1     Q   Well, it wasn't just jewelry that he
2  went in on and talked with - - we're mixing two
3  people. One is, you say, was somehow related
4  to the reason you denied the claim with talking
5  with Melanie Garner because he didn't mention
6  jewelry to her, right? That indicates to you,
7  what? That he committed a fraud by not telling
8  her he had some jewelry?
9        MR. NETTLES: I object to the form of
10  the question.
11    A   No. He was made aware in 07 of the
12  limitations in the policy in regards to jewelry.
13    Q   (BY MR. KIRBY) Right.
14    A   And he didn't - - there was no
15  conversation or letting Melanie know "oh I've
16  got some expensive jewelry". She didn't quote
17  a premium. He never mentioned any jewelry.
18    Q   Okay. So, he didn't insure the jewelry?
19    A   But then he comes in a week before the
20  trip and wants to insure his jewelry.
21    Q   Two-and-a-half years later he comes in.
22    A   Correct.
23    Q   Okay. And two-and-a-half years later

Page 114

1   he comes in and he talks to Agent Melanie - -
2   well is it Agent Melanie Garner, or Audrey
3   Grice; who is he talking to?
4       A   He contacts Ms. Grice.
5       Q   And Ms. Grice said she was first
6   contacted a month before the date of the
7   application inquiring about the PAP.  And what
8   is the PAP, the personal articles policy?
9       A   Yes, sir.
10      Q   So, a month before the trip - - it's not
11  like he came into the office the week before, I
12  mean, they talked about what needed to be
13  done a month before, didn't they?
14      A   She stated that Mr. Pittman contacted
15  her and wanted to know what he needed to
16  insure the jewelry and guns.
17      Q   About a month before?
18      A   That's what she said, yes, sir.
19      Q   Okay.  And then, he comes in on June
20  the 11th with appraisals for the jewelry,
21  wanting to take out the policy?
22      A   Correct.
23      Q   Okay.  Told her that he was going out

Page 115

1   of town for a couple of weeks and wanted to
2   make sure the jewelry was covered before he
3   left, and she completed the application on the
4   jewelry, took a premium and bound the
5   coverage, correct?
6       A   Yes.
7       Q   And she shouldn't have done that?
8       A   In relation to what?
9       Q   Well, underwriting contacted her a
10  week after the application and told her they
11  couldn't insure the loose stone and another
12  piece of jewelry since the appraisal was over
13  two years old.
14      A   Correct.
15      Q   She shouldn't have bound the coverage
16  on those two items, right?
17      A   Correct.
18      Q   Okay.  A policy was going to be issued
19  without these two items?  Then she says "she
20  tried to call Mr. Pittman on the phone, as well
21  as his cell phone, but got no answer.  She left
22  messages on the voice mail.  She never
23  received a return call from Mr. Pittman before

Page 116

1   the loss was discovered and Mr. Pittman said
2   he didn't receive any calls from the office
3   while he was out of the country and the first
4   time he was notified of the loose stone and
5   other piece of jewelry not covered under the
6   policy was when he reported the theft on July
7   the 7th, 2010.  Ms. Grice indicated he told her
8   he was not concerned about the other piece of
9   jewelry as it was not stolen because Rhonda
10  had it with her on the cruise.  As of this date,
11  Mr. Pittman still has not provided a current
12  appraisal on the piece of jewelry that was
13  requested to afford coverage."  What about
14  this statement from this person indicated to
15  you that this claim should be denied, your
16  recommendation it should be denied?
17      A   From Ms. Grice?
18      Q   Yes.
19      A   Nothing.  Well, I mean, it speaks for
20  itself that he - - the policy was taken out
21  shortly before the trip.  That was considered.
22      Q   That s the point you're making, is in
23  your mind that indicated to you that was the

Page 117

1   reason for denial is because the policy was
2   taken out one week before the trip?
3       A   That was one of the many factors that
4   were considered.
5       Q   Right.  And I'm going through them
6   with you because I'm asking you about all of
7   them because I don't want to get in trial and
8   be bushwhacked by one I hadn't asked you
9   about.  That's why I'm being careful to go
10  through these.
11      A   I understand, but we - - there were
12  many, many factors that were considered and
13  this - - a new policy was considered.
14      Q   Right.  And then, the opportunity, the
15  alarm system, you've relayed that to me in
16  great detail as to what about the alarm, in your
17  mind, caused you concern that caused you to
18  recommend the claim not be paid.  I think
19  you've told me about that, have you not?
20      A   Well, I had relayed to you, with my
21  limited experience of alarms, basically the
22  conclusion reached by Mr. Hopkins.
23      Q   Why did you find somebody to check

Page 118

1  his work?  Why did you have his work checked?
2      A    Well, Mr. Hopkins is an electrician
3  here.
4      Q    Right.
5      A    And after he finished his inspection
6  examination, I felt with the - - again, from my
7  limited experience of how alarms work and
8  technical - - the technology with alarms, I
9  wanted to, I guess, call an alarm specialist to
10  look at and check the information.
11      Q    So, I mean, you had engineer Perry
12  Hopkins.  How did you know who Perry Hopkins
13  was?  Have you used him before?
14      A    Yes.
15      Q    And he was an engineer?
16      A    Yes.
17      Q    And you wanted him to check out the
18  burglar alarm?
19      A    Yes.
20      Q    And he did?
21      A    Yes.
22      Q    And you thought, "well he's an
23  engineer, I maybe ought to get a security

Page 119

1  person to check his work"?
2      A    Yes, with all the technical items
3  related to an alarm system, I felt I'd like to get
4  an alarm specialist to check this - - check it
5  out.
6      Q    So, you did, and you hired Mr. Mangum
7  of Creative Security Systems, right?
8      A    Yes, sir.
9      Q    And where is he located?
10      A    Montgomery.
11      Q    Montgomery.  And did you talk to him
12  about his background and experience in
13  security systems?
14      A    Yes.
15      Q    What was your understanding was his
16  background and experience with security
17  systems?
18      A    He'd furnished a resume, I guess you'd
19  call that, a history, of his experience and
20  background.
21      Q    Now, as I understand it, I'm looking at
22  23 of 42 of your report, the next to the last
23  paragraph.  The only activity that took place

Page 120

1  on the armed event during the time of their
2  vacation was a periodic ADT, which was an
3  Event Code E602.  This is a monthly check
4  where the system places a call into the ADT
5  center which took place on June 18, 2010.
6  Hopkins opined this was an indication the
7  system was armed the entire length of time and
8  none of the active zones were compromised."
9  And did you obtain from Mr. Pittman a copy of
10  his contract with the security company?  Did
11  you get that, and what information regarding
12  the security system did you obtain from Mr.
13  Pittman?
14      A    I mean, as I sit here today I believe we
15  received something in regard to his contract,
16  you know.  That was a long time ago, but I
17  think we did.
18      Q    Okay.  Now, if we go over to the
19  discussion of the - - on 24 of 42, it says "the
20  information obtained during the investigation
21  regarding the alarm system confirmed Ms.
22  Pittman did not arm the system on June 16,
23  2010 for  away' as she testified.  In fact, the

Page 121

1  system was armed at  stay' which deactivated
2  the motion detector."  You're talking about the
3  motion detector on the inside of the house?
4      A    Correct.
5      Q    "The information obtained further
6  confirms that whoever armed the system before
7  leaving on June 18, 2010 set the alarm and
8  bypassed Zone 11 a total of seven times."
9  Now, this occurred all on the day that they
10  left, June 16, correct?
11      A    Correct.
12      Q    And "this promotes the question of why
13  someone would arm, deactivate, bypass and
14  arm the system seven times before the final
15  activity.  It appears whoever was arming the
16  system wanted to make sure Zone 11 was
17  bypassed and the final alarm was set."  And I
18  guess what you're getting at there, it is your
19  suspicions, and it would be your thought that
20  this activity with this door, and when we're
21  talking about bypassing a Zone 11, we're
22  talking about the bedroom door, correct?
23      A    Yes.

Page 122

1    Q    Is it your judgment, based upon your
2  investigation in this case and your adjusting of
3  this claim that that was the method of entry at
4  the house for the theft was through that
5  bedroom door?
6    A    Yes.
7    Q    It would have to be, wouldn't it?
8    A    I mean, based on the alarm, that door
9  was taken - - that was the only door taken out
10  of the system.
11    Q    So, if anybody went through - - in
12  through any other door, then that should set
13  the system off?
14    A    Correct.
15    Q    Because although it was set on "stay",
16  the alarms on all the doors except the bedroom
17  door would have been activated?
18    A    That's my understanding.
19    Q    Okay.  You say the system was
20  deactivated at 10:50 p.m.  You told me about
21  that.  Now, "the evidence confirms" - - this is
22  the second paragraph on 25, "that the
23  Pittmans' alarm system was operating properly

Page 123

1  during the time frame they were away on
2  vacation.  The evidence further confirms
3  although the telephone line was cut, the alarm
4  system still functions properly and recorded
5  all events which transpired during the relevant
6  time frames.  The evidence confirms whoever
7  alarmed the system on June 16, 2010 wanted to
8  insure Zone 11 bedroom door was bypassed
9  and unprotected."  Where did you get the
10  information that this system still works even if
11  the telephone lines are cut?
12    A    Well, you need to talk to Mr. Hopkins
13  about that, but in other words, it's my
14  understanding that the alarm, and then all the
15  security on the doors could be set and the
16  alarm would be activated.
17    Q    Your understanding from your report
18  from Mr. Perry Hopkins is that even if this
19  phone line is cut that the system still works
20  with that line cut; that's your understanding?
21    A    Yes.
22    Q    And what I was trying to get at, and I
23  thought I had read this, Mr. Craig.  I've gone

Page 124

1  through this report and the attachments of the
2  engineer Mr. Hopkins, and I'm trying to find
3  any report where he makes a statement, and
4  you can look at his report, that when the
5  system - - the line is cut, the system still
6  operates.  And I don't see that in his report.
7  And you can look at it and see if you see it, if
8  you want to.  Do you think maybe that was in a
9  conversation with him?
10    A    I mean, you don't need to talk to Mr.
11  Hopkins about that.  I mean, the report stands
12  on it's own.
13    Q    Okay.  Well, whether or not it's in his
14  report, you got some information somewhere
15  "that the evidence confirms, although the
16  telephone line was cut, the alarm system still
17  functions properly and recorded all events
18  which transpired during the relevant time
19  frame."  You got that information somewhere,
20  did you not?
21    A    I assume I did.
22    Q    Okay.  Because it's in your report?
23    A    Yes.

Page 125

1    Q    Okay.  And the fact of the matter is, is
2  that the evidence shows that if the telephone
3  line is cut, this alarm system, nothing on this
4  the system will work, then your opinions that
5  all these recordings are there and that they are
6  correct may be incorrect?
7        MR. NETTLES:   I object to the form of
8  the question.
9    A    You're going to have to repeat that.
10    Q    (BY MR. KIRBY)  Sure.  Would it effect
11  your opinions to know that if this line is cut
12  this system does not work at all?
13    A    I mean, the report of Mr. Hopkins has
14  indicated it does, that the computer - - I mean,
15  the alarm still records the data.  And there is
16  no - - his conclusion that there is no events
17  recorded during the time they were out of
18  town.
19    Q    Right.  Well, his opinion is going to be
20  wrong if this alarm doesn't work if the line is
21  cut, isn't it?
22    A    I wouldn't agree to that, no.
23    Q    So, his opinion is still going to be

Page 126

1  right even if the alarm doesn't work at all with
2  the line cut?
3      A   I mean, his report is - - it speaks for
4  itself.
5      Q   Right.  His report is based upon the
6  assumption that the alarm system still works if
7  you cut the line, correct?
8      A   Yeah, he says that it does.
9      Q   Right.
10     A   Right.
11     Q   Now, we go on to the issue of "it has
12 been confirmed that Mr. Pittman used his cell
13 phone to call 911 when he returned.  The land
14 line was not used.  There are two other houses
15 in the area."  And then, motive, we talk about
16 motive, which you have here.  The purchase of
17 the home, the fact that he had a mortgage on
18 the home, the Luverne Property, you talk about
19 that.  You're talking about his financial
20 situation, correct?
21     A   Correct.
22     Q   And I guess - - and one of the things,
23 though, about his financial situation is you're

Page 127

1  saying - - you're not saying he concealed his
2  financial situation to you?  He was open with
3  you about he did have financial problems, and
4  he was open to you about the bankruptcy, and
5  most of his financial records are a matter of
6  public record, aren't they?
7      A   Not all of them, no.
8      Q   Well, you had his credit reports, you
9  had his bankruptcy materials, you had the
10 mortgages on the home, y'all had all these
11 vehicles that he owned, y'all did title searches
12 on that.  Was there any financial information
13 that you say he withheld from you or hid from
14 you?
15     A   You mean in regard to his business and
16 his home?
17     Q   Yeah, his financial situation.  I mean,
18 it was no secret to you that he was having
19 financial problems?  I mean, that was
20 something that you knew, you were able to
21 document, you were able to talk with him
22 about, and he never denied that, did he?
23     A   No.

Page 128

1      Q   I mean, so, not at any point did he ever
2  mislead you by saying "I'm not in financial
3  trouble.  I'm not having difficulties, you know,
4  financially", he was always up front and honest
5  with you about that?
6      A   He never made those statements, no.
7      Q   Okay.  I mean, do you feel like he hid
8  something from you about his financial
9  condition?
10     A   I mean, we were eventually, later in the
11 claim process were able to get his credit report
12 and some other documents that he didn't want
13 to submit initially to us.
14     Q   Well, a lot of people don't want to
15 submit their credit reports to you, do they not?
16 I mean, that's not unusual?
17     A   I wouldn't agree with that.
18     Q   Well, you can't get them without their
19 authorization, their credit reports?
20     A   No.
21     Q   But you got his credit reports, that's
22 what I'm saying?
23     A   Eventually in December, yes, sir.

Page 129

1      Q   Right.  But my point is this:  Are you
2  telling me he hid something from you?  That's
3  the third time I've asked that question.  Are
4  you saying he hid or concealed financial
5  information from you?
6      A   In relation to his finances, no.
7      Q   Okay.  And also, you had the credit
8  reports, as I understand it, prior to the denial
9  of the claim?
10     A   Correct.
11     Q   Okay.  Now, as far as the appraisals, he
12 did obtain appraisals that you requested of
13 him from the artwork, as I understand it?
14     A   Yes, he submitted some letters from
15 Park West Gallery.
16     Q   Okay.  And you worked with him in
17 getting appraisals and all?  In fact, State Farm
18 got their own appraisals?
19     A   Yeah.
20         MR. NETTLES:  You want to take a
21 break?
22         MR. KIRBY:  Just a quick one.
23         (Short break)

1   Q   (BY MR. KIRBY)  As I'm going through
2   your report that was submitted, you're talking
3   about his credit report on Page 29, "confirms
4   the insured began to have financial trouble in
5   2009 and continued in 2010."  You question - -
6   did the fact that he went on a cruise, did that
7   effect your opinion to recommend the claim be
8   denied, the fact that he had taken this cruise?
9       A   Again, we considered all the factors,
10  Mr. Kirby.
11      Q   Well, see, my problem with that, Mr.
12  Craig, is that if I say, why was this claim
13  denied, you know, on the one hand you're
14  trying to tell me "because of everything in this
15  42-page report, every single thing in there was
16  a reason we used to deny this claim".  I'm just
17  trying to get some specifics from you.  Was
18  that a reason you denied the claim was because
19  he went on a cruise?
20      A   In the totality of all the facts and
21  circumstances occurring in this report, it was
22  considered, yes, sir.
23      Q   Considered and that was part of your

1   reason to deny the claim?
2       A   I mean, this claim committee report
3   speaks for itself.
4       Q   So, are you saying the reason for the
5   denial of the claim was denied is "because
6   every single sentence in this report was one of
7   our reasons to deny this claim.  Every sentence
8   I put in this report served as a reason that I
9   recommended this claim be denied"?
10      MR. NETTLES: I object to the form of
11  the question.
12      A   The factors and circumstances in the
13  claim committee report were considered in the
14  final resolution of the claim.
15      Q   (BY MR. KIRBY) All right.  Let me go on
16  and see if I can't be any more specific than
17  that.  Is that the reason you told Mr. Pittman
18  the claim was denied?
19      MR. NETTLES:  What?
20      Q   (BY MR. KIRBY)  Every single line in this
21  entire report.  Is that why you told Mr. Pittman
22  the claim was denied?
23      A   What State Farm told Mr. and Mrs.

1   Pittman is in that - - the reason for the claim
2   being denied is in that letter that we sent to
3   them.
4       Q   And that's the formal denial of the
5   claim in that letter, is it not?
6       A   I'm sorry?
7       Q   That's the formal denial, is the letter
8   they received?
9       A   Yes.
10      Q   Okay.  They didn't receive a copy of
11  your committee report?
12      A   No.
13      Q   Now, when we continue on with this
14  report - -
15      MR. NETTLES: By the way, may I
16  interrupt y'all for one thing here?
17      MR. KIRBY: Sure, you may.
18      MR. NETTLES: Felicia reminded me
19  during this last break, there was a name
20  inadvertently redacted from the report you and
21  Mr. Craig have been looking at.
22      MR. KIRBY: Right.
23      MR. NETTLES: A member of committee.

1   It was later on some of the subsequent - -
2   apparently there was a telephone number by - -
3   taken off the telephone number.  They left - -
4   also redacted Gregory Laws' name.
5       MR. KIRBY: Gregory Laws.
6       MR. NETTLES: Gregory Laws.  He was the
7   chairperson of the claim committee.
8       MS. LONG:  And that was on the first
9   page of the claim committee report.
10      MR. KIRBY:  All right.  Thank you.
11      Q   The fact that he had lawsuits from
12  Bondy's Motors, Inc., did that cause you to
13  recommend the claim be denied?
14      A   We considered that.
15      Q   Did it cause you to recommend that the
16  claim be denied?  Not did you just consider it,
17  did it form the basis of your denial - -
18  recommendation of a denial?
19      A   Concerning his financial condition at
20  the time of the theft, that was considered.
21      Q   And served as a factor in your denial of
22  the claim, correct?
23      A   His financial condition at the time of

Page 134

1  the reported theft was considered, yes, sir.
2      Q   And part of that - - as the basis of that
3  was the lawsuit involving Bondy's?
4      A   Yes.
5      Q   And the same is true about the
6  property deal in which Mr. Pittman - - well, let
7  me go back in this.  There was a complaint
8  filed regarding Land Ventures, LLC - - Land
9  Ventures For Two, LLC, David and Jessica
10  Pittman Barron filed.  Mr. Pittman claimed his
11  daughter owed him some money on a house
12  that had been mortgaged.  Did that fact - - was
13  that a fact upon which you recommended this
14  claim be denied, the fact that that litigation
15  was in existence?
16      A   We considered that in the big picture
17  of his financial condition at the time of the
18  reported theft.
19      Q   In the big picture of his financial
20  condition there was a lawsuit between him and
21  David and Jessica Pittman Barron, and that
22  served as part of the basis for which you
23  recommended this claim be denied, because it

Page 135

1  was part of his financial condition?
2      A   A history of his financial condition,
3  yes, sir.
4      Q   And it would be true that you - - your
5  answers would be the same regarding the fact
6  that he was involved in a bankruptcy
7  proceeding; would that be correct?
8      A   And you're referring to the current
9  bankruptcy proceeding?
10      Q   Yeah, I'm saying that the fact that he
11  was in bankruptcy served as part of the basis
12  for which you recommended this claim be
13  denied, the fact that he was in bankruptcy?
14      A   We considered that.  It was part of his
15  financial condition at the time of the theft.
16      Q   And therefore, it had a bearing on your
17  recommendation that his claim be denied?
18      A   Yes, sir.
19      Q   The misrepresentation, we've talked to
20  you about that.  Talking about the "away", and
21  the bypassing of Zone 11.  But is it your
22  specific testimony that in this case, part of the
23  reason why you recommended this claim be

Page 136

1  denied was "at the beginning of the
2  examination under oath Mr. Pittman testified
3  he had never been convicted of a crime, and
4  near the conclusion he was specifically asked if
5  he had been charged with a crime in Leon
6  County, Florida in  97.  Only when confronted
7  with the specific charge did he change his
8  testimony to confirm he had - - that he had
9  previously been convicted of a crime."  Did
10  that serve as part of your basis for the denial
11  of - - recommendation of denial of this claim?
12      A   I mean, we considered his testimony
13  that he provided during the examination under
14  oath as part of the claim process.
15      Q   His whole entire examination under
16  oath, which is 198 pages, served as the basis
17  for which you denied his claim, those 198
18  pages was one of the reasons that you denied
19  his claim?
20      A   It was only part of the many factors
21  that we used.
22      Q   But the entire statement he gave that
23  198 pages served as one of the basis and part

Page 137

1  of the reason why you denied his claim?
2      A   Some of the information he provided in
3  there was considered.
4      Q   What information?
5      A   Well, the information he provided as to
6  his financial condition - -
7      Q   Okay.
8      A   - - which is his - - the alarm situation.
9      Q   Financial condition, the alarm.
10      A   As I sit here today, that's all I can
11  recall.
12      Q   Okay.  Now, portions of the claim were
13  paid.  You recommended there would be certain
14  portions of the claim paid, correct?
15      A   Yes, I made some payments to Mr.
16  Pittman.
17      Q   You made payments for $3,238.70 for
18  repair and painting of sheetrock walls for
19  damage as a result of artwork being removed
20  from the walls, correct?
21      A   Yes.
22      Q   You paid for replacement of the garage
23  door?  And by the way, do you say that the

Page 138

1   Pittmans are the ones that tore up the garage
2   door?
3       A   It's my understanding, based on the
4   report and the alarm situation that the damage
5   to that garage door would have had to have
6   occurred when the alarm was off.
7       Q   Here's my question: Are you saying the
8   Pittmans caused the damage to the garage
9   door?
10      A   And I'm saying that on that evening of
11  the 4th when they returned, the report
12  indicates there's no indication of any breaches
13  to the doors prior to their return.
14      Q   All right.  Here's my question: Are you
15  saying the Pittmans had anything to do with
16  tearing up the door?
17      A   I'm trying to answer your question.
18      Q   Okay.  Well, it's a pretty simple
19  question.
20      A   Well, okay.  It's my understanding the
21  alarm indicates there were no breaches to the
22  doors during their absence, when they're out
23  of the country.  The alarm does not show that.

Page 139

1   The alarm was disarmed, and then there's
2   damage to the garage door.
3       Q   After the alarm was disarmed?
4       A   Because it's not showing up on the
5   alarm system.
6       Q   All right.  So, are you saying the
7   Pittmans did that?  Or are you saying the
8   Pittmans had someone do that?
9       A   I'm saying they're involved in that,
10  yes, sir.
11      Q   In either doing - - tearing up the door
12  themselves, or having someone else tear up
13  the door, you say they're involved in that?
14      A   Yes.  And in procuring the loss, yes,
15  sir.
16      Q   I'm specifically asking you now about
17  the garage door.
18      A   I believe they're involved in that, yes,
19  sir.
20      Q   Okay.  As well as you would also
21  believe that they are involved in the tearing up
22  of the sheetrock where the paintings were
23  removed?  Either they were directly involved,

Page 140

1   or had someone else do it, correct?
2       A   The circumstance in relation to the
3   alarm and taking the door out of the alarm
4   system indicates that they were involved in
5   this theft.
6       Q   Which would include the removal of the
7   paintings from the house, correct?
8       A   They were involved in that, yes, sir.
9       Q   And they were involved, if they were
10  involved in the removal of the paintings from
11  the house, they were involved in the tearing up
12  of the sheetrock and the damages to the
13  sheetrock, correct?
14      A   Yes.
15      Q   Okay.  In addition to payments for
16  those amounts, you made payments - - on Page
17  37, you made payments for $4,520.33 on
18  August 20th, 2011.  This was for replacement of
19  televisions, correct?
20      A   Yes.
21      Q   Those were televisions that were
22  stolen in the burglary, correct?
23      A   They were claimed by the Pittmans in

Page 141

1   the reported theft.
2       Q   As being stolen, correct?  Those would
3   have been TVs that the Pittmans either had
4   stolen themselves, or TVs that they had had
5   someone else steal, correct?
6       A   They reported those claims as stolen
7   to State Farm.
8       Q   Here's my question - -
9       A   Okay.
10      Q   - - your opinion is, is that they
11  participated in stealing those televisions, or
12  they had someone else steal them, correct?
13      A   Yes, sir.
14      Q   As far as the laptop and the DVD
15  player, it would be your same impression that
16  the Pittmans participated in stealing the
17  laptop, as well as the DVD, or they had
18  someone to steal the laptop, as well as the
19  DVD, correct?
20      A   Yes.
21      Q   Okay.  Were you aware that the inside
22  of this house had been shown on the internet,
23  as far as being for sale, including the artwork?

Page 142

1    A    Yes.
2    Q    Did you inquire as to who had viewed
3  the website, to see who had looked at the
4  artwork - -
5    A    No.
6    Q    - - or who had looked at the house?
7    A    No.
8    Q    Do you know if you could do that?
9    A    If there was information who got on
10  the real estate - -
11   Q    Right.
12   A    I'm not aware of that, no, sir.
13   Q    Do you know if you could do that?
14   A    I don't know.
15   Q    Okay.  Now, I'm going to your analysis,
16  which is the last section of your report,
17  actually it's the section closest to the end.
18  "Based on the investigation conducted and the
19  testimony provided by Todd and Rhonda
20  Pittman, there is substantial circumstantial
21  evidence that supports material
22  misrepresentations have been made after the
23  loss."  And it is circumstantial.  Do you know

Page 143

1  what circumstantial means?
2    A    Yeah, it's the indirect evidence.
3    Q    Right.  And in fact, the evidence of
4  misrepresentations that you're talking about,
5  it is all, as you say, circumstantial, is it not?
6    A    I mean, the alarm system being - - the
7  facts of that, that would not be circumstantial.
8    Q    No, you're saying "other than the alarm
9  system".
10   A    Oh, I'm sorry.
11   Q    And I'm sorry.  Other than the alarm
12  system, you told me there was a statement that
13  it was activated as being different than what
14  Ms. Pittman represented, and I understand
15  that, that would be a direct - -
16   A    Right.
17   Q    - - evidence.  But other than that, it's
18  all circumstantial, isn't it?
19   A    Yes.
20   Q    Okay.  Now, "while the insured
21  provided appropriate documentation to verify
22  the purchase of the jewelry and art collection
23  reported as stolen, and a display of the art

Page 144

1  collection at issue, the factual evidence
2  gathered during the investigation
3  demonstrates an actual loss did not occur."
4  What do you mean a loss did not occur?  Are
5  you saying that the items were simply not
6  stolen?
7    A    Well, referring to - - the actual loss
8  means a direct, you know, accidental loss.
9    Q    Right.  You're saying that the Pittman
10  either stole their own possessions, or had
11  someone steal them?
12   A    We're saying they were involved in the
13  loss, yes, sir.
14   Q    And so, therefore, a loss didn't occur
15  because they were involved in it?
16   A    Because it's not an accidental event,
17  it's an intentional act.
18   Q    Now, "the investigation revealed
19  substantial motive on the part of Mr. and Mrs.
20  Pittman and the participation of or
21  procurement of the reported theft loss."  Now,
22  is there, in your judgment, any evidence, and
23  I'm talking about direct or circumstantial that

Page 145

1  either Mr. or Mrs. Pittman participated in the
2  - - participated in or procured the theft loss?
3  Any evidence of that, other than you've told
4  me about the code of the bedroom - - where the
5  bedroom was being bypassed?
6    A    Can you repeat that, Mr. Kirby?  I'm
7  sorry.
8    Q    Sure.  "The investigation revealed
9  substantial motive on the part of Mr. and Mrs.
10  Pittman and the participation of or
11  procurement of the reported theft loss."  I'm
12  not talking about motive, I know what motive
13  is.
14   A    Okay.
15   Q    I'm talking about, do you have direct
16  evidence that they participated, either Mrs.
17  Pittman or Mr. Pittman, in the theft
18  themselves?
19   A    Would it not be - - the alarm system
20  being - -
21   Q    You're maintaining that would be - -
22   A    That is - - in my opinion, that's direct
23  evidence that Mr. and Mrs. Pittman were

Page 146

1  involved in the loss.
2      Q    Okay. That being the bedroom was
3  bypassed?
4      A    And then swearing under oath that that
5  was not - -
6      Q    Right.
7      A    And they pushed "stay" and she
8  punched in her code, and they left.
9      Q    Anything other than that that they
10 directly participated in the theft?
11     A    Well, in relation to the alarm, if they
12 - - if they set the alarm that way, I mean, they
13 are involved in the loss and - - I mean,
14 procuring the loss. The door has been taken
15 out of the system, and they have
16 misrepresented that material fact to us. So, I
17 mean, they are, in my opinion, involved in the
18 procurement of the loss.
19     Q    Anything other than those facts you
20 just told me that you think shows they were
21 involved in the procurement or the direct
22 theft? I'm talking about the procurement or
23 the theft.

Page 147

1      MR. NETTLES: Are you speaking of
2  direct evidence or circumstantial?
3      MR. KIRBY: Well, I'm talking about any
4  evidence.
5      Q    I mean, I know what you're saying, you
6  think they participated in the theft because
7  Zone 11 was out of the system. I understand
8  everything you've told me about the alarm. Is
9  there other evidence you have, other than the
10 alarm evidence, that they directly participated
11 or had someone else commit this theft?
12     A    Not that I can think of here today.
13     Q    Okay.
14     MR. NETTLES: Well, I think that's - - are
15 you saying direct evidence? You used the word
16 "direct" again. Are you saying direct or
17 circumstantial, or just direct evidence?
18     MR. KIRBY: I'm talking about direct.
19 And I'm not talking about motive.
20     Q    I'm assuming you're saying because he
21 was in financial trouble, that may have been a
22 motive for him to do this himself?
23     A    That was considered, yes, sir.

Page 148

1      Q    Right. And I mean, I understand about
2  motive.
3      A    You're not asking about motive.
4      Q    No. And I mean, we've gone - - you're
5  talking about the financial condition, that's a
6  reason you say Mr. and Mrs. Pittman either had
7  their own stuff stolen by themselves or they
8  got someone else to steal it, because they were
9  in financial trouble?
10     A    Yes.
11     Q    Okay. And I understand about the
12 motive, financial motive. And I'm excluding
13 the motive and the security system. Any other
14 reason you say they committed the theft or had
15 someone else do it, other than the motive of
16 the financial condition and all those
17 associated elements or the security system?
18     MR. NETTLES: Object to the form of the
19 question.
20     A    I'm sorry, Mr. Kirby, I'm having a
21 senior moment here. You're not talking about
22 motive?
23     Q    (BY MR. KIRBY)  Right. There's two

Page 149

1  ways to prove someone, I would think, had
2  stolen their own property. Either you can say
3  "look, I got a witness that saw them go in a
4  house, load this stuff in the car and leave", or
5  "I got a cancelled check where they hired
6  somebody to go in there and steal it, and I got
7  a picture of him driving off with all their stuff
8  in the truck". I understand that would be a
9  direct way to prove it.
10     Your direct analysis of why you say this
11 is their theft, or they hired someone, consists
12 of your analysis of the security system, which
13 you've explained to me in detail, right; that's
14 one reason?
15     A    Right.
16     Q    Then another reason is is you say "I
17 believe they did it, either taken their own
18 items or hired someone else to do it, because
19 they were in financial distress"?
20     A    That was a factor I considered.
21     Q    Right. And I'm just asking you, any
22 other factor that you considered that made you
23 think they committed the theft or had someone

Page 150

1  else do it?
2        MR. NETTLES: Any other factor?
3        MR. KIRBY: Yeah.
4     A    Well, I mean, we considered the
5  alarm - -
6     Q    (BY MR. KIRBY) Yes.
7     A    - - we considered their severe financial
8  condition.
9     Q    Correct.
10    A    We considered them purchasing a
11 jewelry policy a week before the trip.
12    Q    Absolutely. I understand that.
13    A    We considered the selected theft of the
14 artwork.
15    Q    And I'm - - well, go ahead. Keep going.
16 I don't mean to interrupt you. Selected theft
17 of artwork.
18    A    Okay. We considered there was no
19 other prior - - no other prior break ins,
20 vandalism at their house or the neighbors'
21 house. I considered there was some, you know,
22 late reporting by Mr. Pittman.
23    Q    I'm sorry, say that again, I just didn't

Page 151

1  hear you?
2     A    Some late reporting of the claim by Mr.
3  Pittman.
4     Q    Late reporting. By what do you mean,
5  you mean he didn't report the claim properly?
6     A    Yes.
7     Q    When did he report the claim?
8     A    July 7th.
9     Q    It happened - - they got home on the
10 4th, right?
11    A    Correct.
12    Q    He called the police the 4th?
13    A    Yes.
14    Q    And do you know what day the 4th was
15 on?
16    A    Sunday.
17    Q    And then, he called State Farm on the
18 7th?
19    A    Yeah.
20    Q    And that's late?
21    A    That's just one of the factors that I
22 considered.
23    Q    Okay. Go ahead. I don't mean to butt

Page 152

1  in. Go ahead. Late reporting. Go ahead. The
2  others?
3     A    We felt it was, you know, unusual, as
4  far as the - - his time involved in getting back
5  with the initial claim representative.
6     Q    You felt like he was not responding
7  promptly to the initial claim representative,
8  correct? Am I correct?
9     A    Yeah. I mean, we considered that. It
10 was - -
11    Q    Sure.
12    A    - - there was telephone contacts made
13 to him, and voice mails left on the 7th. He does
14 not return the call back to State Farm until, I
15 believe it was the 12th of July. And just one of
16 the factors, felt that was, you know, unusual.
17 We considered the, you know, information
18 provided by Mr. Solomon, the sheriff's deputy.
19 When he - -
20    Q    Was that information from Mr. Solomon
21 that "it seems unusual that this artwork was
22 stolen, usually crackheads around here steal
23 something else"?

Page 153

1     A    That was - - that was, you know, one of
2  the many things he had some concerns, about
3  financial. He was aware of the - - I guess he
4  had served some court documents.
5     Q    Okay.
6     A    He had some concerns about the alarm
7  system.
8     Q    What was his concern about the alarm
9  system?
10    A    Well, he just made a comment, the
11 phone line's cut, about why there wouldn't be
12 any signal sent. And you know, him calling us
13 - - calling State Farm, that's unusual for
14 generally a law enforcement to call the
15 insurance company. But I mean, he had some
16 concerns.
17    Q    Wonder how he knew y'all were the
18 insurance company?
19    A    I don't know how he knew that.
20    Q    Yeah. Okay. The selected theft, no
21 prior break ins, the late reporting, the
22 sheriff's reports. Anything else you're
23 thinking of that had to do with the denial of

Page 154

1   the claim, other than those you've already
2   expressed to me?
3       A   In relation to the - - financial was the
4   - - with the pending bankruptcy.
5       Q   Correct.
6       A   And this is in relation to the house he
7   purchased - - or sold to Mr. Kirkpatrick.
8       Q   Right.
9       A   It was my understanding that prior to
10  his departure on his trip, the court
11  administrator had filed a motion to dismiss the
12  bankruptcy.
13      Q   Yes.
14      A   That ruling had not been ruled - - you
15  know, the judge, whatever, had not ruled on
16  that motion before he left.  It was my
17  understanding that was over the Coy Burgess
18  property.
19      Q   Right.
20      A   And that was one reason he was trying
21  to get it back, that he had sold the property
22  without the court's approval.  And the
23  administrator was filing a motion to dismiss

Page 155

1   the bankruptcy.
2       Q   So, what impact did that have on your
3   recommendation, the fact that the bankruptcy
4   was going to be maybe dismissed?  What did
5   that have to do with anything with the claim?
6       A   Well, it, in my opinion, gave a - -
7   around the time it was filed, it's my
8   understanding if the bankruptcy was dismissed
9   then his home place, Regions Bank, was
10  involved in the bankruptcy.  It's my
11  understanding then Regions Bank then, correct
12  me if I'm wrong, could then move forward to
13  foreclosure if it was dismissed.
14      Q   Okay.  And so, if they had - - and so,
15  what did that have to do with the reason you
16  denied the claim?  That his bankruptcy would
17  be dismissed and he could be foreclosed, what
18  did that - - what was the significance of that to
19  you, was it the financial impact?
20      A   Well, yes.  And then, that issue of that
21  pending motion out there, if it was - - if it was
22  dismissed then Regions would foreclose on the
23  house and he would lose his house.

Page 156

1       Q   Which was financial?
2       A   Yes.  But he - - he would actually have
3   - - he would lose his house.
4       Q   Okay.  Any others?
5       A   As I sit here today, that's all I can
6   think of, Mr. Kirby.
7       Q   And you mentioned one, and you've
8   explained all those to me, I think, in pretty
9   great detail.  Selected theft, what did you
10  mean by this was a selected theft?
11      A   Just the artwork itself, not everything
12  of value was taken.  There was televisions.  I
13  understand there were some items in son's
14  room, some sports memorabilia that wasn't
15  taken.  And again, in relation to the Geneva
16  County Sheriff's Department that that's their
17  - - in their experience, and you know, in that
18  area, that - - for someone in that area to - -
19  that would be, you know, they don't steal
20  artwork, they steal items like guns and TVs
21  they can pawn.
22      Q   Well, they stole guns and TVs also,
23  didn't they?

Page 157

1       A   Yes, there were some missing.
2       Q   I mean, it's not like somebody went in
3   there and said "I'm a crackhead, I only need to
4   get TVs and guns", I mean, they took the most
5   valuable things in the house, wouldn't you
6   imagine?  They took a safe, they took the
7   artwork, and they took guns and TVs, right?
8       A   Well, I mean, those items were removed
9   in the reported theft, but his comment that
10  they wouldn't know whether this was cheap art,
11  expensive art, they're going to get items they
12  know they can - -
13      Q   You're thinking a person could look at
14  a painting that had the word "Picasso" on it,
15  they wouldn't know that had some value?
16      A   I can't speak to what somebody would
17  think.
18      Q   Well, maybe the better question would
19  be is, "Sheriff, can you tell me anybody in Dale
20  County that" - - Dale County, right?
21          MR. NETTLES: Geneva County.
22          THE WITNESS: Geneva.
23      Q   (BY MR. KIRBY) Geneva County.  "Can

Page 158

1   you tell me anybody down here that's got any
2   art in their house", did you ask that question?
3       A   No.
4       Q   Let me show you something.  I'll mark
5   this as Plaintiff's Exhibit 1.
6       (Plaintiff's Exhibit 1 was marked for
7       identification and a copy of the same
8       is attached hereto as evidence)
9       Q   (BY MR. KIRBY)   And let me show you
10  this letter.  How many cases did you say you've
11  testified in you recalled?
12      MR. NETTLES: Depositions?
13      MR. KIRBY: Yeah.
14      Q   You told me the depositions?
15      A   I think ten or twelve, overall.
16      Q   And would that all be while you worked
17  at State Farm?
18      A   Yes.
19      Q   Would someone at State Farm have a
20  list of the cases that you have testified in?
21      A   I don't believe so.
22      Q   Do you keep a list of the cases you've
23  testified in?

Page 159

1       A   No, sir.
2       Q   If you were asked to go back and sit
3   down and try to recall the cases that you've
4   testified in, would you at least be able to
5   recall some of them?
6       A   You're talking about depositions?
7       Q   Depositions.
8       A   I could probably recall a couple,
9   recently.
10      Q   Can you recall these right now, any of
11  the cases you've testified in by deposition?
12      A   You want a name, or just - -
13      Q   A name would be great.  I know State
14  Farm is going to be the defendant; am I right
15  about that?
16      A   Yeah, we're the defendant in this case.
17      Q   Can you think of the plaintiff's name in
18  any of the cases you've testified in?
19      A   In depositions you're talking about?
20      Q   Yeah, depositions.
21      A   Okay.  Sorry.
22      Q   Like we're doing here today.
23      A   There's a, I think, Joseph Page.

Page 160

1       Q   Joseph Page.  And where was that?
2       A   I believe that case was in federal court
3   in Mobile.
4       Q   Federal court in Mobile.  Okay.
5   Anybody other than Mr. Page?
6       A   There's a Sue Brown.
7       Q   Sue Brown.  Where was that, do you
8   recall?
9       A   I can't remember if that was - - it was
10  in federal court here in Montgomery, or state
11  court.
12      Q   Okay.  Have you ever had to come up
13  with a list of cases that you've testified in for
14  the - - any proceeding, list them?
15      A   No, sir.
16      Q   Okay.  Anybody other than Sue Brown
17  and Joseph Page you recall giving a deposition
18  in?
19      A   That's all I can think of, the current - -
20  I mean, the most recent ones that I can think
21  of today.
22      Q   What about trials, do you remember
23  any trials you've testified in?

Page 161

1       A   I think the last one was - - I think, I'm
2   not sure, his last name was Harris.
3       Q   Do you remember where the court was?
4       A   The federal court in Birmingham.
5       Q   Do you remember who the judge was?
6       A   No, sir.
7       Q   Male, female?
8       A   Male.  And that was, I'm guessing, five,
9   six years ago.
10      Q   Okay.  Do you remember any lawyers
11  that have taken your deposition, their name?  A
12  name like Jere Beasley, or anybody like that?
13      A   Julian McPhillips took my deposition in
14  Sue Brown.
15      Q   Got you.  Now, I've shown you what's
16  marked as Plaintiff's Exhibit 1.  This is a
17  certified mail letter that is - - actually says it's
18  addressed to Mr. Todd Pittman and Mrs.
19  Rhonda Pittman in care of Attorney Rufus R.
20  Smith, Jr.  And as far as this particular case,
21  this April 11, 2011 letter, this is the formal
22  denial letter sent by State Farm to the
23  Pittmans, correct?

Page 162

1    A    Correct.
2    Q    And what this particular letter is, it is
3  a letter that is sent - - this is the actual formal
4  denial letter sent by the insurance company to
5  the insureds?
6    A    This is the letter of denial sent to the
7  insured.
8    Q    Right.  And based upon your training
9  and - - well, let me ask you this:  Have you
10 yourself sent these kinds of letters, that is,
11 these kinds of letters being denial letters to
12 insureds?
13   A    No.
14   Q    You've never sent a denial letter?
15   A    Not that I'm aware of.
16   Q    Okay.  You've never signed a denial
17 letter?
18        MR. NETTLES:  That you recall, sitting
19 here today.
20   A    I don't recall any sitting here today.
21   Q    (BY MR. KIRBY)  Okay.  Now, this one is
22 signed by Tony D. Nix, CPCU, what does that
23 mean?

Page 163

1    A    It's a insurance education, it's a
2  Chartered Public - - Chartered Public - - I don't
3  know.  It's an educational, it's a ten-part - -
4    Q    Are you a CPCU?
5    A    Yeah, and I can't recall - - it's been a
6  long, long time ago.  A long time ago.  But I am
7  a CPCU.
8    Q    Is it a Chartered Property Casualty
9  Underwriter?
10   A    There you go.  See.
11   Q    You're one, and I know one.  All right.
12   A    It's been a long time ago.
13   Q    But you are certified as a CPCU?
14   A    Yes, I am.
15   Q    Whatever it is.
16   A    Okay.
17   Q    And a CIFI, what is that?
18   A    That's an educational - -
19   Q    Are you one of those?
20   A    No.
21   Q    Okay.
22   A    That's a - -
23   Q    All right.  Are you anything other than

Page 164

1  a CPCU certified?
2    A    No.
3    Q    Okay.  And let me go through with you,
4  is it - - what is your understanding of what the
5  purpose of this letter is when it's sent to an
6  insured?
7    A    I mean, as the letter states in that first
8  paragraph, "after careful consideration that"
9  - - well, it's addressed to Mr. Smith, that
10 they're hereby denied, and it gives a reason
11 that "Mr. and Mrs. Pittman had involvement in
12 procuring or causing a theft, and they
13 misrepresented material facts in the
14 presentation of the claim".
15   Q    Okay.  This is the formal denial letter
16 sent by State Farm, correct?
17   A    Yes.
18   Q    It sets out the reason why the claim
19 was denied, and sets out the policy provisions
20 under which it was denied, right?
21   A    Yes.
22   Q    And this letter says "it's being sent to
23 you and sent to Mr. Smith as legal

Page 165

1  representative.  After careful consideration,
2  the claims of your clients, Mr. and Mrs. Todd
3  Pittman, are hereby denied.  Our investigation
4  has revealed Mr. and Mrs. Pittman's
5  involvement in procuring or causing the theft."
6  You have explained your thoughts as to what
7  you think, as far as them procuring or causing
8  the theft, you've told me your reasons why you
9  think that, correct, Mr. Craig?
10   A    I mean, as I sit here today, yes.
11   Q    Right.  And they misrepresented
12 material facts in the presentation of the claim,
13 and by "presentation of the claim", what
14 knowledge do you have that they made
15 misrepresentations presenting the claim?  Your
16 knowledge as you sit here today?
17   A    Okay.  In making the claim to State
18 Farm, and we've talked about the alarm - -
19   Q    Yes.
20   A    - - the situation with the alarm.  Two
21 things, they misrepresented that material fact
22 to State Farm as to the alarm.  And in their
23 examination under oath.  And in their signing

Page 166

1  and submitting to State Farm, under the
2  homeowners policy as well as the personal
3  articles policy.  This first section is related to
4  the homeowners policy, which I think I've
5  previously read that paragraph.  But they're
6  swearing under oath to State Farm they did not
7  cause or procure this loss, "nothing has been
8  done by or with my consent or agreement to
9  violate the provisions of the policy so as to
10 render it void".  They're swearing "I have not
11 concealed or attempted to deceive State Farm
12 as to the extent or caused this loss in any
13 manner."
14     Q    Okay.  I think you've explained that to
15 me, and I understand what you're saying.  And
16 your answer would be the same regarding the
17 loss under the homeowners policy, as well as
18 the loss under the personal property, correct?
19     A    Yes.
20     Q    All right.  Now, back to your report, 41
21 of 42, where we're talking about it's your
22 analysis - - actually, it's your discussion, 41
23 out of 42, it's actually - - it would probably be

Page 167

1  your last page.  And you make a statement, and
2  I want to see if I'm still correct and I'm still
3  understanding your statement.  It says "the
4  necessary key to the investigation was the data
5  received from the Pittmans' alarm system.  The
6  evidence confirms the alarm system was armed
7  'stay' as opposed to 'away' as Mrs. Pittman
8  testified.  The evidence confirmed the person
9  who armed the system on June 16, 2010 armed,
10 deactivated, bypassed and armed the system
11 seven different times to insure that Zone 11
12 was bypassed on the final setting.  The
13 evidence further confirms that the apparent
14 exercise of arming the system, deactivating
15 the system, bypassing Zone 11, and finally
16 arming the system with Zone 11 unprotected
17 was previously conducted on June 11, 2010.
18 The evidence further confirms no error
19 messages were recorded for the garage door
20 and no activities or alarms recorded for the
21 garage door to report was such was the alleged
22 point of entry for the reported theft."
23     I read that to you, and I think I got an

Page 168

1  understanding, but you're talking about, in
2  this case, that was the necessary key in the
3  investigation, you make that statement?
4     A    I mean, that was a material factor that
5  I considered.
6     Q    Right.  But you considered it the
7  necessary key?  And here is all I'm trying to
8  get an understanding of: The necessary key to
9  your investigation, what you're talking about
10 this is, it is the necessary key to their
11 concealment and fraud, correct?
12     MR. NETTLES: Object to the form of the
13 question.
14     A    Okay.  Can you repeat that question?
15 I'm sorry.
16     Q    (BY MR. KIRBY) Sure.  You referred to
17 the necessary key, and I read to you "the
18 necessary key to the investigation was the data
19 received from the Pittmans' alarm system".
20 That, in your judgment, based upon your
21 adjusting and investigation of the claim, that
22 was the key evidence to your recommendation
23 that this claim be denied?

Page 169

1     A    That was one of the many factors, and
2  it was a material factor in the consideration.
3     Q    But I mean, did you consider it to be
4  the necessary key?
5     A    I mean, I put a lot - - I put a lot of
6  weight on the alarm system, because with the
7  Pittmans swearing under oath to State Farm
8  that that did not occur, they just - - you know,
9  just that the alarm code, had pushed "away",
10 and the facts in the alarm did not support that,
11 that that was - - that was very material that Mr.
12 and Mrs. Pittman were involved in this theft.
13     Q    Was it the necessary key?
14     A    It was - - I had put a lot of weight on
15 the material, but once that was determined
16 that was very important information that I
17 considered that Mr. and Mrs. Pittman were
18 involved.
19     Q    Are these your words, "the necessary
20 key to the investigation", are those your
21 words?
22     A    That's what I said.
23     Q    Okay.  And that's still true today, isn't

1  it?
2      A   I put a lot of weight on that, yes, sir.
3      Q   Well, here's all I'm saying: You used
4  the word "the necessary key", do you still
5  stand behind what you said that day that it was
6  the necessary key?
7      A   Yes, sir.  That was very important.
8      Q   It was the necessary key?
9      A   That they were - - based on the alarm
10  situation and them making a material
11  misrepresentation under oath to State Farm
12  that, I mean, they were involved in the loss.
13      Q   Here's the sentence, "the necessary
14  key to the investigation was the data received
15  from the Pittman alarm system."  You agree
16  that the necessary key to the investigation was
17  the data received from the Pittmans' alarm
18  system, you still agree with that?
19      A   Yes.
20      Q   Okay.
21          (Off the record)
22          MR. KIRBY: Well, I'd like to spend more
23  time with you, but that's all I got.

1          FURTHER DEPONENT SAITH NOT
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA     )
4  JEFFERSON COUNTY     )
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype, and the questions and answers
9  thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said hearing.
14      I further certify that I am neither of
15  counsel, nor of kin to the parties to the action,
16  nor am I in anywise interested in the result of
17  said cause.
18
19  _____
20      PAUL MOORE,
21      COMMISSIONER
22
23

1          AMENDMENT TO DEPOSITION
2
3      The witness PAT CRAIG, states that he wishes
4  to make the following changes to his testimony:
5
6  PAGE  LINE     SHOULD READ          REASON
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 174

1           SIGNATURE OF WITNESS
2     STATE OF _____ )
3     COUNTY OF _____ )
4
5         I, PAT CRAIG, the witness in the above
6     deposition, have read the within transcript of my
7     testimony, and have stated such changes (if any)
8     and the reason for each change on a separate sheet
9     attached to this transcript.
10        My testimony as given herein is true and
11    correct to the best of my knowledge and belief.
12
13        _____
14              PAT CRAIG
15    SUBSCRIBED AND SWORN TO before me
16
17    this ____ day of _____, 2011.
18
19
20    _____
21    Notary Public, State of Alabama at large.
22
23    My commission expires:_____

**A**

**ABI** 106:12,17,20
  108:20
**able** 26:17 94:13
  127:20,21 128:11
  159:4
**absence** 63:3 138:22
**Absolutely** 150:12
**accept** 56:22
**access** 52:5
**accessory** 91:16,18,21
  92:14
**accidental** 144:8,16
**account** 75:18
**accurate** 108:6
**act** 144:17
**action** 172:15
**activated** 122:17
  123:16 143:13
**active** 120:8
**activities** 46:18 167:20
**activity** 48:18 119:23
  121:15,20
**actual** 20:5 39:9 79:5
  144:3,7 162:3
**addition** 24:21 25:9
  98:7 140:15
**additional** 81:18
**addressed** 161:18
  164:9
**adequate** 30:10
**adjust** 18:6 35:14
  38:20
**adjusted** 72:19
**adjuster** 29:17,22
  30:18,19,22 31:9
  32:18,22 33:18 35:10
  37:3
**adjusting** 7:15 8:1,6
  17:13,18,20 18:3,13
  18:16,20 20:20 29:17
  30:11 31:19 41:9
  122:2 168:21
**adjustment** 7:12 32:13
**administration** 6:17
**administrator** 154:11
  154:23
**ADT** 120:2,4
**advise** 61:13
**advised** 69:19 87:12
  89:6
**advising** 14:1
**affairs** 67:10
**afford** 116:13
**agent** 61:4 93:12 109:9
  109:11,12 110:2
  111:7 114:1,2
**ago** 78:11,13 120:16
  161:9 163:6,6,12
**agree** 33:17 39:15 40:4
  40:8 73:18 125:22

**128**:17 170:15,18
**AGREED** 1:17 2:5,11
  2:19
**agreement** 49:14 50:20
  166:8
**ahead** 26:9 44:23 51:6
  150:15 151:23 152:1
  152:1
**al** 1:11
**Alabama** 1:2 2:2 4:6,10
  4:16,21 6:3 11:5,10
  11:12,22 93:6,22,23
  94:11,12,15 96:6
  107:7 172:3 174:21
**alarm** 38:15 42:14,15
  42:16 43:1,14,15,18
  43:19 44:15 45:7,20
  46:5 47:19,21 48:11
  51:21,22 53:1,5,9,15
  54:2,15 55:4 57:13
  57:17 58:5,18,23
  59:21 117:15,16
  118:9,18 119:3,4
  120:21 121:7,17
  122:8,23 123:3,14,16
  124:16 125:3,15,20
  126:1,6 137:8,9
  138:4,6,21,23 139:1
  139:3,5 140:3,3
  143:6,8,11 145:19
  146:11,12 147:8,10
  150:5 153:6,8 165:18
  165:20,22 167:5,6
  168:19 169:6,9,10
  170:9,15,17
**alarmed** 123:7
**alarms** 58:9 117:21
  118:7,8 122:16
  167:20
**alleged** 167:21
**allow** 109:23
**allowed** 38:6 71:6
**Allstate** 8:5,7,11,14
**altercation** 92:2,6,13
**AMENDMENT** 173:1
**amount** 12:23 68:2
  70:6 71:7
**amounts** 140:16
**analysis** 57:15 142:15
  149:10,12 166:22
**annual** 109:15
**answer** 30:5 36:4
  115:21 138:17
  166:16
**answers** 135:5 172:8
**anybody** 19:18 23:1
  61:14 122:11 157:19
  158:1 160:5,16
  161:12
**anyway** 68:16
**anywise** 172:16

**apparent** 167:13
**apparently** 133:2
**appeared** 66:14
**APPEARING** 4:2,12
**appears** 121:15
**application** 111:9
  114:7 115:3,10
**appointment** 38:7
**appraisal** 115:12
  116:12
**appraisals** 114:20
  129:11,12,17,18
**approached** 98:10
**appropriate** 143:21
**approval** 154:22
**April** 67:16 73:12
  107:19,20 108:2,3,6
  108:8 161:21
**area** 11:2,3 61:21 62:3
  126:15 156:18,18
**arguing** 86:8,12,14
**argumentative** 40:23
**arm** 120:22 121:13,14
  91:18,19 120:1,7
  121:1,6 167:6,9,9,10
**arming** 121:15 167:14
  167:16
**arrest** 96:7
**arrested** 94:19,23 95:9
**arrests** 94:14
**arriving** 48:10
**art** 109:17 143:22,23
  157:10,11 158:2
**articles** 24:19 25:5,14
  26:1,14 27:19 39:10
  49:4 54:10 109:15
  111:15 114:8 166:3
**artwork** 88:6,10,11,15
  88:17,20 109:14,23
  110:23 111:1 129:13
  137:19 141:23 142:4
  150:14,17 152:21
  156:11,20 157:7
**asked** 38:13 69:17
  72:22 97:20 98:16
  99:8,21 105:23 106:8
  106:20 117:8 129:3
  136:4 159:2
**asking** 20:7 40:3,8
  51:11 52:22 55:6
  59:14 63:8 65:18,20
  85:5,11 92:9,10
  100:3 117:6 139:16
  148:3 149:21
**assign** 2:15
**assigned** 12:19,22
**assist** 106:9 107:8
**assistance** 106:20
**assisting** 31:4
**associated** 148:17

**assume** 124:21
**assuming** 147:20
**assumption** 126:6
**attached** 101:21 158:8
  174:9
**attachments** 124:1
**attempt** 106:1
**attempted** 49:16 50:22
  166:11
**attended** 67:17
**attorney** 52:6 161:19
**Audrey** 111:8 114:2
**August** 94:20 140:18
**authority** 18:22 19:2,3
  19:9,12,15
**authorization** 128:19
**auto** 8:10,11
**available** 16:9
**Avenue** 4:5
**awarding** 83:22
**aware** 18:12 48:23
  74:11 75:14 77:6,20
  96:10,17 113:11
  141:21 142:12 153:3
  162:15

**B**

**B** 109:22
**back** 10:5,6 30:16 47:9
  48:10 54:1 67:20
  68:1,3 70:4,5 73:16
  73:19 74:9,14 76:20
  76:22 77:2 82:20
  83:2 84:7 86:18,21
  102:23 111:10 134:7
  152:4,14 154:21
  159:2 166:20
**background** 6:1 119:12
  119:16,20
**bank** 86:16 155:9,11
**bankruptcies** 79:8
**bankruptcy** 52:5,6,14
  60:6,8 71:20,21,23
  72:10 75:8,11,16,22
  127:4,9 135:6,9,11
  135:13 154:4,12
  155:1,3,8,10,16
**barn** 97:2 105:10
**Barron** 63:17,18 64:1
  64:16 134:10,21
**based** 22:11 23:19
  24:19 25:6,14 26:14
  28:15 29:6 32:14
  54:11 57:14 58:16
  63:8 65:21 70:1 73:1
  90:17 122:1,8 126:5
  138:3 142:18 162:8
  168:20 170:9
**basic** 87:17 96:6
**basically** 117:21
**basis** 15:9 39:23 99:10

**133**:17 134:2,22
  135:11 136:10,16,23
**Bates** 24:15 26:4 101:1
  101:9
**battery** 92:17
**bearing** 112:14 135:16
**Beasley** 161:12
**bedroom** 44:17 121:22
  122:5,16 123:8 145:4
  145:5 146:2
**began** 130:4
**beginning** 54:5 136:1
**behalf** 4:2,12 28:11
  29:18 48:7,23 51:10
  105:15
**belief** 174:11
**believable** 104:2
**believe** 12:10 18:2
  41:20 60:10 62:14
  67:16 82:6 95:16
  96:10 103:22 108:21
  112:3 120:14 139:18
  139:21 149:17
  152:15 158:21 160:2
**believed** 104:11
**Ben** 103:3,17
**Bert** 4:13 70:21 78:19
  100:15
**best** 8:3 29:19,23 44:22
  56:4,5 91:23 174:11
**better** 157:18
**big** 134:16,19
**Birmingham** 4:6,16
  161:4
**birth** 5:18
**bit** 5:16 6:1 99:16
**boat** 62:5
**Bondy's** 133:12 134:3
**Bonnieville** 85:23
  86:14
**born** 6:2
**bottom** 26:5 101:10
**bound** 115:4,15
**box** 4:9 98:9
**boxes** 88:1,4,6,22
**boy** 101:12
**boyfriend** 77:14
**breach** 24:20 25:6,15
  26:15 55:11
**breached** 54:11
**breaches** 138:12,21
**break** 5:14 57:6,8,10
  100:17 129:21,23
  132:19 150:19
  153:21
**break-ins** 60:4
**bring** 7:3 9:12 111:23
**broken** 61:20
**brought** 105:9
**Brown** 160:6,7,16
  161:14

**bubble** 88:6
**bunch** 30:17
**Bureau** 7:12 13:9
14:16,17,23 107:7
**Burgess** 67:14 73:10
154:17
**burglar** 118:18
**burglary** 92:23 94:4
140:22
**bushwhacked** 117:8
**business** 6:17 7:4 66:21
67:2,10,12 69:10,16
89:7 127:15
**Butler** 21:14,16
**butt** 151:23
**buyer** 77:8
**bypass** 44:17 121:13
**bypassed** 58:7 121:8,17
123:8 145:5 146:3
167:10,12
**bypassing** 121:21
135:21 167:15
**by-passed** 43:20

_____

**C**

**C** 4:1 172:1,1
**call** 13:5,22 16:6 17:1
19:21 115:20,23
118:9 119:19 120:4
126:13 152:14
153:14
**called** 10:5,13 26:6
67:19,21,22 68:5
151:12,17
**calling** 70:3 153:12,13
**calls** 116:2
**Campbell** 104:15,15,18
104:22 105:2,4,12,12
105:15,16,21 106:5,8
106:12,17,19,23
107:7,14,15 108:19
**cancelled** 149:5
**car** 61:20 149:4
**care** 52:18 161:19
**careful** 117:9 164:8
165:1
**Carol** 64:2 77:22,23
**carrier** 74:13 77:5
**carry** 73:14
**case** 13:13,16 17:11,12
20:4 29:15 34:21
35:9,11 42:5 53:8
105:7 122:2 135:22
159:16 160:2 161:20
168:2
**cases** 94:14 158:10,20
158:22 159:3,11,18
160:13
**Casualty** 1:11 8:23
163:8
**cause** 13:1 49:12,17

50:7,10,16,23 133:12
133:15 166:7 172:17
**caused** 65:20 69:2 73:7
79:2 85:1,8,14,17,18
108:22 117:17,17
138:8 166:12
**causing** 50:8,9 51:14
164:12 165:5,7
**cell** 115:21 126:12
**center** 120:5
**certain** 9:23 12:22 35:3
35:3 36:10 60:5
137:13
**certified** 161:17 163:13
164:1
**certify** 172:6,14
**chairperson** 108:3
133:7
**chance** 56:9
**change** 76:18 136:7
174:8
**changes** 173:4 174:7
**charge** 136:7
**charged** 136:5
**charges** 95:5
**Charles** 61:7 62:7
**Chartered** 163:2,2,8
**cheap** 157:10
**check** 63:1 74:16,20,21
76:14 93:4,7 96:19
97:7 117:23 118:10
118:17 119:1,4,4
120:3 149:5
**checked** 107:13 118:1
**child** 67:4
**CIFI** 163:17
**CIRCUIT** 1:1
**circumstance** 23:23
27:13 28:2 39:8,14
40:6 42:4 140:2
**circumstances** 31:2
32:15 33:10 51:20
66:6,9 73:2 96:3,12
97:8 99:14 130:21
131:12
**circumstantial** 142:20
142:23 143:1,5,7,18
144:23 147:2,17
**claim** 9:18 10:5,17,19
12:22 13:2,10 17:13
17:15 18:3,7,14,15
18:19,20,23 19:1,4,5
19:16,16,21,22 20:1
20:3,20,21,23 21:3
21:11 23:12,23 24:4
24:5,17,19 25:6,11
25:14 26:14 28:11
29:18 30:7,8,11,19
30:23 31:1,3,5,12,15
31:17,17,20 32:8,12
32:15,19,21,23 33:1

33:11 34:15 35:11,14
35:17,18,22 36:2,9
36:11,21 37:4,5
38:21,21 39:3 41:10
42:11 52:11 54:10,18
54:23 55:2 56:19
59:15 62:1,16 63:19
64:2,7,13 65:1,10,17
65:20 66:1,7,10,11
66:17 69:3 71:6,11
72:13,19 73:8 74:12
77:4 78:1 79:4 81:19
81:22 82:13,21 83:22
83:23 84:3,4,6,6,22
85:2,8,15,19 87:8,11
88:8 89:3 90:23
94:18 95:8 98:19
99:2,11,19,23 102:20
103:19 104:4 107:16
107:18,22 108:9,10
110:5,11,13,16
111:22 112:15,23
113:4 116:15 117:18
122:3 128:11 129:9
130:7,12,16,18 131:1
131:2,5,7,9,13,14,18
131:22 132:1,5 133:7
133:9,13,16,22
134:14,23 135:12,17
135:23 136:11,14,17
136:19 137:1,12,14
151:2,5,7 152:5,7
154:1 155:5,16
164:14,18 165:12,13
165:15,17 168:21,23
**claimed** 87:3 88:12
90:4,7,14 134:10
140:23
**claiming** 77:7
**claims** 7:16,18,19,20,21
8:6,9 9:10,14,16,19
9:23 10:1,7,9,16,21
11:22 12:5,16,19
14:1 17:18,20 23:15
40:19,21 41:2,5,14
55:19 141:6 165:2
**clear** 54:6 65:13
**client** 30:9 31:18
**clients** 165:2
**closest** 142:17
**closing** 67:18 68:14
69:4 70:2 76:2,8,12
77:12,16 79:7,10
**code** 43:3 120:3 145:4
146:8 169:9
**coded** 44:16,17
**cold** 24:3
**collection** 143:22 144:1
**college** 6:8,10,11,12
**combined** 18:17
**come** 18:22 20:5 37:21

38:14 44:8 61:11
86:18 160:12
**comes** 62:23 112:8,20
113:19,21 114:1,19
**coming** 88:20 112:19
**comment** 52:16 153:10
157:9
**commission** 174:23
**Commissioner** 1:23
2:20 172:21
**commit** 147:11
**committed** 51:18 57:18
113:7 148:14 149:23
**committee** 19:22 20:1,3
21:11,21 22:2,9,16
23:3,8,9,11,15 25:1
56:19 59:8 94:18
95:9 107:22 131:2,13
132:11,23 133:7,9
**communicate** 14:23
15:8 16:7
**companies** 15:15
**company** 5:23 8:5,23
10:6 13:22 16:10,11
19:17,19 28:9 49:11
120:10 153:15,18
162:4
**complaint** 96:23 97:8
97:10 134:7
**complaints** 96:20
**completed** 115:3
**compliance** 2:8
**compromised** 120:8
**computer** 125:14
**computer-aided**
172:10
**concealed** 27:12 28:1
39:7 49:16 50:22
51:16 52:15 54:14
127:1 129:4 166:11
**concealment** 24:20
25:7,15 26:7,15 27:9
27:21 29:6 39:4,5,10
39:15,17 40:5,9,14
41:11 42:3 43:8,10
43:11 48:22 49:9
50:1,4,11 51:4,10,13
52:21,22 53:20 54:12
55:11 56:1,2 59:16
168:11
**concern** 111:7 117:17
153:8
**concerned** 52:19 116:8
**concerning** 67:14 79:7
96:7 99:13 104:16
110:13 133:19
**concerns** 14:2 36:3,5
37:20 58:20,22 60:13
67:3 75:9 77:17 79:3
153:2,6,16
**concluded** 100:2

**conclusion** 58:5,9,13
59:5 117:22 125:16
136:4
**condition** 52:15 59:22
59:23 69:11 128:9
133:19,23 134:17,20
135:1,2,15 137:6,9
148:5,16 150:8
**conditions** 27:6
**conducted** 142:18
167:17
**confirm** 136:8
**confirmed** 120:21
126:12 167:8
**confirms** 121:6 122:21
123:2,6 124:15 130:3
167:6,13,18
**confronted** 136:6
**confusing** 85:9
**consent** 49:14 50:20
166:8
**consider** 84:2 110:15
133:16 169:3
**consideration** 64:20
66:3 74:3 88:9 89:5
112:2 164:8 165:1
169:2
**considered** 55:1 79:17
90:9,13 98:13 99:3,5
99:12 100:6,7 103:21
104:3,6,9 110:1,12
112:23 116:21 117:4
117:12,13 130:9,22
130:23 131:13
133:14,20 134:1,16
135:14 136:12 137:3
147:23 149:20,22
150:4,7,10,13,18,21
151:22 152:9,17
168:5,6 169:17
**consists** 149:11
**constituted** 51:9
**constitutes** 50:4
**construction** 92:23
**contact** 35:21 36:4 37:2
106:2 110:2
**contacted** 15:20 73:15
106:20 107:7 114:6
114:14 115:9
**contacts** 104:22 114:4
152:12
**contained** 26:2
**contains** 27:19
**continue** 132:13
**continued** 130:5
**continuously** 8:19
**contract** 28:5 34:1,3,5
120:10,15
**contractors** 68:10,11
89:10
**contradicts** 102:1,8

conversation 67:20
73:17 97:21 98:4
113:15 124:9
conversations 37:7,10
47:17 63:8 65:15,21
97:12,13,15
convicted 80:1,11
92:13,17,19,23 94:4
96:16 136:3,9
conviction 95:15,18
96:9
convictions 95:10
copy 16:14 20:2 23:16
78:17 105:11 120:9
132:10 158:7
correct 8:22 9:1 12:2
16:2 21:2 23:17
25:16,17 26:7 27:7
27:16,17 28:6 29:1
29:11 38:2,18,21
41:7 44:10,18 49:20
50:2 54:16 55:12,21
56:2 61:5,6 63:11
66:14 78:6 81:5 84:9
84:19 87:11 93:12
100:4 104:5,10
106:14,21 107:1
108:5 111:9 113:22
114:22 115:5,14,17
121:4,10,11,22
122:14 125:6 126:7
126:20,21 129:10
133:22 135:7 137:14
137:20 140:1,7,13,19
140:22 141:2,5,12,19
150:9 151:11 152:8,8
154:5 155:11 161:23
162:1 164:16 165:9
166:18 167:2 168:11
172:11 174:11
Corresponded 37:15
cosmetic 87:17
counsel 1:18 2:12,14
172:15
country 11:7 116:3
138:23
county 13:23 60:12
70:16,17 96:21
104:17 106:9 107:2
136:6 156:16 157:20
157:20,21,23 172:4
174:3
couple 7:2 8:3 115:1
159:8
course 41:14 44:4
51:21 82:14
court 1:1 71:20,21,23
72:10 75:22 96:6
104:20 153:4 154:10
160:2,4,10,11 161:3
161:4

court's 154:22
coverage 28:17 32:13
33:19,20 34:9,12,18
34:21,22 109:14,19
109:21,22,23 111:15
115:5,15 116:13
covered 28:3 32:17
33:2,13,13,14 34:16
35:2 54:7 71:12
103:1 115:2 116:5
Coy 67:14 73:10
154:17
CPCU 162:22 163:4,7
163:13 164:1
crackhead 157:3
crackheads 152:22
Craig 1:20 5:4,5 19:2
20:23 22:1 23:2
24:18 26:12 28:16
29:13 35:13 54:9
56:6 57:11 65:13
69:17 99:16 100:18
101:16 102:2 103:14
108:2 123:23 130:12
132:21 165:9 173:3
174:5,14
created 39:13
Creative 119:7
credible 104:8,9
credit 52:7 77:7 127:8
128:11,15,19,21
129:7 130:3
Crenshaw 70:16
crime 13:8 14:16,17,22
62:4 136:3,5,9
criminal 93:4
cruise 116:10 130:6,8
130:19
current 10:11 116:11
135:8 160:19
currently 5:20 9:18
cut 46:9 123:3,11,19,20
124:5,16 125:3,11,21
126:2,7 153:11
C.J 6:23
C.R 69:17

                D

D 3:2 162:22
daily 15:9
Dale 157:19,20
Daleville 88:23
damage 137:19 138:4,8
139:2
damages 33:15,16
38:23 140:12
data 125:15 167:4
168:18 170:14,17
date 5:18 24:22 25:10
42:23 80:23,23
107:18,21 108:5,13

114:6 116:10
daughter 89:12 134:11
David 134:9,21
day 2:3 63:1 121:9
151:14 170:5 174:17
deactivate 121:13
deactivated 121:1
122:20 167:10
deactivating 167:14
deal 9:10 134:6
dealing 9:13
dealings 104:23 106:4
deceive 49:16 50:22
166:11
December 66:5,20
128:23
deception 94:20 95:23
96:2
decided 65:16 109:21
decision 19:6,8,10,15
21:22 22:11 23:11,21
24:1 32:16 55:1
66:10 81:18,21 99:22
107:15,17 108:6,8
110:15
deed 73:19 75:13
defendant 159:14,16
Defendants 1:13 4:12
defined 25:9 41:16,17
41:19
degree 6:16
demonstrates 144:3
denial 20:5,8,9,13,15
20:16 24:18 25:4,13
26:12,13 29:5 54:9
61:9 62:16 63:10
64:12 66:11 69:3
74:2 79:4,12 84:6
98:18,19 99:2,10,11
99:19 102:15 104:4
117:1 129:8 131:5
132:4,7 133:17,18,21
136:10,11 153:23
161:22 162:4,6,11,14
162:16 164:15
denied 18:23 28:18
32:21 39:3 41:10
52:20 54:19 55:10
59:15 62:1 64:7 65:2
65:10 66:1 73:8
82:13,21 84:5,7,23
85:2,15,20 89:3
102:20 103:19 110:6
110:16 112:15 113:4
116:15,16 127:22
130:8,13,18 131:5,9
131:18,22 132:2
133:13,16 134:14,23
135:13,17 136:1,17
136:18 137:1 155:16
164:10,19,20 165:3

168:23
deny 19:16 23:11 24:5
28:11 63:19 65:20
66:10,17 85:8 88:8
108:10 110:11
111:22 130:16 131:1
131:7
denying 83:22 111:22
department 6:22 10:1
14:1 104:18 106:9
107:3 156:16
departure 154:10
DEPONENT 171:1
deposit 98:9
deposition 1:18 2:6,7
2:16,20 5:6,12
159:11 160:17
161:11,13 172:7
173:1 174:6
depositions 2:9 158:12
158:14 159:6,7,19,20
deputies 60:13
deputy 13:23 61:3
104:15,18,21 105:2,4
105:16 106:8,11,19
106:23 107:6,14
108:19 152:18
described 86:23 90:5
describes 86:5
description 12:9,14
detail 117:16 149:13
156:9
detected 58:10
detector 58:8 121:2,3
determination 20:20
33:12
determinative 65:9
determine 32:13 33:2
33:14,15 34:15 38:23
determined 71:8,11
169:15
developed 67:13
development 68:9 69:5
89:11
different 30:8 143:13
167:11
difficulties 52:1,1,4,8
74:4 128:3
diligent 30:12
diligently 36:8,16,18
direct 143:15 144:8,23
145:15,22 146:21
147:2,15,16,16,17,18
149:9,10
directions 18:6
directly 139:23 146:10
147:10
disarm 46:6,11,12,22
47:14
disarmed 45:7 46:8,9
46:10 47:2,4 48:5,16

48:19 139:1,3
discovered 84:21 116:1
discuss 67:2 69:16,21
discussion 109:17
120:19 166:22
dismiss 154:11,23
dismissed 155:4,8,13
155:17,22
display 143:23
distress 149:19
DISTRICT 1:2
DIVISION 1:3
document 49:10 53:22
79:6 127:21
documentation 143:21
documented 36:11
documents 14:12 82:7
128:12 153:4
doing 18:21,21 30:22
139:11 159:22
dollar 12:23
door 43:19,19 53:9
121:20,22 122:5,8,9
122:12,17 123:8
137:23 138:2,5,9,16
139:2,11,13,17 140:3
146:14 167:19,21
doors 122:16 123:15
138:13,22
Dothan 4:10
draw 58:13 59:4
driving 149:7
duration 9:12
DVD 141:14,17,19

                E

E 3:2 4:1,1 172:1,1
education 163:1
educational 163:3,18
effect 2:7 36:22 125:10
130:7
either 23:13 24:4 33:5
42:5 57:18 59:2
61:10 65:4 108:22
139:11,23 141:3
144:10 145:1,16
148:6 149:2,17
electrician 118:2
elements 148:17
Eluding 94:11
employed 5:20,22 6:22
7:11 8:19 62:21
endangerment 94:16
95:5,12,15
enforcement 15:6
153:14
engineer 118:11,15,23
124:2
engineering 44:9
engineers 38:14
entire 27:22 39:11

120:7 131:21 136:15
  136:22
entries 46:6
entry 122:3 167:22
error 167:18
estate 61:4 142:10
et 1:11
ethical 31:10
Eugene 104:14 105:14
evaluate 12:19 30:7
  31:17 33:1
evening 138:10
event 34:16 46:22
  47:22 89:18 120:1,3
  144:16
events 123:5 124:17
  125:16
eventually 83:11
  128:10,23
evidence 2:17 68:22
  122:21 123:2,6
  124:15 125:2 142:21
  143:2,3,17 144:1,22
  145:3,16,23 147:2,4
  147:9,10,15,17 158:8
  167:6,8,13,18 168:22
exact 80:23
exactly 72:12
examination 3:4 5:1
  48:10 87:13 105:8
  118:6 136:2,13,15
  165:23
example 109:18 111:16
excluding 148:12
exclusions 34:11 35:5
Excuse 45:23 70:13
exercise 167:14
exhaustive 16:20
Exhibit 158:5,6 161:16
EXHIBITS 3:9
existence 134:15
expensive 109:20
  111:19 112:9,12
  113:16 157:11
experience 117:21
  118:7 119:12,16,19
  156:17
expert 44:16 46:2
  47:17 48:16 53:7
expert's 43:21 57:14
expires 174:23
explained 54:13 149:13
  156:8 165:6 166:14
explaining 111:14
expressed 154:2
extensive 16:21 42:12
extent 16:6 49:17 50:23
  166:12
E602 120:3

F

F 172:1
facing 107:23
fact 27:13 28:1 39:7,13
  40:6 42:4 45:15 72:9
  91:16,21 98:22
  111:22 112:15
  120:23 125:1 126:17
  129:17 130:6,8
  133:11 134:12,13,14
  135:5,10,13 143:3
  146:16 153:15 165:21
factor 61:9,23 64:4
  65:5,9 74:1 90:8,10
  90:12 99:1 110:14
  112:1 133:21 149:20
  149:22 150:2 168:4
  169:2
factored 62:16 63:9,18
  64:23 65:8 79:11,15
  89:2,3 110:4
factors 54:23 56:13,17
  57:2,2 103:21 110:13
  110:17 112:22 117:3
  117:12 130:9 131:12
  136:20 151:21
  152:16 169:1
facts 19:20 23:23 31:2
  32:14 33:10 51:20
  52:17,19 53:8 59:21
  66:6,8,13,17,18 73:1
  79:13 84:21 99:13,17
  130:20 143:7 146:19
  164:13 165:12
  169:10
factual 144:1
failure 64:14,19 89:12
  94:23
fair 23:10 30:11
familiar 89:11
far 17:17 18:3,20,22
  19:14 21:14 29:15,16
  30:11 35:9,21 42:12
  59:20 60:19 75:15
  129:11 141:14,23
  152:4 161:20 165:7
Farm 1:10 5:23 8:15,17
  8:20,22 9:9,20 10:7
  14:21 17:17 18:11
  28:5,8 29:23 32:1
  33:6 35:8,14,21
  49:16 50:22 65:8
  71:9 72:22 78:1
  93:12 109:9 112:23
  129:17 131:23 141:7
  151:17 152:14
  153:13 158:17,19
  159:14 161:22
  164:16 165:18,22
  166:1,6,11 169:7
  170:11
fashion 24:6 99:2

father 67:5 89:14
February 81:3,4,15
  82:19 97:19
federal 160:2,4,10
  161:4
feel 14:12 29:14 128:7
Felicia 4:18 132:18
felon 80:1
felt 88:11 118:6 119:3
  152:3,6,16
female 161:7
Ferguson 21:12 22:16
fianc 67:23
field 7:12
Fifty 46:3
figure 15:22 21:22
  111:21
file 32:22 42:11
filed 74:12 83:1,4,9,12
  134:8,10 154:11
  155:7
filing 2:19 154:23
final 107:15,17 108:6,8
  121:14,17 131:14
  167:12
finally 167:15
finances 69:20 129:6
financial 14:4 51:23
  52:1,4,8,15 59:22,23
  60:7 66:22 67:3
  69:11,19,22 74:4
  126:19,23 127:2,3,5
  127:12,17,19 128:2,8
  129:4 130:4 133:19
  133:23 134:17,19
  135:1,2,15 137:6,9
  147:21 148:5,9,12,16
  149:19 150:7 153:3
  154:3 155:19 156:1
financially 128:4
find 26:18 80:7 85:9
  96:19 99:18 117:23
  124:2
finding 58:12
findings 57:14,16
  58:16,23
fines 94:23
finished 102:12 118:5
fire 1:10 8:22 10:6
  34:16
firearm 92:3 94:9
first 6:21 7:3 8:16 19:8
  27:5 29:16 32:22
  33:18 34:4,7,10,12
  34:14 47:9 77:8
  80:19 81:5,14 98:20
  112:18 114:5 116:3
  133:8 164:7 166:3
Fisher 21:13 22:17
five 161:8
Florida 64:3 78:2,5

80:16,17 91:11 93:1
  93:7,9,11,12 94:1,6,7
  136:6
folks 10:21
follow 10:2
followed 83:6,7
following 83:5 173:4
force 2:7
foreclose 155:22
foreclosed 155:17
foreclosure 155:13
foregoing 172:7,11
Forensic 44:2
form 2:13 24:5 30:3,13
  31:6,13,21 32:9 33:7
  33:22 34:23 36:13
  40:17 49:3,8 51:5
  54:20 85:4,9 99:2,10
  106:15 110:7 113:9
  125:7 131:10 133:17
  148:18 168:12
formal 6:18 24:2 132:4
  132:7 161:21 162:3
  164:15
forward 37:5 38:22
  75:9 155:12
found 62:15 102:13
  104:8
frame 123:1 124:19
frames 123:6
fraud 17:5,5,8,23 24:20
  25:7,15 26:7,15 27:9
  27:21 29:7 39:4,5,11
  39:16 40:9,14 41:11
  43:8,11,12 48:22
  50:1,5,11 51:3,10,18
  52:21,22 53:20 54:12
  54:14 55:11 56:1,2
  59:16 96:16 113:7
  168:11
fraudulent 49:9 51:12
  52:14
free 14:12
friend 10:2
front 21:15 35:15
  128:4
full 2:8 88:1,4
function 18:14
functions 123:4 124:17
funding 103:5
funds 15:12
furnished 52:7 119:18
furs 109:18 111:17
further 2:4,10,18 86:20
  121:5 123:2 167:13
  167:18 171:1 172:14

G

GAB 7:13,16 8:1,4
Gallery 129:15
Gallion 2:1 4:19

garage 137:22 138:1,5
  138:8 139:2,17
  167:19,21
Garner 109:8,9,12
  110:1,14,21 111:13
  112:5 113:5 114:2
gathered 144:2
Gayfers 6:23 7:8,10
general 7:12,13 12:15
generally 11:20,21
  12:18 38:2 53:21
  54:4 153:14
generate 13:10
Geneva 13:23 60:12
  68:15 69:4 70:16
  104:17 106:8 107:2
  156:15 157:21,22,23
gentleman 43:17
getting 15:22 121:18
  129:17 152:4
Gillis 106:7
girlfriend 77:15
give 5:2 44:7 45:11
  68:1 70:3,5 73:18
  78:20 89:14 102:21
given 5:5 68:3 85:12
  89:16 172:12 174:10
gives 18:5,8 164:10
giving 160:17
go 6:4,8,10,18,19,21
  8:16 17:19,19 26:9
  34:3,11 38:4,5 44:23
  51:6 57:2,3 59:9 60:7
  63:16 71:20 73:5
  75:18,21 81:1 83:10
  84:13,20 89:20 117:9
  120:18 126:11
  131:15 134:7 149:3,6
  150:15 151:23 152:1
  152:1 159:2 163:10
  164:3
goal 32:19,20,21
goes 27:18 44:3
going 18:23 19:1,16
  25:11 34:7,10,11
  36:8,8,18,20 39:22
  40:16,20 42:1 50:15
  56:14,21,21,22 57:5
  57:7 70:5 73:14,22
  74:6 75:10,11 85:3
  108:15 114:23
  115:18 117:5 125:9
  125:19,23 130:1
  142:15 150:15 155:4
  157:11 159:14
good 67:5 100:15 110:1
  110:2
gotten 15:18 71:9
  74:14 82:18
graduate 6:12,14
granting 83:22

great 89:22 117:16
  156:9 159:13
Gregory 133:4,5,6
Grice 111:8 114:3,4,5
  116:7,17
grounds 2:15
group 15:2
grow 98:16,23
growing 98:11 99:8
  103:3,5,17
guess 60:4 68:8 118:9
  119:18 121:18
  126:22 153:3
guessing 161:8
Guide 17:21,22
guidelines 17:23
guides 18:8,10
guilty 94:21
gun 92:20
guns 114:16 156:20,22
  157:4,7
guy 103:3,16

**H**

hand 26:5 37:22
  101:10 130:13
handle 12:18 31:1,15
  32:11,23 35:16,18
handled 36:21 38:21
handling 9:10,22 10:17
  35:22 36:2 37:3
happen 12:11 93:4
happened 46:4 151:9
happens 47:22
Harris 161:2
Hartford 93:22,23
hashed 83:16
Haskell 1:23 4:14,19
Hatch 21:13 22:17
Hayden 67:6
head 9:23
heading 106:12,13,17
hear 151:1
hearing 172:13
held 7:5 9:8,9,13
help 99:16
hereto 158:8
hid 127:13 128:7 129:2
  129:4
high 6:4,6
hire 15:3
hired 38:14 85:22
  119:6 149:5,11,18
history 96:5 119:19
  135:2
Holmes 61:7,17 62:7
home 14:19 45:21
  62:11 72:7 73:10
  77:8 96:16 126:17,18
  127:10,16 151:9
  155:9

homeowner 10:7 33:4
homeowners 24:18
  25:5,13 26:13 27:4
  54:9 166:2,4,17
homeowner's 25:23
  26:23 49:4 109:22
homes 72:6,15
honest 128:4
Hopkins 45:12 48:2
  57:22 58:4 117:22
  118:2,12,12 120:6
  123:12,18 124:2,11
  125:13
horses 63:1
house 38:5,10,15 48:11
  60:10,12 61:4,12
  63:6 68:14 70:3,5
  73:16,19 74:5,22
  75:7,10,13,21 79:9
  79:14 85:23 88:5,23
  92:2,7,12,13 121:3
  122:4 134:11 140:7
  140:11 141:22 142:6
  149:4 150:20,21
  154:6 155:23,23
  156:3 157:5 158:2
houses 61:12 126:14

**I**

idea 88:19
identification 158:7
identify 16:5 45:3
  101:6
imagine 157:6
impact 102:19 155:2,19
important 90:3 110:15
  169:16 170:7
impression 141:15
inadvertently 132:20
include 140:6
included 34:8 45:17
including 141:23
inclusions 33:20
incorrect 125:6
increase 109:21
indicate 48:16 111:18
indicated 42:22 43:18
  45:19 48:9 57:17
  61:10,17 62:8 66:19
  66:23 67:17 68:7
  73:13 75:6 85:21
  86:9 88:21 90:18
  103:5 104:18,22
  116:7,14,23 125:14
indicates 44:21 46:2,4
  46:10 48:18 108:21
  113:6 138:12,21
  140:4
indicating 76:17 77:18
  87:18 93:2 109:20
indication 60:2 120:6

138:12
indicator 13:6,11,15
  16:23 17:2,5,7,8,23
indicators 13:9 15:7,9
  16:4,9
indirect 143:2
individual 30:23 31:16
  32:12 33:9,11 42:17
  102:16
individuals 65:22
  99:20
industry 15:6
influence 110:10
influenced 64:6 65:23
  66:9,16 84:22 85:5
  85:16,18
information 13:8 14:3
  14:16,17,22 32:7
  35:15 36:10,19 38:1
  43:13 60:15 63:14,17
  63:21 64:23 66:4,21
  67:13 68:20 69:8,18
  70:1 73:6 79:3 82:15
  82:17,19 83:13,15
  84:1,12,23 85:13
  95:8 96:7 98:14 99:4
  99:13 101:23 102:1,7
  102:8 104:7,10
  105:13,17 106:3,6
  108:20 110:4 118:10
  120:11,20 121:5
  123:10 124:14,19
  127:12 129:5 137:2,4
  137:5 142:9 152:17
  152:20 169:16
informed 77:3
initial 152:5,7
initially 66:13 80:6
  128:13
inquire 72:17 142:2
inquiring 114:7
ins 150:19 153:21
inside 88:4 121:3
  141:21
insistent 68:4
insisting 67:23
inspection 118:5
instance 20:1,17 32:5
  35:11 38:4 39:1
Institute 6:7
instructions 18:5
instrument 95:19
insurance 5:23 7:4,7,11
  7:22 8:5 15:5,14
  27:14 28:2,4,9,13
  29:18 39:8,14,19,20
  40:7,10,15,19 41:7
  41:13,14,18 74:13
  77:5 153:15,18 162:4
  163:1
insure 111:19 112:7,9

112:13,16,17,21
  113:18,20 114:16
  115:11 123:8 167:11
insured 24:20 27:10,11
  28:5,8,12 29:17,18
  29:20 30:1,18 31:5
  31:11 32:7 33:6,21
  34:6 70:12 130:4
  143:20 162:7 164:6
insureds 57:18 59:1
  71:2,3 108:21 162:5
  162:12
insured's 25:6,15 26:15
  54:11 55:10 58:14
intend 109:2
intentional 39:17 40:5
  42:3 144:17
intentionally 27:12,23
  39:6,12
interact 14:22
interest 29:19,23
interested 17:16
internet 15:1 141:22
interpret 41:15 47:19
interrupt 132:16
  150:16
interview 66:5 74:13
interviewed 62:20
  63:14
investigate 18:15 30:7
  31:17 33:1
investigating 17:15
  107:4
investigation 18:21
  28:15 32:13 66:7
  101:22 102:6 106:10
  106:11,13 107:8,9,11
  108:17 120:20 122:2
  142:18 144:2,18
  145:8 165:3 167:4
  168:3,9,18,21 169:20
  170:14,16
investigative 10:12,18
  11:4 13:11 35:13
investigator 104:16
  105:5 106:7 107:1
involve 72:13
involved 13:2,13,16
  15:2,19,23 22:21,22
  31:16 33:10 51:20
  54:23 55:14 68:7,16
  68:23 72:1 75:8,15
  79:9 89:7 92:3
  104:20 135:6 139:9
  139:13,18,21,23
  140:4,8,9,10,11
  144:12,15 146:1,13
  146:17,21 152:4
  155:10 169:12,18
  170:12
involvement 13:4,10

68:13 164:11 165:5
involving 41:14 94:14
  134:3
issue 18:9 126:11 144:1
  155:20
issued 13:18,19 115:18
issues 32:14 55:13 98:9
item 62:6 100:12
items 33:3,14 59:2 60:5
  90:5 97:1 100:8,9
  105:10 115:16,19
  119:2 144:5 149:18
  156:13,20 157:8,11

**J**

J 13:23
jail 94:21
January 5:19
Jay 61:2
JEFFERSON 172:4
Jeffery 4:3
Jenia 61:7 62:7
Jere 161:12
Jessica 63:16,18 64:16
  89:12 134:9,21
jewelry 13:18 59:23
  86:3,7,9,10,15,16,20
  86:23 87:1,1,2,8,9,10
  87:15 90:14,20 98:8
  101:19 109:18,20
  110:18 111:9,12,16
  111:19,23 112:7,10
  112:12 113:1,6,8,12
  113:16,17,18,20
  114:16,20 115:2,4,12
  116:5,9,12 143:22
  150:11
job 10:15 12:9,14,16
  30:6 31:15 32:11
  68:10
jobs 7:4 9:8,9,13
Johnson 4:4
jointly 71:14
Joseph 159:23 160:1
  160:17
Jr 4:7,8 161:20
judge 154:15 161:5
judgment 8:3 122:1
  144:22 168:20
Julian 161:13
July 45:2,9 46:19 58:6
  86:2 90:23 116:6
  151:8 152:15
June 58:6 114:19 120:5
  120:22 121:7,10
  123:7 167:9,17

**K**

keep 150:15 158:22
Ken 61:22 62:12
Kentucky 86:1,3,13

**88:**5,10,18,23 101:16
**kept** 70:15 76:5
**key** 167:4 168:2,7,8,10
  168:17,18,22 169:4
  169:13,20 170:4,6,8
  170:14,16
**kidding** 12:7
**kidnapping** 80:3 91:17
  91:19
**kin** 172:15
**kind** 7:4 8:9 9:21 17:3
  70:23 96:20
**kinds** 7:18,20 162:10
  162:11
**Kirby** 3:5 4:3,4 5:1 7:7
  11:3 19:8,11 20:9,11
  20:15 21:10 24:9
  26:4 27:4 30:5,16
  31:9,18 32:2,18
  33:17 35:6 36:17
  37:1,6 40:22,20 41:1,6
  42:9 44:1,7,12 45:6
  47:13 51:8 55:3,19
  57:7,11 70:14,18,20
  70:23 71:23 72:8
  75:5,12 77:1 78:19
  78:21 79:1 85:10,18
  89:22 90:2 92:8
  93:19 100:4,9,11,15
  100:18 103:2,10,15
  106:19 110:9 113:13
  125:10 129:22 130:1
  130:10 131:15,20
  132:17,22 133:5,10
  145:6 147:3,18
  148:20,23 150:3,6
  156:6 157:23 158:9
  158:13 162:21
  168:16 170:22
**Kirkpatrick** 67:15,17
  67:19,21,23 68:5
  69:4,9 70:2 73:5,5,9
  73:16,18 74:7,8 75:5
  76:21 77:2 78:4,15
  79:3,19 93:13,14
  154:7
**Kirkpatrick's** 68:14
**knew** 52:9 62:21 79:23
  80:3,4 94:1 97:4
  106:3,11 127:20
  153:17,19
**know** 5:12,14 12:14
  15:7,10,11,14,16
  17:4 20:16 24:7,8,9
  30:6 32:16 33:12,14
  37:4 40:18 41:23
  46:12 56:23 60:10
  61:13 62:13,17 63:13
  65:14,18 66:23 67:1
  68:10,19 71:5,9,16
  71:19 72:8,9,11

74:15,16,19 75:1,9
  75:17,20 76:1,3,7,20
  77:1 81:14 86:9,16
  88:13 89:6,7,9 91:2,9
  93:17 94:3,12,16
  95:4,11,14,22 96:4,8
  96:11,15,22 98:13
  99:3,12 103:11 104:6
  104:13 105:23
  108:15 110:20,20
  111:14 112:8,16
  113:15 114:15
  118:12 120:16
  125:11 128:13 130:13
  142:8,13,14,23 144:8
  145:12 147:5 150:21
  151:14 152:3,16,17
  153:1,12,19 154:15
  156:17,19 157:10,12
  157:15 159:13 163:3
  163:11 169:8
**knowledge** 65:17 67:9
  69:1,4,10,20 82:10
  165:14,16 174:11
**known** 104:19,23 106:3
**knows** 104:19 109:16

—————————————
          **L**
**L** 1:15 21:13 22:17
**land** 126:13 134:8,8
**language** 39:23
**laptop** 141:14,17,18
**large** 86:5 87:18 90:16
  101:17,18,20 174:21
**late** 150:22 151:2,4,20
  152:1 153:21
**law** 4:8 15:6 153:14
**Lawrence** 2:2 4:20
**laws** 2:8 133:4,5,6
**lawsuit** 83:1,4,9,11
  134:3,20
**lawsuits** 14:4,5 133:11
**lawyer** 72:13 91:15
  92:8,10
**lawyers** 161:10
**lead** 104:15 105:4
  106:23
**leading** 2:13
**leave** 57:12 149:4
**leaves** 62:4
**leaving** 42:22,23 121:7
**Lee** 1:5 62:13,14,15
  102:16,17 103:2,8,11
  103:16
**left** 51:23 60:1 86:17
  87:15 88:23 115:3,21
  121:10 133:3 146:8
  152:13 154:16
**legal** 164:23
**length** 120:7
**Leon** 136:5

**letter** 3:10 20:5,8,13,16
  20:17 132:2,5,7
  158:10 161:17,21,22
  162:2,3,4,6,14,17
  164:5,7,15,22
**letters** 129:14 162:10
  162:11,11
**letting** 113:15
**let's** 42:20 57:2,3 59:7
  59:9 63:16 73:4
  78:22 79:22
**liar** 105:3
**lie** 105:1
**lied** 69:6
**liens** 79:8
**life** 7:21,21
**lightening** 34:17
**limit** 109:22
**limitations** 109:19
  111:14,17 113:12
**limited** 117:21 118:7
**limits** 40:3
**Linda** 61:3
**line** 123:3,19,20 124:5
  124:16 125:3,11,20
  126:2,7,14 131:20
  173:6
**lines** 123:11
**line's** 153:11
**Lisa** 77:14
**list** 16:3,8,12,14,16,18
  16:18 65:11,14,18
  158:20,22 160:13,14
**listed** 47:10
**listen** 22:10
**listing** 62:17 63:20
**lists** 63:13
**litigation** 134:14
**little** 5:16 6:1
**lived** 61:18 62:2 80:16
  93:8,17,22 94:1
  96:22
**LLC** 2:1 4:14,19 134:8
  134:9
**load** 149:4
**locate** 94:21
**located** 14:18 78:5
  119:9
**location** 86:10
**log** 80:21 81:13 82:4
**long** 4:18 7:1 8:2,12
  57:5,8,8 61:18 78:11
  78:13 120:16 133:8
  163:6,6,6,12
**look** 24:3,12 29:23 33:9
  34:5,7,10 35:12 36:1
  37:23 38:6,15 45:1
  59:9 97:7 118:10
  124:4,7 149:3 157:13
**looked** 43:18 88:5
  142:3,6

**looking** 21:11 24:16
  26:1 30:18 44:1 59:8
  108:2,4 109:8 119:21
  132:21
**looks** 100:22
**loose** 115:11 116:4
**lose** 68:2 70:5,6 155:23
  156:3
**loss** 14:2 24:23 25:8,11
  27:14,23 32:17 33:2
  33:13,13 34:7,9 39:9
  39:12 49:3,7,8,13,17
  49:19 50:7,9,9,17,23
  51:20 52:2 53:12,14
  53:17 68:17 71:12
  73:2 101:17 116:1
  139:14 142:23 144:3
  144:4,7,8,13,14,21
  145:2,11 146:1,13,14
  146:18 166:7,12,17
  166:18 170:12
**lost** 77:7 87:3,8 88:12
  90:5
**lot** 128:14 169:5,5,14
  170:2
**loyalties** 33:5
**Luverne** 68:8 70:9,10
  70:16 89:8 126:18

—————————————
          **M**
**mail** 115:22 161:17
**mails** 152:13
**maintaining** 145:21
**major** 58:20
**making** 23:1,5 44:12
  52:16 116:22 165:17
  170:10
**Male** 161:7,8
**man** 67:1 69:16
**management** 10:9,16
**manager** 20:21 21:5
  25:4
**Mangum** 119:6
**manner** 49:18 51:1
  166:13
**manual** 17:18,21 18:4
**marijuana** 98:11,17,23
  99:9 100:11 103:4,6
  103:17
**mark** 41:1 158:4
**marked** 100:22 158:6
  161:16
**material** 27:13 28:1
  39:7,13 40:6 42:4,13
  142:21 146:16
  164:13 165:12,21
  168:4 169:2,11,15
  170:10
**materials** 127:9
**matter** 125:1 127:5
**matters** 69:16,21

**McGill** 6:7,8
**McPhillips** 161:13
**McRae** 62:14,15,20
  102:17,17 103:3,8,11
  103:16
**mean** 7:6 9:15,21 10:23
  11:1,6,9 12:18 17:5
  17:12 19:3,6,21
  21:16 22:7,8,9 23:15
  28:19 30:6 31:23
  34:1,14 36:15 39:20
  39:21 41:9,12 45:22
  47:16 48:1,2,3 50:12
  52:3 55:18 56:3,12
  58:3,4,21 59:21 60:6
  64:18 66:3 69:7
  72:12 73:1,2 76:5
  82:18 83:1,8,21 84:4
  88:9 92:9 95:12
  98:13,15 99:3,7,17
  103:20,23 104:1,11
  110:9 111:12 112:18
  114:12 116:19
  118:11 120:14 122:8
  124:10,11 125:13,14
  126:3 127:15,17,19
  128:1,7,10,16 131:2
  136:12 143:6 144:4
  146:12,13,17 147:5
  148:1,4 150:4,16
  151:4,5,23 152:9
  153:15 156:10 157:2
  157:4,8 160:20
  162:23 164:7 165:10
  168:4 169:3,5 170:12
**means** 40:14 46:12
  51:18 143:1 144:8
  172:9
**meet** 38:7 64:2 82:12
  84:7
**meeting** 67:4 97:19
**meetings** 81:18,21
**Melanie** 109:8,9
  110:14,21 113:5,15
  114:1,2
**member** 17:11 24:4
  132:23
**memorabilia** 156:14
**memorized** 12:15
**memory** 43:2
**mention** 70:10 86:20
  102:16 112:6,18
  113:5
**mentioned** 59:10 70:9
  86:15 91:9 104:13
  113:17 156:7
**merely** 5:13
**merits** 30:8 31:1,16
  32:12 33:1
**messages** 115:22
  167:19

met 37:13 81:2,5,7,10
   81:12,14,15,15 82:4
   82:9,15 83:12 93:20
method 122:3
MIDDLE 1:2
mind 90:3 100:12
   103:13 110:4 116:23
   117:17
minded 38:14
minor 104:21
minute 42:1 86:21
   100:19
minutes 86:18
mislead 128:2
misrepresentation
   39:18 40:5 42:3,13
   42:16 44:14,15,19,20
   45:15,18 48:7,13
   67:8 69:13,23 135:19
   170:11
misrepresentations
   42:21 142:22 143:4
   165:15
misrepresented 27:12
   28:1 39:7,13 69:8
   146:16 164:13
   165:11,21
missing 157:1
Mitchell 77:14
mixing 113:2
Mobile 6:3,4,23 160:3
   160:4
moment 148:21
money 68:2 70:6 71:10
   71:17,19 72:9 73:22
   74:6,7,9,9 76:4,5,6
   76:20,21 89:14
   134:11
monies 95:1
Montgomery 2:2 4:21
   10:9,10 11:16,18
   119:10,11 160:10
month 114:6,10,13,17
monthly 120:3
months 37:17,19
   108:16
Moore 1:22 172:20
mortgage 126:17
mortgaged 89:15
   134:12
mortgages 127:10
mother-in-law 74:19
motion 58:8 95:2 121:2
   121:3 154:11,16,23
   155:21
motive 126:15,16
   144:19 145:9,12,12
   147:19,22 148:2,3,12
   148:12,13,15,22
Motors 133:12
move 37:5 57:12

155:12
moved 88:10,17
moving 38:22 75:9
multiple 30:14

───────────

N

N 1:15 3:2 4:1
name 5:2,17 8:22 35:12
   85:12 105:9 132:19
   133:4 159:12,13,17
   161:2,11,12
named 71:3 103:3,16
narrow 11:14
National 13:8 14:16,22
nature 63:2
Naylor 77:13,13
near 86:13 136:4
necessary 2:11 29:14
   73:3 82:23 109:3,6
   167:4 168:2,7,8,10
   168:17,18 169:4,13
   169:19 170:4,6,8,13
   170:16
necklace 101:21
need 5:13 14:11 18:8
   36:10,19 37:23 38:5
   38:5 42:9 48:2 56:7,8
   58:4 59:9 62:13
   66:15,15 83:10
   111:19 112:6 123:12
   124:10 157:3
needed 37:4,22 109:21
   114:12,15
negotiating 95:18
neighborhood 60:3
   61:13
neighbors 61:8 150:20
neither 62:5 172:14
NETLES 41:4
Nettles 4:13 7:6 11:1
   19:6 20:7,10,12 24:7
   26:3,21 27:1 30:3,13
   31:6,13,21 32:9 33:7
   33:22 34:23 36:13,22
   39:22 40:16,23 42:7
   44:6,23 45:3 47:3,8
   51:5 54:20 55:17
   57:5 70:13,15 71:21
   75:3 78:17,20,22
   85:3,16 89:20 93:18
   100:1,5,10,16 102:23
   103:14 106:15 110:7
   113:9 125:7 129:20
   131:10,19 132:15,18
   132:23 133:6 147:1
   147:14 148:18 150:2
   157:21 158:12
   162:18 168:12
never 61:19 93:23
   104:23 111:20
   113:17 115:22

127:22 128:6 136:3
   162:14,16
new 13:17,19 16:17
   110:19 112:2 117:13
NICB 13:5,11,15 14:14
   14:14 15:12 16:1,3,8
Nita 61:22 62:13
Nix 20:6,18,19 21:13
   22:2,17,22 23:3,13
   23:20 25:4 162:22
Nix's 22:6
North 4:5,15
Notary 174:21
notation 82:8
notations 81:13
note 73:15 82:3
noted 47:11
notice 2:19
notified 116:4
number 11:13 26:4
   27:5 46:21 101:9
   133:2,3
numbers 101:1

───────────

O

O 1:15 4:9
oath 49:4 49:12,21,23
   50:4,6 51:22 53:3,22
   87:13 105:9 136:2,14
   136:16 146:4 165:23
   166:6 169:7 170:11
object 30:3,13 31:6,13
   31:21 32:9 33:7,22
   34:23 36:13 39:22
   40:16,23 41:4 51:5
   54:20 85:3,8 106:15
   110:7 113:9 125:7
   131:10 148:18
   168:12
objections 2:12,15
obligations 28:7,8 67:5
obtain 32:7 73:6 120:9
   120:12 129:12
obtained 52:11 63:17
   66:6 95:11 105:11,20
   120:20 121:5
obviously 5:12 104:1
occasions 5:8 81:7,9
occur 43:16 144:3,4,14
   169:8
occurred 25:8 43:14
   87:14,20 101:17
   121:9 138:6
occurring 130:21
October 2:3
offered 2:17 105:12
   106:2,5
offering 105:17
offers 60:11
office 4:8 11:15,17 12:5
   14:1,19 109:13

114:11 116:2
offices 1:23
oh 7:10 45:5 47:6 60:21
   70:19 111:18 113:15
   143:10
okay 5:11 7:10,10 8:1,4
   9:17 10:4,13 11:20
   12:8 14:9,21 15:11
   16:8 18:13,18 19:18
   20:14 21:18 22:15
   23:10 24:2,9,12
   25:20 26:9,10,20
   27:8,9 28:3,21 29:8
   29:12 32:5 36:17
   41:21 42:11 43:4,21
   44:12 45:2,6,11,14
   46:1,8,14,20 47:12
   47:21 48:5,15,20
   49:19 50:8 51:2,7
   53:3,13,19 54:5 55:3
   56:19 57:6 58:21
   59:20 60:22 61:16,22
   63:23 64:4,11 66:19
   67:7 68:13 69:1 70:7
   70:11,19,22,23 71:5
   73:9 75:15 76:10,18
   76:19 78:3,14 79:15
   79:18 81:4 82:3 83:6
   84:13 85:21 86:21
   87:6,16 88:14,19
   89:1 90:21 91:23
   92:16 94:18 97:4,12
   97:23 98:3,6 100:14
   100:20 101:6,11,13
   102:3,11 104:1,12
   105:6 106:7 108:8
   111:4,5,6 112:11
   113:18,23 114:19,23
   115:18 120:18
   122:19 124:13,22
   125:1 128:7 129:7,11
   129:16 132:10 137:7
   137:12 138:18,20
   139:20 140:15 141:9
   141:21 142:15
   143:20 145:14 146:2
   147:13 148:11
   150:18 151:23 153:5
   153:20 155:14 156:4
   159:21 160:4,12,16
   161:10 162:16,21
   163:16,21 164:3,15
   165:17 166:14
   168:14 169:23
   170:20
old 115:13
once 169:15
ones 59:3 101:7 138:1
   160:20
ongoing 106:11 107:12
open 32:22 127:2,4

operates 124:6
operating 122:23
operational 18:4
Operations 17:21,22
opined 120:6
opinion 66:17 125:19
   125:23 130:7 141:10
   145:22 146:17 155:6
opinions 125:4,11
opportunity 117:14
opposed 167:7
order 28:11
ordinary 63:4
organization 15:5
ought 54:19 55:10
   118:23
outcome 84:2
outset 32:19
outside 92:4,6,12
overall 158:15
owe 33:4
owed 134:11
owned 112:3 127:11
owner 77:13

───────────

P

P 1:15 4:1,1,9
Pace 61:22 62:2,7,13
pad 42:8
page 3:4 21:15 24:13
   24:14,14 45:4,5,5
   60:20,23 88:1 101:15
   102:21,22 103:6
   108:1 130:3 133:9
   140:16 159:23 160:1
   160:5,17 167:1 173:6
pages 99:17 136:16,18
   136:23
paid 19:1,5,5 31:5,12
   32:8,20 71:5,7 72:9
   95:1 99:23 117:18
   137:13,14,22
painting 137:18 157:14
paintings 129:22 140:7
   140:10
PAP 109:17 114:7,8
paragraph 27:21 50:12
   50:16 53:23 119:23
   122:22 164:8 166:5
Park 4:15 129:15
part 11:22 18:16 69:2
   98:20 130:23 134:2
   134:22 135:1,11,14
   135:22 136:10,14,20
   136:23 144:19 145:9
participants 21:14
   108:4
participated 53:12,14
   53:17 141:11,16
   145:1,2,16 146:10
   147:6,10

participating 89:10
participation 144:20
  145:10
particular 17:10 18:9
  19:18,23 29:15 32:5
  32:15 39:1 161:20
  162:2
particularly 86:4
particulars 96:4
parties 1:17 2:14
  172:15
Pat 1:20 5:4 20:23
  21:23 23:2 24:17
  26:12 35:12 54:8
  56:6 173:3 174:5,14
Paul 1:22 172:20
pawn 156:21
pay 19:16 24:4 95:1
payable 74:17
paying 67:4 68:10,11
  89:9
payment 71:14 73:14
  74:22 75:2 76:2,11
  76:14,15 94:22
payments 75:16,18,20
  137:15,17 140:15,16
  140:17
pays 15:12
peer 44:9
pending 14:4 60:7
  94:22 154:4 155:21
penitentiary 80:5 91:3
  92:5
penny 76:8
people 22:2 62:18 63:9
  63:21 65:11,14,16
  85:13 97:14 113:3
  128:14
peoples 85:12
performed 108:22
period 37:17,19 38:19
  58:11 62:8,10
periodic 120:2
periodically 62:23
Perry 118:11,12
  123:18
person 36:4 37:3,13
  56:6 77:14 84:17
  104:2 109:10 111:7
  116:14 119:1 157:13
  167:8
personal 24:19 25:5,14
  25:23 26:14 27:18
  39:10 49:4 54:10
  72:5,6,13,15 109:15
  111:15 114:8 166:2
  166:18
personally 15:8
phone 115:20,21
  123:19 126:13
  153:11

photographs 38:10
  100:23 101:2,3
Picasso 157:14
picture 54:6 134:16,19
  149:7
piece 115:12 116:5,8,12
pieces 101:18
Pittman 1:4,5 37:8,9
  42:5,6,18,18,20
  44:14,20 45:19 48:8
  48:23 49:1 52:7
  58:17 61:11 62:22
  63:16,18 64:16 67:15
  67:19,22 68:1,12
  69:15,18 70:4 71:4
  71:15 72:18 73:12,14
  73:15,20,21 75:7,17
  76:1,3,8 79:7 85:22
  86:4,9,11,15,19
  87:12 89:17 96:23
  97:5 98:10,16,23
  99:8 101:3 103:5
  105:8 108:11 109:13
  109:20,23 110:21
  111:18 112:2 114:14
  115:20,23 116:1,11
  120:9,13,22 126:12
  131:17,21 132:1
  134:6,10,10,21 136:2
  137:16 142:20
  143:14 144:20 145:1
  145:10,17,17,23
  148:6 150:22 151:3
  161:18,19 164:11
  165:3 167:7 169:12
  169:17 170:15
Pittmans 37:7 38:20
  51:11 62:11 122:23
  138:1,8,15 139:7,8
  140:23 141:3,16
  144:9 161:23 167:5
  168:19 169:7 170:17
Pittman's 35:12 66:21
  69:10 86:8 89:7,12
  90:17 101:19 165:4
place 4:15 100:15
  119:23 120:5 155:9
places 120:4
PLAINTIFF 4:2
Plaintiffs 1:7
plaintiff's 3:10 158:5,6
  159:17 161:16
player 141:15
please 5:2 60:20
pled 94:20
plus 74:9
point 14:10 93:18
  116:22 128:1 129:1
  167:22
police 94:11 104:14
  151:12

policies 24:21 25:8,16
  25:22 26:16,19 27:2
  27:3 54:13
policy 13:17,19 16:17
  24:19,22 25:6,9,9,14
  25:22,23 26:14 27:10
  27:11,15,19,22 28:4
  28:13 33:4 34:8,10
  35:2,7 39:4,6,10,11
  39:23 40:3,4,11,22
  41:2,16,19 49:5,15
  50:21 54:10 60:1
  71:1,6 109:15,22
  110:3,5,19 111:13,15
  111:17 112:2 113:12
  114:8,21 115:18
  116:6,20 117:1,13
  150:11 164:19 166:2
  166:3,4,9,17
policyholder 32:1
portion 28:13
portions 137:12,14
position 10:9,11
possession 86:4,7 87:19
  90:17,20 101:19
possessions 144:10
possible 17:4,6,8 32:20
  111:14
possibly 66:22 86:5
pouch 86:19
preferred 97:21
premises 101:3
premium 109:16
  113:17 115:4
present 12:5 13:9
presentation 164:14
  165:12,13
presented 49:11
presenting 165:15
pretty 60:19 138:18
  156:8
previous 83:15
previously 82:15 83:14
  100:21 136:9 166:5
  167:17
prior 60:3,3 97:1
  104:21 110:19 129:8
  138:13 150:19,19
  153:21 154:9
prison 80:12,13,15
private 67:1 69:15
probably 20:2 72:3
  107:14 159:8 166:23
problem 130:11
problems 14:4 60:3
  61:19 62:3 63:5
  66:22 69:19,22 74:4
  127:3,19
procedure 18:16
proceeding 135:7,9
  160:14

proceeds 72:18,19
process 18:19 22:21
  52:12 68:12 128:11
  136:14
processed 36:12
procure 49:12 50:7,10
  50:16 166:7
procured 57:19 145:2
procurement 144:21
  145:11 146:18,21,22
procuring 50:8,9 51:14
  139:14 146:14
  164:12 165:5,7
progressed 10:2
progression 10:2
promotes 121:12
promotion 9:23
prompt 30:10
promptly 152:7
proof 49:3,7,8,19
properly 32:23 122:23
  123:4 124:17 151:5
Properties 68:15
property 7:20,20 8:10
  8:11 67:14,18,20
  68:1,3,8 69:5 70:9
  72:5,5,6,14,15,15
  89:8 96:9,12 98:11
  98:17 99:1,9 103:4
  103:17 126:18 134:6
  149:2 154:18,21
  163:8 166:18
prove 149:1,9
proves 53:17
provide 63:22 85:1,14
provided 18:10 63:15
  63:22 66:4 73:13
  82:16 83:14 84:1
  99:4 102:1,8 104:7
  104:10 116:11
  136:13 137:2,5
  142:19 143:21
  152:18
provision 24:21 25:7
  25:16,18,20,21 26:1
  26:2,5,6,16,18,19
  27:16,19,20 28:17
  29:5,7 54:12 55:11
provisions 29:9 49:14
  50:20 164:19 166:9
public 127:6 163:2,2
  174:21
pull 96:5
punched 43:2,3,4 146:8
punching 43:7
purchase 59:23 110:18
  126:16 143:22
purchased 16:18 73:9
  154:7
purchasing 150:10
purpose 164:5

pursuant 28:12
pushed 146:7 169:9
put 15:7 86:16,16
  131:8 169:5,5,14
  170:2
P.C 4:4
p.m 45:13 47:13 122:20

_____

             Q

question 20:12,14 23:4
  26:10 30:4,14 31:7,8
  31:14,22 32:10 33:8
  33:23 35:1 36:14
  40:17 41:1 51:6,7
  54:21 63:7,11,12
  64:18 72:20,23 85:4
  85:7,9,11 95:4 98:21
  102:3 106:16 110:8
  113:10 121:12 125:8
  129:3 130:5 131:11
  138:7,14,17,19 141:8
  148:19 157:18 158:2
  168:13,14
questions 2:13,14
  30:15,17 36:3,5
  37:20,21 56:10 172:8
quick 129:22
quiet 61:21
quite 16:21 42:11
quote 113:16
quoted 109:14

_____

             R

R 4:1,7,8 161:19 172:1
raised 6:2
Randy 60:18
reached 117:22
reactivated 45:16
reactivation 45:17
read 22:3 26:18 27:8
  27:20 39:2 51:3,8,14
  53:22 55:6 57:1 78:9
  78:12 97:10 123:23
  166:5 167:23 168:17
  173:6 174:6
reading 2:5 47:18
real 61:4 72:5,14
  142:10
really 98:15 100:13
Realty 77:13
rear 43:19 53:9
reason 28:17,22 78:3
  112:14 113:4 117:1
  130:16,18 131:1,4,8
  131:17 132:1 135:23
  137:1 148:6,14
  149:14,16 154:20
  155:15 164:10,18
  173:6 174:8
reasoning 87:1 88:14
reasons 28:19 29:2

131:7 136:18 165:8
**recall** 14:8 43:2 44:22
   56:4 91:23 92:18,21
   93:3 95:13 109:19
   137:11 159:3,5,8,10
   160:8,17 162:18,20
   163:5
**recalled** 158:11
**recalls** 87:23 88:3
**receive** 116:2 132:10
**received** 13:22 72:19
   96:13 101:23 102:7
   115:23 120:15 132:8
   167:5 168:19 170:14
   170:17
**receiving** 96:9,12
**reckless** 94:16 95:5,12
   95:15
**recommend** 25:13 39:2
   66:10 69:3 73:7
   85:14 88:8 99:19,22
   110:16 117:18 130:7
   133:13,15
**recommendation** 19:7
   19:12,13,14 21:4,5
   21:23 22:1,5,6 23:14
   24:13,17,23 25:3,12
   26:12 28:22,23 29:4
   29:9 52:20 54:6,8
   55:7,9,12,18,20
   56:17,23 61:9 62:1
   63:10,19 64:6,12
   65:1,10,23 79:12,16
   84:22 89:2 98:19
   99:10 102:14,20
   116:16 133:18
   135:17 136:11 155:3
   168:22
**recommendations**
   22:10,12 23:2,5,13
   23:19,20 55:21 59:15
**recommended** 29:4
   131:9 134:13,23
   135:12,23 137:13
**recommending** 41:10
   74:2 103:19 110:5
**recommends** 24:18
   25:4 26:13 54:9
**record** 21:8 43:23
   44:11 93:5 97:20
   98:3 103:9 127:6
   170:21
**recorded** 24:5 97:16,18
   97:22 98:11 123:4
   124:17 125:17
   167:19,20
**recordings** 125:5
**records** 48:15 52:5
   125:15 127:5
**redacted** 132:20 133:4
**Rediker** 4:14

**refer** 14:11 18:9 29:14
   29:14 58:1 80:21
   102:15
**reference** 17:18 106:17
**referred** 16:23 168:16
**referring** 135:8 144:7
**refusal** 64:19
**regard** 120:15 127:15
**regarding** 120:11,21
   134:8 135:5 166:16
**regards** 13:18 42:13
   43:1 112:23 113:12
**Regions** 155:9,11,22
**relate** 39:18 40:10,15
   54:1
**related** 9:15 31:3 72:4
   113:3 119:3 166:3
**relating** 2:9 27:13 28:2
   39:8,14 40:6,18 41:2
   41:6,13,15,18 57:21
**relation** 53:1,8 59:12
   79:5,13 110:18 111:1
   111:12 115:8 129:6
   140:2 146:11 154:3,6
   156:15
**relative** 57:16
**relayed** 117:15,20
**relevant** 123:5 124:18
**remain** 8:2
**remember** 59:12 61:18
   77:17 82:11 95:20
   160:9,22 161:3,5,10
**remembered** 70:21
**reminded** 132:18
**removal** 140:6,10
**removed** 137:19
   139:23 157:8
**render** 49:15 50:21
   166:10
**rendered** 24:1,22 25:10
   Renfroe 21:13 22:17
**repair** 96:16 137:18
**repeat** 20:14 26:10
   51:7 98:20 102:3
   125:9 145:6 168:14
**replacement** 137:22
   140:18
**report** 20:3 21:12
   23:16,21 29:10 43:22
   44:5,9,21 45:12 46:2
   46:10,21 47:10,11,14
   47:18 48:18 52:10
   55:16,20 56:18,20
   57:1,22 58:3 59:8
   61:2 63:13,20 64:8
   64:17 65:22 79:2
   101:15 105:10,11,15
   105:19,20 107:22
   119:22 123:17 124:1
   124:3,4,6,11,14,22
   125:13 126:3,5

**128**:11 130:2,3,15,21
   131:2,6,8,13,21
   132:11,14,20 133:9
   138:4,11 142:16
   151:5,7 166:20
   167:21
**reported** 13:20 34:15
   60:14 104:16 116:6
   134:1,18 141:1,6
   143:23 144:21
   145:11 157:9 167:22
**reporting** 57:15 150:22
   151:2,4 152:1 153:21
**reports** 45:1 52:7 94:18
   127:8 128:15,19,21
   129:8 153:22
**Represent** 55:17
**representation** 55:16
**representative** 9:18
   10:5,17,19 12:17
   21:1,4 24:17 25:12
   55:19 64:2 78:2
   152:5,7 165:1
**representatives** 10:22
   11:23
**represented** 143:14
**representing** 29:19
   30:1 31:19,23 32:2
**represents** 172:11
**requested** 116:13
   129:12
**resolution** 131:14
**respective** 1:18
**responding** 60:12
   152:6
**responsibilities** 32:6
**responsibility** 29:22
   31:10
**restitution** 94:22 95:1
**restore** 46:7,22 47:23
**restored** 45:8 46:17
   47:1 48:4,6
**result** 105:7 137:19
   172:16
**resulted** 79:4
**resume** 119:18
**return** 73:20,22 74:6
   115:23 138:13
**returned** 126:13
   138:11
**revealed** 144:18 145:8
   165:4
**review** 12:19 26:8 30:6
   41:22,23 44:9 56:8
   95:6
**reviewed** 23:22 42:2
   100:6
**revoke** 95:2
**Rhonda** 1:5 42:6,18,20
   49:1 71:4,15 116:9

**142**:19 161:19
**ride** 85:22 86:2
**right** 7:1 11:8 12:21
   13:21 17:9 18:10
   19:23,23 21:10,15,19
   21:20 22:16 23:6,15
   26:5,9 27:4,15 32:3
   34:18 35:9,17,19
   37:10 38:9 43:5 44:5
   44:6 46:9 48:12
   49:22 50:18 53:6,11
   55:5,8,23 56:15
   57:23 58:12 59:7
   60:9 62:12,19 63:16
   71:13 73:4,11 76:18
   77:6 78:8 81:2 87:21
   88:16 89:13 91:4
   93:21 96:8 100:20
   101:9,14 103:2
   105:22 107:10
   108:12,15 109:10
   113:6,13 115:16
   117:5,14 118:4 119:7
   125:19 126:1,5,9,10
   129:1 131:15 132:22
   133:10 138:14 139:6
   142:11 143:3,16
   144:9 146:6 148:1,23
   149:13,15,21 151:10
   154:8,19 157:7,20
   159:10,14 162:8
   163:11,23 164:20
   165:11 166:20 168:6
**ring** 101:20
**robbery** 91:17,19
   92:20 94:9
**role** 17:12 20:19
**room** 156:14
**Rufus** 4:7,8 161:19
**ruled** 154:14,15
**rules** 2:9
**ruling** 154:14

_____

**S**

**s** 1:15 4:1,13 116:22
**safe** 86:10 98:9 157:6
**SAITH** 171:1
**sale** 60:11 61:5 79:5
   141:23
**satisfactory** 71:8
**saw** 86:22 87:9,18 88:6
   90:14,16 101:17
   149:3
**saying** 23:10 36:23
   44:13 46:15 48:22
   50:3,10 51:12 52:13
   53:16 57:20 58:21
   64:14 69:6 70:15
   84:10 85:13,19 87:7
   87:7,22 112:11,12
   127:1,1 128:2,22

**129**:4 131:4 135:10
   138:7,10,15 139:6,7
   139:9 143:8 144:5,9
   144:12 147:5,15,16
   147:20 166:15 170:3
**says** 25:12 26:12 39:10
   40:4,11,12 41:6
   46:21 47:13 48:19
   53:7 69:14 74:5
   87:22 98:10 101:15
   106:7 109:12 115:19
   120:19 126:8 161:17
   164:22 167:3
**school** 6:4,6
**schooling** 6:19
**Scientific** 44:2
**searches** 127:11
**second** 112:19 122:22
**second-degree** 94:19
**secret** 127:18
**section** 27:6,6 142:16
   142:17 166:3
**sections** 39:2 61:1
**security** 57:16 59:17
   118:23 119:7,13,16
   120:10,12 123:15
   148:13,17 149:12
**see** 21:3 24:3 25:3
   28:21,22 29:3,8
   30:10 31:11 32:8,20
   34:8,11,18 47:14
   58:12 61:14,14 62:9
   63:3 78:23 84:14
   97:7,8 99:15 108:3
   112:11 124:6,7,7
   130:11 131:16 142:3
   163:10 167:2
**seeing** 21:12 31:5 86:23
   87:2 108:2
**seen** 16:11,18 76:14
   86:3 89:9 90:4 97:13
**selected** 60:4 150:13,16
   153:20 156:9,10
**senior** 148:21
**sent** 132:2 153:12
   161:22 162:3,4,6,10
   162:14 164:5,16,22
   164:23
**sentence** 94:21 131:6,7
   170:13
**separate** 18:14 20:10
   174:8
**September** 95:2
**sequence** 47:10
**serious** 98:12
**serve** 136:10
**served** 91:10 131:8
   133:21 134:22
   135:11 136:16,23
   153:4
**service** 15:3 30:10

53:16
set 38:7 43:19 51:23
    53:4 58:5 63:1 121:7
    121:17 122:12,15
    123:15 146:12
sets 28:7 164:18,19
setting 53:15 101:20,21
    167:12
seven 121:8,14 167:11
severe 52:1 59:22
    150:7
SF001137 44:2
SF001283 44:4
sheet 21:6,7 107:23
    174:8
sheetrock 137:18
    139:22 140:12,13
sheriff 108:13 157:19
sheriff's 14:1 60:13
    61:3 104:17 106:9
    107:2 152:18 153:22
    156:16
Short 57:10 100:17
    129:23
shortly 60:1 116:21
show 20:1 100:21
    108:1 138:23 158:4,9
showed 20:4 105:19
showing 70:2 139:4
shown 141:22 161:15
shows 125:2 146:20
SICU 10:16
sides 32:3
signal 153:12
signature 2:5 174:1
signed 20:16 49:19
    162:16,22
significance 88:7
    102:19 103:13,18
    155:18
significant 90:6,10
    100:8,9,12 102:14
signing 53:21 165:23
Simmons 61:3
simple 138:18
simply 29:13 144:5
single 130:15 131:6,20
sir 5:3,15 6:9 7:14,17
    8:21 9:4,6,11 10:14
    10:20 12:13 13:12
    14:13 15:13,13,17
    16:10,13,19,21 17:1
    18:2 22:4,23 24:11
    25:2 28:20 29:21
    30:20 32:4 35:23
    38:2,23 40:12 45:10
    48:14 53:18 54:4
    60:18 74:18,23 77:10
    79:17 80:13 81:6
    91:1,5 93:6 96:14
    101:8 102:4,10

105:18 108:14 114:9
    114:18 119:8 128:23
    130:22 134:1 135:3
    135:18 139:10,15,19
    140:8 141:13 142:12
    144:13 147:23 159:1
    160:15 161:6 170:2,7
sit 7:2 14:7 15:13 22:9
    42:12 56:3 68:22
    79:20 81:11 89:23
    95:12,20 96:17
    120:14 137:10 156:5
    159:2 165:10,16
site 68:11 92:23
sitting 162:18,20
situation 53:4 58:18
    126:20,23 127:2,17
    137:8 138:4 165:20
    170:10
SIU 10:13,19,21 11:3
    11:21 12:16,21 17:11
six 108:16 161:9
size 86:6
skipped 36:18
Slaughter 2:1 4:14,19
Smith 4:7,8 21:13
    22:17 76:23 161:20
    164:9,23
sold 67:15 74:5 154:7
    154:21
Solomon 13:23 61:3
    152:18,20
somebody 59:4 117:23
    149:6 157:2,16
son's 156:13
sorry 15:17 47:7 60:21
    70:18 84:16,16
    102:21 103:15 109:4
    132:6 143:10,11
    145:7 148:20 150:23
    159:21 168:15
sort 98:9
sounds 92:11
South 2:1 4:20
SOUTHERN 1:3
speak 58:3 157:16
speaking 11:2 71:22
    75:4 147:1
speaks 34:1 39:23
    56:20 64:9 116:19
    126:3 131:3
special 10:11,18 11:3
    13:1 35:13
specialist 119:8 119:4
specific 131:16 135:22
    136:7
specifically 69:12
    99:21 136:4 139:16
specifics 130:17
Spence 65:6 66:2 67:17
    67:21 68:7,15 69:14

69:15 89:6
spend 170:22
sports 156:14
Springhill 6:11
staff 109:10 111:7
stand 13:7 170:5
standpoint 90:4
stands 14:14 124:11
stapled 101:1
start 21:12 34:19 42:20
    59:8 80:19
started 7:3 9:22 10:4
starting 57:3
state 1:10 5:23 8:15,17
    8:20,22 9:9,20 10:7
    14:21 17:17 18:11
    28:5,8 29:23 31:23
    33:6 35:8,14,21
    49:16 50:22 65:7
    71:8 72:22 78:1 80:4
    93:12 109:9 112:23
    129:17 131:23 141:7
    151:17 152:14
    153:13 158:17,19
    159:13 160:10
    161:22 164:16
    165:17,22 166:1,6,11
    169:7 170:11 172:3
    174:2,21
stated 54:8 69:15,20
    101:19 114:14 174:7
statement 49:3,6,20,22
    51:9,12,17 56:7
    69:14 77:19,22 78:4
    78:9,16 93:10 102:5
    103:12,16 116:14
    124:3 136:22 143:12
    167:1,3 168:3
statements 51:2,13
    128:6
states 1:1 58:9 164:7
    173:3
stating 58:18 79:8
status 107:10
stay 43:19 44:17 58:6
    121:1 122:15 146:7
    167:7
stayed 110:2
steal 141:5,12,18
    144:11 148:8 149:6
    152:22 156:19,20
stealing 97:1 141:11,16
stenotype 172:8
Stephens 21:13 22:18
STIPULATED 1:16
    2:4,10,18
stipulations 35:3
stole 144:10 156:22
stolen 59:2,3 88:12
    90:5,15 96:9,12,13
    116:9 140:22 141:2,4

141:6 143:23 144:6
    148:7 149:2 152:22
stone 86:5 87:18 90:16
    101:17,20 112:3,4,20
    115:11 116:4
stood 68:2
stop 5:13 100:15
stopped 50:13
store 6:23
storm 34:17
straight 46:1 72:10
Street 2:2 4:20
structure 94:5
stuff 148:7 149:4,7
submit 128:13,15
submitted 19:20,21
    49:2 79:7,10 129:14
    130:2
submitting 166:1
SUBSCRIBED 174:15
subsequent 133:1
substantial 68:2 70:6
    87:15 90:20 142:20
    144:19 145:9
Sue 160:6,7,16 161:14
suffered 34:6
Suite 4:15
Suits 100:16
summary 65:15
summer 80:8,19 81:16
    82:2,5,10,13,20 91:4
    93:9 110:23
Sunday 151:16
supplied 60:15
suppliers 60:11
support 67:4 169:10
supported 15:5
supports 101:23 102:7
    142:21
supposed 30:21
sure 14:19 20:15 34:2
    35:6 36:11 40:2
    44:13 48:20 51:8
    57:7 58:2 72:12
    80:22 84:4 95:7
    98:22 102:5 111:11
    115:2 121:16 125:10
    132:17 145:8 152:11
    161:2 168:16
surmised 87:10
surmising 87:4
suspended 94:22
suspicions 77:12
    121:19
suspicious 62:10 63:5
    77:15
Sutler 22:18
Sutter 21:16,19 22:19
    22:20
swearing 49:11,21 50:6
    51:22 53:22 146:4

166:6,10 169:7
sworn 49:2,6 58:17
    79:6 90:17 96:21,23
    174:15
system 38:15 42:14,15
    42:16 43:1,20 45:16
    46:5,7,8,11,13,15,16
    46:23 47:2,14 48:5
    51:21 53:1,10,15
    54:2,16 57:13,16,17
    58:7,10,23 59:17,21
    96:6 104:21 117:15
    119:3 120:4,7,12,21
    120:22 121:1,6,14,16
    122:10,13,19,23
    123:4,7,10,19 124:5
    124:5,16 125:3,4,12
    126:6 139:5 140:4
    143:6,9,12 145:19
    146:15 147:7 148:13
    148:17 149:12 153:7
    153:9 167:5,6,9,10
    167:14,15,16 168:19
    169:6 170:15,18
systems 119:7,13,17

**T**

T 1:15,15 172:1,1
take 5:13 9:7 38:11
    41:22 57:6,8 95:7
    98:12 101:5,7 110:3
    114:21 129:20
taken 1:22 38:16 43:20
    60:6 77:19,22 78:4,9
    93:11 101:2,4 116:20
    117:2 122:9,9 130:8
    133:3 146:14 149:17
    156:12,15 161:11
    172:7
talk 62:12,18 64:10,14
    64:19 65:16 78:8
    79:23 82:14,16,20
    83:2 84:11 93:15
    102:17 119:11
    123:12 124:10
    126:15,18 127:21
talked 63:14,21 65:12
    65:14 77:4 78:14
    80:1 84:15,17 93:19
    98:7,8 102:11 103:11
    104:12 107:14
    108:12 109:13 113:2
    114:12 135:19
    165:18
talking 11:9 16:1 25:21
    26:6 27:16 28:16
    39:16 40:9 42:17
    45:18 51:16,17 54:3
    57:21 59:11 64:21
    66:1 80:19 85:20
    86:22 90:7 91:8

102:12 105:2,14
110:21,22 111:8
112:5 113:4 114:3
121:2,21,22 126:19
130:2 135:20 143:4
144:23 145:12,15
146:22 147:3,18,19
148:5,21 159:6,19
166:21 168:1,9
**talks** 114:1
**taught** 17:19
**taxes** 77:7
**Taylor** 64:3,10 77:23
77:23 93:10
**team** 20:21 21:5 25:4
**tear** 139:12
**tearing** 138:16 139:11
139:21 140:11
**technical** 118:8 119:2
**technology** 118:8
**telephone** 15:1 66:5
78:10 123:3,11
124:16 125:2 133:2,3
152:12
**televisions** 140:19,21
141:11 156:12
**tell** 5:16 13:15 14:14
17:2 29:16 35:12,15
35:20 36:7,18 37:23
40:13 41:21 42:2
50:14 53:14 66:8
74:8 75:12 77:9,11
77:16 80:14 83:6,9
91:6,14,18 92:16,19
92:22 97:23 110:9
130:14 157:19 158:1
**telling** 40:7 70:4 83:8
90:22 99:7 113:7
129:2
**ten** 5:10,11 46:2 62:3,6
158:15
**ten-part** 163:3
**Teresa** 65:6 66:2 69:14
**term** 41:11
**terminology** 35:17
**testified** 100:2 110:1
120:23 136:2 158:11
158:20,23 159:4,11
159:18 160:13,23
167:8
**testimony** 58:17 83:2,3
83:7,10 90:18 100:2
135:22 136:8,12
142:19 172:12 173:4
174:7,10
**Testing** 44:2
**Thank** 70:21 133:10
**theft** 13:20 34:16,21,22
35:2 57:18,19 58:15
60:4,14,14 61:14
87:3,14,19 88:17

90:6,19,23 94:20,21
95:22 96:2 97:1
104:16,17 105:10,15
105:19,20 106:14
107:1,5 108:22,22
116:6 122:4 133:20
134:1,18 135:15
140:5 141:1 144:21
145:2,11,17 146:10
146:22,23 147:6,11
148:14 149:11,23
150:13,16 153:20
156:9,10 157:9
164:12 165:5,8
167:22 169:12
**thefts** 61:20 104:21
**themself** 57:18
**thereto** 172:9
**thing** 33:18 34:4,7,10
34:13,14 103:7
104:14 130:15
132:16
**things** 16:17,22 57:12
59:7,10,11,18,19
65:19 78:15 98:7
100:3 104:3,4,13
126:22 153:2 157:5
165:21
**think** 5:8 10:4 12:1
27:5 38:16 44:3 47:3
54:13 56:11 59:1
68:5,17 72:14 79:19
79:21 81:9 85:2
89:15 90:1 91:13
98:15 99:7 108:3
112:11 117:18
120:17 124:8 146:20
147:6,12,14 149:1,23
156:6,8 157:17
158:15 159:17,23
160:19,20 161:1,1
165:7,9 166:4,14
167:23
**thinking** 153:23 157:13
**third** 129:3
**third-degree** 94:21
**thirty** 86:17
**thirty-five** 86:18
**thirty-three** 9:2
**thirty-two** 9:4,5
**Thomas** 67:15
**thought** 21:20 54:14
56:2 102:23 104:2
118:22 121:19
123:23
**thoughts** 165:6
**three** 61:12 81:11,12
81:14
**thumbnail** 86:6 101:18
**tied** 75:10
**time** 2:16,16 14:11 38:3

38:19 41:22 45:11,15
46:2 47:23 52:2 57:8
62:9,11 63:1 67:4
77:3,8 78:11,13 81:5
89:16 91:10 93:18
95:7 101:22 102:6
107:13 111:5 112:4
112:20 116:4 120:1,7
120:16 123:1,6
124:18 125:17 129:3
133:20,23 134:17
135:15 152:4 155:7
163:6,6,12 170:23
**times** 5:10,11 38:4 68:6
81:11,12,14 121:8,14
167:11
**title** 10:15 74:12 77:5
77:14 127:11
**today** 7:2 9:13 12:12
14:7 15:13 42:12
43:22 44:22 56:3
68:23 79:20,21 81:11
89:23 91:23 95:13,20
96:17 120:14 137:10
147:12 156:5 159:22
160:21 162:19,20
165:10,16 169:23
**Todd** 1:4 42:5,17 48:23
52:7 71:3,15 96:22
103:5 142:19 161:18
165:2
**Todd's** 103:4,17
**told** 15:16 36:1 37:2
52:3,7 53:3 54:15
55:23 61:1,2,4,23
62:14 65:7,12 66:13
66:17 72:1 75:7 80:9
80:11,18 83:11 89:1
91:3,6,13,21 92:11
92:12 97:5 98:6,22
101:16 103:23
108:19,23 114:23
115:10 116:7 117:19
122:20 131:17,21,23
143:12 145:3 146:20
147:8 158:14 165:8
**Tony** 22:2 23:3,13,20
25:4 162:22
**tool** 17:4,6
**top** 57:3 87:22 88:2,3
103:6,10
**tore** 138:1
**tornado** 34:17
**total** 121:8
**totality** 51:19 52:17,18
59:20 66:12,15
130:20
**touch** 52:6
**touched** 62:6
**town** 86:13 115:1
125:18

**trailer** 87:23 88:4,22
88:22
**training** 162:8
**transaction** 74:10
**transcribed** 172:9
**transcript** 172:12
174:6,9
**transcription** 172:10
**transferred** 10:8
**transpired** 123:5
124:18
**trial** 2:16 56:10 117:7
**trials** 160:22,23
**tried** 115:20
**triggered** 12:23
**triggers** 13:4
**trip** 42:23 60:1 86:1,12
90:22 101:16 110:19
112:8,21 113:20
114:10 116:21 117:2
150:11 154:10
**trouble** 128:3 130:4
147:21 148:9
**truck** 149:8
**true** 66:18 73:4 98:16
102:2 134:5 135:4
169:23 172:11
174:10
**truth** 53:15
**try** 33:18,20 159:3
**trying** 10:1 12:1 21:22
43:2 99:18 123:22
124:2 130:14,17
138:17 154:20 168:7
**turn** 45:20,22,23 48:11
108:8
**turned** 46:14,15,16
47:20,21 48:17 58:8
**turning** 46:13
**TVs** 141:3,4 156:20,22
157:4,7
**twelve** 5:10,11 158:15
**two** 46:6,18 60:12
113:2 115:13,16,19
126:14 134:9 148:23
165:20
**two-and-a-half** 113:21
113:23
**type** 7:19 9:23 62:4

_____
**U**

**U** 1:15
**Uh-huh** 76:17 93:2
**unaware** 93:8
**understand** 20:18 23:4
31:8 34:4 44:13
47:16 48:21,21 55:15
56:15,16,16 60:23
63:7,10,12 64:18
69:5 71:18 85:4 87:6
87:21 90:21 93:14

99:5 106:16 117:11
119:21 129:8,13
143:14 147:7 148:1
148:11 149:8 150:12
156:13 166:15
**understanding** 15:4
22:13 43:17 57:13
62:22 72:3 76:12
92:15 102:9 106:10
106:22 107:6 119:15
122:18 123:14,17,20
138:3,20 154:9,17
155:8,11 164:4 167:3
168:1,8
**understood** 67:7 79:6
100:10
**Underwriter** 163:9
**underwriting** 115:9
**unit** 10:12,18 11:4 13:1
35:13
**UNITED** 1:1
**unloading** 87:23 88:3
**unlocked** 62:5
**unoccupied** 94:4
**unprotected** 123:9
167:16
**unusual** 62:9 128:16
152:3,16,21 153:13
**upset** 89:17
**use** 22:7 36:15 42:7,10
82:6 99:9
**uses** 111:16
**usually** 152:2
**utilize** 15:10 18:5

_____
**V**

**v** 1:8
**vacation** 120:2 123:2
**valuable** 157:5
**value** 33:3 60:5 156:12
157:15
**vandalism** 61:20
150:20
**various** 9:8 18:5,6 61:1
100:23
**vehicle** 87:23 88:3
**vehicles** 6:5 127:11
**Ventures** 134:8,9
**verify** 143:21
**viewed** 142:2
**violate** 49:14 50:20
166:9
**voice** 115:22 152:13
**void** 24:22 25:10 27:10
27:22 39:5,11 49:15
50:21 166:10
**voluntarily** 105:17
**vote** 22:5,7,15 24:3
**voted** 24:4

_____
**W**

waived 2:6,20
walls 137:18,20
want 11:13 26:11 29:12
  40:13 41:21 42:2,7
  57:9 78:8 89:20 98:1
  112:13,17 117:7
  124:8 128:12,14
  129:20 159:12 167:2
wanted 38:11 67:19
  73:16,20,20 83:20
  84:11 86:10 98:23
  105:23 106:1 114:15
  115:1 118:9,17
  121:16 123:7
wanting 59:18 70:3
  111:22 114:21
wants 112:9,21 113:20
wasn't 76:13 113:1
  156:14
way 11:20 15:18 28:4
  47:4 60:23 72:11
  132:15 137:23
  146:12 149:9
ways 149:1
Webb 60:16,17 68:6
  79:22,23,23 80:20
  81:2 84:14,15,18,20
  85:1,7,20,21 86:22
  87:2,9,17,23 88:2,5
  88:21 89:1,5,11
  90:21 91:2 93:15,20
  94:19 95:9 97:13,15
  98:22 99:4 100:2
  101:15 102:1,9,11,13
  103:7,12,23 104:2,7
  104:19,20,23 105:1,3
  105:9,16 106:1,2
website 142:3
week 13:18 112:8,19,21
  113:19 114:11
  115:10 117:2 150:11
weeks 115:1
weight 169:6,14 170:2
went 6:20 38:9 47:9
  59:16 76:6 82:19
  83:2,13,16 84:7 92:1
  92:5 102:12 110:22
  113:2 122:11 130:6
  130:19 157:2
West 129:15
we'll 36:9 57:8
we're 10:23 11:6 19:15
  36:20 57:7 66:1
  85:20 113:2 121:20
  121:21 144:12
  159:16,22 166:21
we've 39:1 51:21 62:12
  65:12 98:7 102:11
  135:19 148:4 165:18
whatsoever 76:4
William 60:16,17 79:22

84:14,18,23 104:19
  105:3
wind 34:17
WINDHAM 1:4
wishes 173:3
withdrawn 95:3
withheld 127:13
witness 2:6 26:22 47:6
  47:12 70:19,22 87:9
  90:3 149:3 157:22
  172:13 173:3 174:1,5
witnesses 63:13
Wonder 153:17
wondering 9:22
word 22:7 35:4 36:15
  56:22 111:16 147:15
  157:14 170:4
words 34:16 36:22
  123:13 169:19,21
work 6:21 8:16 32:6
  36:8,19,20 44:10
  118:1,1,7 119:1
  125:4,12,20 126:1
worked 7:8 9:2 89:8
  96:22 129:16 158:16
workforce 6:19,20
working 30:10 35:11
  38:20
works 11:21 15:16
  22:14 24:10 123:10
  123:19 126:6
world 110:10
worried 11:11
worthless 95:18
wouldn't 12:6 122:7
  125:22 128:17
  153:11 157:5,10,15
wrap 88:7
wrapped 88:6
written 12:9,14
wrong 35:4 125:20
  155:12
wrote 35:6 74:20,21

X

X 3:2

Y

yard 62:5
yeah 9:21 11:11 12:1,1
  12:2 20:9 21:17 29:6
  31:9 32:4 35:2 37:1,2
  38:7 55:13 59:14
  63:12 78:13,21 79:14
  83:11 84:1 86:2
  94:13 95:6 99:6
  126:8 127:17 129:19
  135:10 143:2 150:3
  151:19 152:9 153:20
  158:13 159:16,20
  163:5

year 6:14 8:13,16 9:5
  97:1
years 7:2 8:3 9:2 10:10
  62:3,6 104:19 106:4
  112:4 113:21,23
  115:13 161:9
year-and-a-half 8:13
Young 2:1 4:14,19
y'all 14:23 65:15 78:20
  127:10,11 132:16
  153:17
y'all's 22:10,11

Z

Zone 45:7,16 46:7,16
  46:22 47:1,23 48:4,6
  53:15 58:7 121:8,16
  121:21 123:8 135:21
  147:7 167:11,15,16
zones 120:8

$

$1,200 109:16
$10,000 73:13,21,23
  74:14,16 76:11,13,22
$15,000 76:22,23 77:2
$3,238.70 137:17
$4,520.33 140:17
$9,000 76:16,18

0

07 113:11

1

1 3:10 27:6 158:5,6
  161:16
1:11-CV-202 1:8
10 95:2
10:50 45:13 47:13
  122:20
11 45:8,16 46:7,16,22
  47:1,23 48:4,6 53:16
  58:7 121:8,16,21
  123:8 135:21 147:7
  161:21 167:11,15,16
  167:17
11th 114:20
1139 102:23
12th 152:15
12:30 89:21
1400 4:15
158 3:10
16 120:22 121:10 123:7
  167:9
16th 58:6
1611 100:22 101:11
1613 101:11
1615 101:11
1617 101:11
1619 101:11
1619-B 101:12

1621 101:12
1623 101:12
1625 101:12
1627 101:12
1629 101:13
1631 101:13
1633 101:13,14
17 60:21 81:4,15
17th 81:3
18 88:2 120:5 121:7
18-page 77:19,22
19 103:6,10
1951 5:19
1973 6:15,18
1978 8:18,20
198 136:16,17,23

2

2 27:5,6,21
20th 140:18
2001 4:15
2007 4:5 95:10 109:12
  110:23 112:5,13,16
2008 95:10
2009 94:20 130:5
2010 58:6,7 67:16
  73:12 86:1,2 91:1
  116:7 120:5,23 121:7
  123:7 130:5 167:9,17
2011 2:3 81:3,4,15
  97:20 107:19,20
  108:7 140:18 161:21
  174:17
23 119:22
24 120:19
24th 5:19
25 122:22
29 130:3
29th 66:5

3

3rd 4:5
305 2:1 4:20
3359 100:22
35203 4:6,16
36104 2:2 4:21
36302 4:10
37 140:17
38 101:15

4

4 45:5
4th 45:2,9 46:19 58:6
  90:23 138:11 151:10
  151:12,14
41 21:6,7 24:15 166:20
  166:22
42 21:6,7 24:15 60:21
  88:2 99:17 101:15
  103:6,10 119:22
  120:19 166:21,23

42-page 130:15

5

5 3:5 107:19 108:3
5th 2:3 107:20
5683 88:1
5725 26:2,3
5729 24:15

6

6th 108:7,8
6629 4:9

7

7 46:22 47:4,10
7th 116:7 151:8,18
  152:13
78 10:5

8

8 46:21 47:5,9

9

911 126:13
97 136:6



**State Farm Fire and Casualty Company**

Home Office, Bloomington, Illinois 61710

April 11, 2011

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
Mr. Todd Pittman
Mrs. Rhonda Pittman
c/o Attorney Rufus R. Smith, Jr.

RE:  Claim Number:  01-Q278-187          **REDACTED**
       Policy Number:  01-GW-4934-4
       Date of Loss: 7-4-10

       Claim Number:  01-Q279-037
       Policy Number:  01-BE-Y465-6
       Date of Loss: 7-4-10

Dear Attorney Smith:

This letter is being sent to you as legal representative of the above named insureds.  After careful consideration, the claims of your clients', Mr. and Mrs. Todd Pittman are hereby denied.  Our investigation has revealed Mr. & Mrs. Pittman's involvement in procuring or causing the theft and they misrepresented material facts in the presentation of this claim.

Your clients' homeowner's policy provides, in pertinent part:

**SECTION I AND II – CONDITIONS**

      2.  **Concealment or Fraud.**  This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

......

**SECTION I – LOSSES INSURED**

......

**COVERAGE B – PERSONAL PROPERTY**

We insure for accidental direct physical loss to property described in Coverge B caused by the following perils, except as provided in **SECTION I – LOSSES NOT INSURED:**

......

      9.  **Theft,** including attempted theft and loss of property from a known location when it is probable that the property has been stolen.



PLAINTIFF'S
EXHIBIT
_____/_____
CRAIG

# State Farm Insurance Companies



Letter
Page Two
April 11, 2011

This peril does not include:

......

b.  loss caused by theft:

(1)  committed by an insured or by any other person
regularly residing on the **insured location.** Property
of a student who is an insured is covered while
located at a residence away from home, if the theft is
committed by a person who is not an **insured;**

......

In addition, your clients' Personal Articles Policy provides in pertinent part:

### CONDITIONS

......

2.        **Concealment or Fraud.** This entire policy, will be void if, whether before or
after a loss, you have intentionally concealed or misrepresented a material
fact or circumstance relating to this insurance.

......

As a result of the above mentioned determination, these policies are rendered void as of the date of loss. Any
unearned premium will be returned in separate correspondence.

By calling your attention in this letter to certain provisions of your clients' policies, State Farm Fire and Casualty
Company does not intend to de-emphasize or waive any other provisions of the policies. State Farm Fire and Casualty
Company fully and completely reserves all of its rights under the applicable policies.

Sincerely,

Tony D. Nix CPCU, CIFI
Team Manager
State Farm Fire and Casualty Company

cc:  Attorney Bert Nettles
Claim Representative Pat Craig

HOME OFFICES:  BLOOMINGTON, ILLINOIS 61710-0001