**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| WINDHAM TODD PITTMAN and RHONDA LEE PITTMAN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:11-cv-202-MEF (WO—Publish) |
| STATE FARM FIRE AND CASUALTY COMPANY, a stock company, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

Despite experiencing extreme financial difficulty at the time, Todd and Rhonda Pittman—the plaintiffs in this case—went on a European vacation in the summer of 2010. They returned stateside to a burglarized home; their art collection was missing as were two pieces of expensive jewelry. Seeking recompense, they filed a claim with State Farm, their insurer. Rather than cutting a check immediately, State Farm decided to take a closer look at the Pittmans' claim after the police expressed skepticism about the alleged burglary. The ensuing investigation revealed a number of anomalies, and although the Pittmans partially cooperated, they admittedly failed to provide State Farm with the banking and credit card information it requested to help with its investigation. The Pittmans ended up filing suit and State Farm concluded that it should deny the

1

couple's claims. Now the insurer has moved for summary judgment, arguing that the Pittmans' failure to discharge their post-loss duties vitiates their claims. The Court agrees, and for the reasons discussed below, summary judgment is due to be GRANTED in State Farm's favor.

## II. JURISDICTION & VENUE

The Court has jurisdiction over this case under the diversity statute, 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000 and the parties hail from different states. The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations to support both.

## III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present

2

evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). And a genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of

material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ.

P. 56(c).

## IV. THE RELEVANT FACTS[1]

### A. Background

Todd and Rhonda Pittman have been married for 16 years. (T. Pittman Dep. 20.)

Todd worked as the self-employed owner of two Florida companies—Land Ventures for

Two, L.L.C., and Land Management, L.L.C. (*Id.* at 81–82.) Rhonda kept the home. (R.

Pittman Dep. 27–28.) In May of 2006, the Pittmans bought and moved into a new house

in Daleville, Alabama. (T. Pittman Dep. 151.)

To safeguard their purchase, they bought an alarm system through ADT. (T.

Pittman Dep. 164–65.) The system included a siren, sensors on each outside door, and a

motion detector in the living room. (*Id.* at 166.) The only entry points to the house were

the front door, a back door off the dining room, a back door off the master bedroom, and

a door inside the garage. (*Id.* at 161.) The outside doors had working deadbolts and a

keyless entry lock. (T. Pittman Dep. 161–62; R. Pittman Dep. 70.) Moreover, only

members of the Pittman family had keys to the house and knowledge of the ADT alarm

---

[1] In constructing the facts, the Court has relied on Todd Pittman's Deposition (Doc. # 22-2, -3) and the exhibits submitted during his questioning (Docs. # 22-4–22-10); Rhonda Pittman's Deposition (Doc. # 23-1) and the exhibits submitted during her questioning (Docs. # 23-1–23-4); Pat Craig's Deposition (Doc. # 23-5); Perry Hopkins' Deposition (Doc. # 23-6); Thomas Kirkpatrick's Deposition (Doc. # 23-7); Teresa Spence's Deposition (Doc. # 24-1) and the exhibits submitted during her questioning (Doc. # 24-2); various pictures of the Pittmans' home (Docs. # 24-3–24-5); William Webb's Deposition (Doc. # 25-1) and the related exhibits (Docs. 25-2, -3); and Tony Nix's affidavit and attached exhibits (Doc. # 25-4).

codes. (T. Pittman Dep. 172; R. Pittman Dep. 72, 76.)

The Pittmans had good cause to keep such tight security. The couple collected art avidly, keeping many of their favorite works in their Daleville home. (T. Pittman Dep. Ex. 15.) In addition to the artwork, the Pittmans also owned two pieces of rather expensive jewelry. The first was a 5.5 carat loose diamond that Todd bought in 2006. (*Id.* at Exs. 15, 18, 19.) The second was a 11.97 carat diamond bracelet purchased in 2008. (*Id.*)

### B. The insurance policies

### 1. The homeowner's policy

State Farm insured the Pittmans' Daleville residence under a policy purchased by the couple when they bought their home. In 2007, Todd Pittman visited the office of State Farm agent Melanie Garner to ask her some questions about the insurance covering the Pittmans' artwork. (Craig Dep. 109–10.) After Mr. Pittman gave Garner a value for the artwork, the two discussed coverage options and eventually decided to increase the limits of the homeowner's policy held by the Pittmans. (Nix Aff. Ex. 3, at 12.) The relevant portions of the policy, with their original emphasis, read as follows:

#### DECLARATIONS CONTINUED

We agree to provide the insurance described in this policy:

1. based on your payment of premium for the coverages you chose;

2. based on your compliance with all applicable provisions of this policy; and

5

3.      in reliance on your statements in these **Declarations**.

. . .

## SECTION I – COVERAGES

### COVERAGE B – PERSONAL PROPERTY

1.      **Property Covered.** We cover personal property owned or used by an **insured** while it is anywhere in the world.

. . .

## SECTION I – LOSSES INSURED

### COVERAGE B – PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, . . . .

9.      **Theft,** including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

This peril does not include:

. . .

b.      loss caused by theft:

(1)      committed by an **insured** or by any other person regularly residing on the insured location.

. . .

## SECTION I – CONDITIONS

2.      **Your Duties After Loss.** After a loss to which this insurance may apply, you shall see that the following duties are performed:

a.      give immediate notice to us or our agent. Also

notify the police if the loss is caused by theft. . . . .
. . .

c.      prepare an inventory of damaged or stolen personal
        property. Show in detail the quantity, description,
        age, replacement cost, and amount of loss. Attach to
        the inventory all bills, receipts and related
        documents that substantiate the figures in the
        inventory;

d.      as often as we reasonably require:
        . . .

        (2)     provide us with records and documents we
                request and permit us to make copies;

        (3)     submit to and subscribe, while not in the
                presence of any other **insured**:

                (a) statements; and

                (b) examinations under oath; and

        (4)     produce employees, members of the
                insured's household or others for
                examination under oath to the extent it is
                within the insured's power to do so; and

e.      submit to us, within 60 days after the loss, your
        signed, sworn proof of loss which sets forth, to the
        best of your knowledge and belief:

        (1)     the time and cause of loss;

        (2)     interest of the insured and all others in the
                property involved and all encumbrances on
                the property;

        (3)     other insurance which may cover the loss;
                . . .

        (6)     an inventory of damaged or stolen property
                described in 2.c;

7

. . .

6.      **Suit Against Us.** No action shall be brought unless there
has been compliance with the policy provisions.

. . .

8.      **Loss Payment.** We will adjust all losses with you. . . . Loss
will be payable 60 days after we receive your proof of loss
and:

      a.      reach agreement with you;

      b.      there is an entry of final judgment; or

      c.      there is a filing of an appraisal award with us.

. . .

12.     **Intentional Acts.** If you or any person insured under this
policy causes or procures a loss to property covered under
this policy for the purpose of obtaining insurance benefits,
then this policy is void and we will not pay you or any other
**insured** for this loss.

### SECTION I AND SECTION II – CONDITIONS

2.      **Concealment or Fraud.** This policy is void as to you and
any other **insured**, if you or any other **insured** under this
policy has intentionally concealed or misrepresented any
material fact or circumstance relating to this insurance,
whether before or after a loss.

(R. Pittman Dep. Ex. 3.)

## 2. The personal articles policy

On June 11, 2010—six days before the Pittmans were to leave for Europe—Todd

Pittman visited the office of State Farm agent Melanie Garner ("Garner") once again, this

time inquiring about a personal articles policy. (Craig Dep. 113–14; T. Pittman Dep. 294;

R. Pittman Dep. 14.) Pittman spoke with Garner's assistant, Audrey Grice ("Grice"), telling her that he wanted to take out a policy that day on some jewelry. (Craig Dep. 113–14.) He presented Grice with the necessary appraisals, and told her that he needed the policy soon because he was going out of town and wanted the jewelry insured before he left. (*Id.* at 114–15.) After Pittman completed an application, Grice accepted his first premium payment and bound coverage. (*Id.* at 114–15.) The relevant portions of the policy, with their original emphasis, read as follows:

**PROPERTY COVERED**

We cover the Classes of Property shown in the Declarations.

**LOSSES INSURED AND LOSSES NOT INSURED**

We insure for accidental direct physical loss or damage to the property covered . . . .

**CONDITIONS**

2.    **Concealment or Fraud.** This entire policy will be void if, whether before or after a loss, you have intentionally concealed or misrepresented a material fact or circumstance relating to this insurance.

. . .

7.    **Your Duties After Loss.** In case a covered loss occurs, you must:

. . .

   b.    report as soon as practicable in writing to us or our agent any loss or damage which may become a claim under this policy . . .

8.    **Examination Under Oath.** You agree:

9

. . .

    d.    to produce such records as we may need to verify the claim and its amount, and to permit copies of such records to be made if needed.

9.    **Suit Against Us.** No action will be brought unless:

    a.    there has been compliance with the policy provisions; and

    b.    the loss has become payable as specified in the **CONDITION** entitled **"Loss Payment."**

. . .

10.    **Loss Payment.** We will adjust all losses with you. . . . Loss will be payable 60 days after we receive your Proof of Loss and:

    a.    we reach agreement with you;

    b.    there is an entry of a final judgment; or

    c.    there is a filing of an appraisal award with us.

(R. Pittman Dep. Ex. 2.)

## C. The loss and its aftermath

The Pittmans, on June 16, 2010, embarked for a European vacation set to include a Mediterranean cruise and which would culminate in Venice, Italy. (T. Pittman Dep. Ex. 20.) Before leaving the house that day, they armed their security system. (*Id.*) Then they proceeded to the Dothan, Alabama, airport to catch their flight. (*Id.*)

On July 4, the Pittmans returned stateside to a burglarized home. (T. Pittman Dep. 234; R. Pittman Dep. 117.) Rhonda Pittman entered the house first, and, as she did, the alarm remained silent. (T. Pittman Dep. 234; R. Pittman Dep. 121.) When Todd tried to

call the police from the home phone, the line was dead; he used his cell phone to call 911 instead. (T. Pittman Dep. Ex. 17, at 108.) About 15 or 20 minutes after Todd's call, Sheriff's Deputies Jay Soloman ("Soloman") and Tim Forehand ("Forehand")—both of the Geneva County Sheriff's Department—arrived at the scene. (*Id.* at 237, 240, Ex. 21.)

Three days later, Todd Pittman reported the loss to Melanie Garner at the local State Farm office. (T. Pittman Dep. 255.) State Farm assigned a claim representative to the case who tried to call the Pittmans that day. After leaving voicemail messages on the Pittmans' home phone and on each one's cell phone, the claim representative did not receive a call back until five days later when Rhonda Pittman returned the calls and provided the initial information about their loss. (Craig Dep. 152.)

On July 14, 2010, the claim representative assigned to the Pittmans' case received a call from Deputy Jay Soloman, the officer who had responded to Todd Pittman's 911 call. (Craig Dep. 13–14.) Soloman told the representative he had concerns about the burglary and that he planned on opening an investigation about the incident. (*Id.*) Due to Soloman's concerns, and because one of the Pittmans' claims involved a policy issued only days before the loss, State Farm decided to launch an investigation too. (*Id.* at 13.)

### D. The investigation

At the outset State Farm asked the Pittmans to provide documentation supporting their claims. This included a July 12 request for the Pittmans to produce "documentation of ownership of the items stolen," including, "cancelled checks, receipts, credit card

statements" and similar documents. (T. Pittman Dep. 268, Ex. 25.) State Farm then took

the Pittmans' file and referred it internally to its Special Investigations Unit (SIU) on July

19, 2010.[2] The case landed on the desk of SIU Claim Representative Pat Craig ("Craig").

(Nix Aff. 3.)

The next day Craig called Todd Pittman and, after a follow up call the day after

that, the two men made plans to meet at the Pittmans' home on July 26, 2010. During the

meeting, Craig learned from Todd and Rhonda that they were having financial and legal

problems—they had several lawsuits and judgments pending against them,[3] one of their

businesses was in bankruptcy, and their home was tied up in the bankruptcy proceedings.

(Craig Dep. 14; T. Pittman Dep. Ex. 25.) In light of these revelations, Craig asked the

Pittmans to provide documentation of their financial problems, which included a request

for a mortgage payment history, individual credit reports, and a credit report for Land

Ventures for Two, L.L.C. (T. Pittman Dep. Ex. 26.) Craig also gave the couple the option

of having him gather the information by asking them to sign an authorization form that

would allow him to do so. (*Id.* at 269–70, Ex. 26.) But Todd Pittman declined, refusing

---

[2] In addition to Deputy Soloman's concerns and the timing of the loss, State Farm also relied on the National Insurance Crime Bureau's indicators for potential fraud. (Craig Dep. 12–14.) The Bureau maintains the list of indicators to provide a tool to the insurance industry and law enforcement in their efforts to investigate and combat insurance fraud. (*Id.* at 15–17.)

[3] In 2010, Todd Pittman had a $42,800 judgment entered against as a result of a lawsuit filed against him by Bondy Motors over a car he had purchased. (T. Pittman Dep. Ex. 2.) Southeast Alabama Medical Center had a pending $13,429.38 judgment against Todd, too, (*id.* at 66–67), as did Farm Credit of Northwest Florida, which had a $771,829.97 judgment for debts owed under promissory notes that Todd had guaranteed (*id.*).

both to sign the authorization form and to provide the information until he could speak with a lawyer. (*Id.*)

The Pittmans did, however, produce a number of documents that State Farm asked for. By July 26, 2010, they had completed personal property inventory forms listing the property allegedly stolen from their Daleville home. (T. Pittman Dep. 174–76, Exs. 15, 26.) Attached to these forms were appraisal documents, photos of the art, and an estimate from a gun dealer valuing some guns allegedly taken from the Pittmans' home. (*Id.* at 174–76, Exs. 15, 26.) Two days later, the couple agreed to allow Perry Hopkins, an electrical engineer hired by State Farm, inspect their alarm system. (T. Pittman Dep. 285, Exs. 24, 31; R. Pittman Dep. 148–49; Hopkins Dep. 30, 74–75.)

Craig followed up with the Pittmans by way of an August 11, 2010, letter. (T. Pittman Dep. 271–72, Ex. 27.) He reminded the Pittmans of the "Duties After Loss" condition in the policy requiring them to "provide us with records we request and permit us to make copies" (*id.* at Ex. 27), and he repeated his request for financial documents (*id.*). In addition, Craig made a "formal request" for records held by the Pittmans or records that they could obtain covering any art purchases they made during their European vacation using their onboard credit card, as well as any credit card records or canceled checks relating to their art purchases during the relevant period. (*Id.*) Although Craig offered to reimburse the couple for any expenses incurred in obtaining the records, Todd Pittman demurred, saying only that he wanted counsel to represent him. (*Id.* at

13

272.) Rhonda Pittman failed to respond altogether. (R. Pittman Dep. 139–40.)

In another letter, which was dated August 19, 2010, Craig asked the Pittmans for documentation concerning the jewelry allegedly stolen from their home. (T. Pittman Dep. 273, Ex. 28; R. Pittman Dep. 140–141.) More specifically, he sought from them "any credit card record or canceled checks or bank statements that you have in your possession or you can obtain" supporting the purchase of the loose diamond and diamond bracelet insured by State Farm. (T. Pittman Dep. 273, Ex. 28.) Todd Pittman claimed he did not have these records, and he never asked the vendors from whom he purchased the jewelry to provide them. (*Id.* at 276–77.) He also once again refused to sign an authorization form that would have allowed Craig to gather the requested documents. (*Id.*)

Tony Nix, a State Farm team manager, wrote a letter to the Pittmans on August 23, 2010. (R. Pittman Dep. 141.) Like Craig, he reiterated the Pittmans' duties and obligations under the policy. (*Id.*) A few weeks later, on September 10, 2010, Craig again followed up with the Pittmans with two letters. In the first, he documented their failure to produce the requested records of the jewelry purchases and their refusal to sign the authorization form, calling the information "relevant and material to the investigation, evaluation and review of" the Pittmans' claim. (T. Pittman Dep. 275, Ex. 30.) Craig's second letter made yet another request for the documents related to the Pittmans' artwork purchases, asking the Pittmans to provide credit card statements, bank statements, and cancelled checks, or to sign an authorization form allowing State Farm to

procure the documents. (T. Pittman Dep. 278–79, Ex. 31.) Furthermore, he again reminded the Pittmans that they had thus far failed to produce information relevant and material to the investigation, evaluation, and review of their claim. (*Id.*)

On September 14, 2010, the Pittmans completed and signed proof of loss forms. They claimed a $70,276 loss under the Personal Articles Policy (for the jewelry); a $3,236.70 loss under Coverage A of their Homeowner's Policy (for damage from the break in); and $426,365 under Coverage B of the Homeowner's policy (for the artwork). (T. Pittman Dep. Exs. 36, 37.) They also represented under oath that they did not cause the loss, conceal information regarding the loss, attempt to deceive State Farm, or do anything else to violate the insurance policies governing their claims. (*Id.*)

The Pittmans responded through their attorney to the two letters Craig had sent on November 12, 2010. (T. Pittman Dep. 281, Ex. 32.) The response had with it some of the requested documents, including documentation for the artwork the Pittmans purchased from Park West Gallery along with a copy of their mortgage payment history. (*Id.*) But it did not contain documentation of their other artwork, their credit reports, or receipts for the purchase of the jewelry. (*See id.*) The Pittmans partly remedied this, however, when they gave State Farm some credit reports on December 13. (T. Pittman Dep. 134–35, Ex. 12; R. Pittman Dep. 50–51, Ex. 6.) The credit reports revealed a grim financial picture for the Pittmans. They had a $658,700 balance on their mortgage with $40,090 of that amount past due. (T. Pittman Dep. 140, Ex. 12; R. Pittman Dep. 54, Ex. 6.) In addition,

they had well over $200,000 in other debt—all of it past due as well. (*See, e.g.*, T.

Pittman Dep. 140–42, Ex. 12; R. Pittman Dep. 55–62, Ex. 6.)

The Pittmans began to produce more information once the new year rolled around.

They sat for an examination under oath in January of 2011. And on February 2, they

furnished a copy of their travel itinerary for their European vacation to State Farm. (T.

Pittman Dep. 281–82, Ex. 33.) They also returned signed errata sheets to the court

reporter who observed their examinations and produced copies of the ADT records that

State Farm had asked for on February 28.[4] (*Id.* at 283, Ex. 34.)

Meanwhile, Perry Hopkins gave State Farm a report detailing his findings about

the Pittmans' alarm system. (Hopkins Dep. 55; Nix. Aff. Ex. 1.) He found that, based on

his analysis of the data stored on the Pittmans' alarm system control panel, the alarm had

been set in "stay" mode, which disarms the interior sensors, rather than "away" mode,

which would have left them armed, right before the Pittmans left for vacation. (Hopkins

Dep. 149, 151–52.) In addition, he found that the alarm sensor on the master bedroom's

exterior door was bypassed on the day the Pittmans departed and the motion sensors were

disabled. (*Id.* at 149, 151–52, 164.) State Farm sought and received a second opinion

from Shelton Mangum, and after using all of the information available to Hopkins,

Mangum concurred with Hopkins' findings. (Hopkins Dep. 62–63; Nix Aff. Ex. 2.)

Despite their willingness to cooperate in some respects, the Pittmans never

---

[4] The Pittmans' attorney included in the February 28 response a demand that State Farm pay their claim. (T. Pittman Dep. 283, Ex. 34.)

produced the credit and bank account records that Craig had requested. (*See* T. Pittman Dep. 283.) Rhonda Pittman never gathered the requested bank statements and banking information, nor did she see to it that Todd or anyone else did either. (R. Pittman Dep. 49.) She also admitted that she never tried to contact their credit card companies to request statements and account information. (*Id.* at 64–65.) And neither Todd nor Rhonda have disputed that they refused to execute authorizations that would have allowed State Farm to gather the information.

### E. The Pittmans' lawsuit and State Farm's denial of their claims

The Pittmans filed this suit on March 18, 2011. (Doc. # 1.) Their complaint contained two counts—one for breach of contract and one for bad faith arising from State Farm's alleged refusal to pay their claims. (*Id.*) At that time, State Farm had yet to make a final decision regarding the Pittmans' claims, so it went ahead and proceeded with its review. (Craig Dep. 23–24.) The insurer went on to conclude the process and produce a Claim Committee Report recommending the denial of both claims under the homeowner's policy and personal articles policy. (Craig Dep. 21–25; Nix. Aff. Ex. 3.) From there, Craig sent a denial letter to the Pittmans' lawyer informing the couple that State Farm was denying their claims due to their involvement in causing the loss. (Craig Dep. 20.) Craig elaborated on the denial by noting how the Pittmans' claim fell outside the "theft" covered in Coverage B and that it additionally ran afoul of the "Intentional Acts" and "Fraud and Concealment" conditions placed on the policies. (*Id.*)

## V. Discussion

### A. Background on insurance principles

Insurance operates on the principal of indemnity: its purpose is to protect an insured against loss, not to create an opportunity for gain. To this end, a person seeking to guard against the risk of loss contractually transfers a specified risk to an insurer in exchange for a payment called a premium. This gives the insured the right to demand a payment from the insurer if the loss occurs—but only so long as the conditions stated in the policy are satisfied.

While insurance has unquestionable benefits, it also creates it own set of problems. The most important and troublesome of which is moral hazard—the idea that having insurance creates an incentive for a policyholder to change his or her behavior because someone else bears the potential loss.[5] Moral hazard usually rears its ugly head in one of two ways. The first involves a situation where someone buys insurance intending to cause the loss so he or she can collect the proceeds. Indeed, many a movie plot centers on a life insurance beneficiary plotting to kill an insured relative so the slayer can enjoy a large payday. The second type refers to a situation where having insurance causes the insured to relax the level of care he takes in safeguarding his property. He knows the insurer will bear the loss, and so he considers it a waste of time, money, and effort to take much care in securing the insured property.

---

[5] The problem of moral hazard is not strictly limited to the field of insurance. It also explains why landlords require security deposits and no one vacuums his or her hotel room before departing.

18

To combat moral hazard, insurance companies impose limits on what they cover and require a minimum level of conduct from the insured. In the health insurance arena, for example, insurers require co-pays from insureds. This discourages unnecessary doctors visits and makes sure the insured bears some responsibility for the cost of care. When it comes to life and property insurance, underwriters will only issue policies to a person with an insurable interest; that is, someone interested in the continued existence of the person or property insured. Other tools used by insurance companies include limiting the insurance payout to the insured property's fair market value; excluding certain types of losses; requiring cooperation from the insured when the insurer is investigating a loss; employing fraud investigators; and obligating the insured to take certain measures to minimize the risk of loss (like requiring a homeowner to have a smoke detector).

### B. Analysis

Under Alabama law, "a contract of insurance is essentially like all other contracts, and governed by general rules of contract." *Pate v. Rollison Logging Equip., Inc.*, 628 So. 2d 337, 345 (Ala. 1993) (internal citations omitted). To succeed on a breach of contract claim, a plaintiff has to prove four elements: "(1) the existence of a valid contract binding the parties in the action; (2) [the plaintiff's] own performance under the contract; (3) the defendant's nonperformance; and (4) damages. *Emps. Benefit Ass'n v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998) (citing *S. Med. Health Sys., Inc. v. Vaughn*,

669 So. 2d 98, 99 (Ala. 1995)). Although the same general rules govern garden variety

contract actions and insurance contract disputes, Alabama has a well-settled canon of

construction calling for courts to construe insurance contracts liberally in favor of the

insured and strictly against the insurer. *Rogers v. State Farm Fire & Cas. Co.*, 984 So. 2d

382, 392 (Ala. 2007) (quoting *Allstate Ins. Co. v. Skelton*, 675 So. 2d 377, 379 (Ala.

1996)).

State Farm contends that the Pittmans refused to provide documents to the insurer

that it reasonably requested and which would have helped with its ongoing fraud

investigation. In State Farm's view, the Pittmans' failure either to turn over the requested

banking and credit card information or to execute an authorization form allowing it to

gather the records means that the couple never triggered the insurer's duty to cover their

loss. Similarly, State Farm argues that the Pittmans filed suit too early, because the

applicable policies say that claims are not payable until 60 days after the insurer receives

properly documented proofs of loss—yet the Pittmans filed suit just 28 days after

submitting their errata and signature pages from their examinations under oath.[6]

The Pittmans dispute all of this of course, and claim that a genuine issue of

material fact exists as to whether they performed the post-loss duties set forth in their

policy. In their eyes, State Farm made a number of overly broad requests to prolong the

---

[6] The Pittmans' complaint also contained a count pressing a bad faith claim against State Farm. In their response brief, they have voluntarily stipulated to the dismissal of this count, thereby leaving only their contract claim.

process and avoid paying out on a legitimate claim. To support their argument, the Pittmans list extensively what they *did* do to cooperate with State Farm, including providing timely notice and an inventory, submitting to examinations under oath, and swearing to proof of loss documents.

The resolution of the summary judgment dispute turns on the interpretation of the policy provision requiring the Pittmans to "provide [State Farm] with records and documents we request and permit us to make copies" as often as the insurer "reasonably require[s]." (R. Pittman Dep. Ex. 3, at 90.) Does this language, as State Farm contends, amount to a strict condition precedent to an insurance payout? Or does State Farm have to show that it suffered prejudice as a result of the Pittmans' refusal to provide access to the requested documents?

Alabama case law decidedly favors State Farm. In *Nationwide Insurance Company v. Nilsen*, 745 So. 2d 264 (Ala. 1999), Nilsen bought a homeowner's policy from Nationwide just two months before his home burned down. Given the loss's timing, Nationwide hired an investigator to inspect the burned down house. Although the investigator could not pinpoint the cause and nature of the fire, he found that it burned extremely hot, and his testing of some of the debris revealed the presence of a commonly found flammable substance. Nationwide then asked Nilsen to sit for an examination under oath, which the homeowner's policy contemplated and allowed. Nilsen hired an attorney and agreed to be examined, but never followed through on his end. Instead, he

21

cancelled his deposition upwards of four times, hired a new attorney, and filed suit in state court, thus leaving Nationwide's investigation unfinished.

Nationwide moved for summary judgment on Nilsen's breach of contract claim, arguing that Nilsen's failure to sit for an examination under oath meant he did not comply with a condition precedent to coverage. The trial court disagreed, however, and entered judgment in Nilsen's favor to the tune of $74,174.17 in damages. Nationwide appealed and the Supreme Court of Alabama reversed. The state supreme court held that "Nilsen failed to comply with a condition precedent" when he refused to sit for an examination under oath. *Nilsen*, 745 So. 2d at 266. Accordingly, the Court held that "Nationwide was entitled to a judgment as a matter of law on Nilsen's breach of contract claim." *Id.*

In reaching this conclusion, the *Nilsen* Court made two points relevant here. First, it accepted Nationwide's argument that the policy language requiring the insured, "as often as [Nationwide] reasonably required," to "submit to an examination under oath," constituted "a strict condition precedent to Nationwide's liability under the contract." *Id.* at 267. Second, the Court noted that "an insurer's obligation to pay or to evaluate the validity of an insured's claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *Id.* (citing *United Ins. Co. of Am. v. Cope*, 630 So. 2d 407, 411 (Ala. 1993)). Given this reasoning, it would appear that State Farm has the better of the argument about the nature of the provision at issue here.

But the Pittmans attempt to distinguish *Nilsen* by citing to *Clarke v. Allstate Insurance Co.*, 728 So. 2d 135 (Ala. 1998). In *Clarke*, two drivers filed a claim under an automobile policy they had with Allstate. In response, the insurer asked them to sit for examinations under oath, but neither insured appeared. After the drivers filed suit, Allstate moved for summary judgment, relying on a policy endorsement it claimed it added to the insureds' policy and which required the insureds to sit for the requested examination. One of the insureds, however, claimed in an affidavit that she never received the endorsement containing the examination-under-oath requirement. Hence the Supreme Court of Alabama held that the insured's "denial of the receipt of the endorsement, together with Allstate's failure to assert that it had mailed or delivered it, leaves a fact question as to whether the endorsement was delivered and was thereby made a part of the policy . . ." *Clarke*, 728 So. 2d at 140.

This case mirrors *Nilsen* more closely than it does *Clarke*. The Pittmans, unlike the plaintiff in *Clarke*, do not dispute that they had a copy of the insurance policy containing the various duties after loss provisions; Rhonda Pittman admitted as much during her examination under oath. (R. Pittman Dep. 17–18, 20–21.) This takes the matter outside the ambit of *Clarke*: there can be no genuine issue of material fact about whether they received the policy and knew its contents. The only remaining questions, then, are whether the policy provisions requiring the Pittmans to provide reasonably requested documentation amount to a "strict conditions precedent" like the examination-

23

under-oath requirement in *Nilsen*, and, if so, whether State Farm's request was reasonable under the circumstances and the terms of the insuring agreement.

The structure of the insurance contracts and the relevant case law make clear that the Pittmans' had to comply with reasonable document requests as a strict condition precedent to coverage. The "Your Duties After Loss" section of the Pittmans' homeowner's policy contains both an examination-under-oath provision and a provision requiring the insureds to provide documents reasonably requested by the insurer. The same goes for their personal articles policy. If the examination-under-oath provision is a strict condition precedent under *Nilsen* and found in the same place as the document request provision, then why wouldn't the latter be treated the same as the former?

The Pittmans have failed to provide a persuasive reason why it should not be. Conversely, the Southern District of Alabama has held that a policy provision in a homeowner's policy, found under a section titled "What You Must Do After A Loss," required the insured to provide an inventory list and that the failure to fulfill this obligation amounted to a breach of a strict condition precedent to coverage. *Hillery v. Allstate Indem. Co.*, 705 F. Supp. 2d 1343, 1362 (Ala. 2010) (applying Alabama law). In so holding, the *Hillery* court stated, "the law is clear that an insurer's obligation to pay covered claims under a policy of insurance is not triggered until the insured complies with the insurer's reasonable requests for statements and documents pursuant to a 'duties after loss' provision." *Id.* (citing *Nilsen*, 745 So. 2d at 266). Thus the structure of the

24

Pittmans' policies, combined with the *Nilsen* and *Hillery* holdings, suggest that all of the post-loss duties contained in the "Your Duties After Loss" section amount to strict conditions precedent to coverage, and that a failure to fulfill those obligations on the part of the insured allows the insurer to refrain from paying out on a claim.

The purpose of the post-loss obligation provisions—to provide a tool in the battle against moral hazard—further buttresses this conclusion. The insurance contracts at issue provide that an insured breaches the agreement by causing the loss himself. The difficulty for the insurer, however, is that an insured who breaches the contract will be loathe to come forward with evidence of his breach; after all, he wants the illicit payout. So the problem is one of asymmetrical information: the insured knows whether or not he caused the loss, but the insurer lacks the information necessary to decide whether to pay the claim or deny it for breach of contract. To address this problem, insurers include post-loss duties requiring the insured to provide information that will shed light on matter. If the insured refuses, his or her non-cooperation will in and of itself amount to a breach. With this in mind, it makes sense to construe the post-loss duty provisions as strict conditions precedent to coverage, as the *Nilsen* and *Hillery* courts have done, because doing so forces the insured to help the insurer investigate the merits of the claim at the outset rather than allowing him to stonewall and let him hold the threat of litigation over the insurer's head like the sword of Damocles.

Having decided that the disputed provision amounts to a strict condition precedent

to coverage, the only remaining question is whether there is a genuine issue of material fact about whether the Pittmans failed to fulfill their obligations. The homeowner's policy required the Pittmans to "provide [State Farm] with records and documents we request and permit us to make copies" as often as the insurer "reasonably require[s]." (R. Pittman Dep. Ex. 3, at 90.) And it is undisputed that they failed to do this. Yet they argue that a genuinely disputed issue exists because they complied with most of their post-loss obligations, because State Farm's requests were overly broad, and because the insurer did not suffer prejudice as a result of their breach.

The Pittmans' arguments contain a number of fatal flaws. First, while their satisfaction of *some* of their post-loss duties (like providing notice of the loss, filling out an inventory of the lost property, and submitting to examinations under oath) is laudable, it does not excuse their refusal to provide the banking and credit card information requested by State Farm. Under Alabama law, compliance with *each* of the post-loss duties is required: insurance companies have no "obligation to investigate or pay a claim until the insured has complied with all the terms of the contract with respect to submitting claims for payment." *United Ins. Co. of Am. v. Cope*, 630 So. 2d 407, 412 (Ala. 1996). In other words, an insured cannot pick which duties he or she wants to comply with and shirk the rest. The Pittmans, in an attempt to claim they discharged their duties, seize on a single sentence in State Farm's 34-page committee report, which states: "the insured provided appropriate documentation to verify the purchase of the jewelry

26

and art collection reported as stolen." (Nix Aff. 132.) But their reliance on this sentence ignores how it only relates to the *purchase* of the artwork and jewelry. The requested banking and credit card information, which State Farm had been requesting for months,[7]

---

[7] The correspondence includes the following requests:

- A July 12, 2010, letter from State Farm representative Suzanne Newman to the Pittmans requesting "cancelled checks, receipts, credit card statements . . ." (T. Pittman Dep. Ex. 25.)

- A July 28, 2010, letter from Pat Craig to the Pittmans confirming that he had informed the Pittmans that he would "need to obtain some financial information" from them and had asked them to sign authorization forms to that end. (*Id.* at Ex. 26.)

- An August 4, 2010, letter from Tony Nix to the Pittmans citing to the insurance policies and asking them to comply with their post-loss duties contained therein. (R. Pittman Dep. Ex. 17.)

- An August 11, 2010, letter from Craig to the Pittmans in which he confirmed the couple's refusal to provide some of the requested documentation, admonished them about their post-loss duties, and reserved State Farm's right to request additional documentation as the investigation progressed. (T. Pittman Dep. Ex. 27.)

- An August 19, 2010, letter from Craig "requesting any and all credit card records or canceled checks that would support purchase of the diamond bracelet" and offering to reimburse the Pittmans for any charges incurred in fulfilling the request. (*Id.* at Ex. 28.)

- An August 23, 2010, letter from Nix to the Pittmans again citing to the insurance policies and asking them to comply with their post-loss duties. (*Id.* at Ex. 29.)

- A September 10, 2010, letter from Craig to the Pittmans again requesting the credit card information related to their purchase of the diamond bracelet and offering to reimburse them for any expenses incurred in obtaining the information. (*Id.* at Ex. 30.)

- A second September 10, 2010, letter from Craig asking the Pittmans to provide the requested credit card information per the "Duties After Loss" section of their insurance policy. (*Id.* at Ex. 31.)

- An October 1, 2010, letter from State Farm's attorneys to Rufus Smith noting how the Pittmans failed to sign an authorization allowing State Farm to obtain and produce the requested "credit card statements, bank statements, and/or cancelled checks," and noting how they have a contractual duty to perform their post-loss duties. (R. Pittman Dep. Ex. 23.)

would be useful to verify the value of the property, to see if they sold the property sometime after the purchase, and to get a better picture of their overall financial situation.

Second, the Pittmans' contention that State Farm made unreasonable and overly broad requests lacks merit. The bank and credit card information requested by State Farm was hardly collateral as the Pittmans suggest. It would have allowed State Farm to verify the Pittmans' claims about how much they paid for the artwork and jewelry (a better indicator of value than appraisals that could be inflated drastically); to spot any unusual financial activity that might suggest they faked the loss (for example, an entry for a rental unit in Europe) or fenced the insured property (like unexplained large cash deposits); and to get a better picture of their overall financial health, which would have allowed the insurer to gauge their incentive to commit fraud. State Farm, moreover, offered to reimburse the Pittmans for any expenses incurred in getting these documents. The insurer even went so far as offering to relieve the Pittmans of the burden of gathering the information if only they would sign an authorization form—which they refused to do. At bottom, the materiality of the requested information, combined with State Farm's willingness to make the process inexpensive and virtually hassle free for the Pittmans, makes the insurer's actions imminently reasonable. If anyone acted unreasonably, it was the Pittmans when they refused to perform their obligations, yet turned around and sued State Farm for breach of contract.

Third, and finally, an insurer does not have to prove prejudice under Alabama law

when an insured breaches a condition precedent to coverage. In arguing otherwise, the Pittmans cite to cases interpreting the more generalized "cooperation clauses" found in policies, *see, e.g.*, *Emp'rs Ins. Co. of Ala. v. Crook*, 160 So. 2d 463, 465 (Ala. 1964); *Ala. Farm Bureau Mut. Cas. Ins. v. Teague*, 110 So. 2d 290, 293 (Ala. 1959), instead of cases dealing with specific, enumerated post-loss duty provisions like those applied in *Nilsen* and *Hillery* and the one at issue here. Distinguishing between the two types of provisions and applying a different standard to each makes sense, as Judge Thompson noted in *Alberson v. Nationwide Assurance Company*, No. 03-cv-11, 2003 WL 23335453 (M.D. Ala. Oct. 24, 2003). Cooperation clauses, on the one hand, create a broad and somewhat vague duty for the insured, thus making it likely a jury will have to resolve the question of whether he discharged his duty. *See id.* at *3 (citing *Home Equity Indem. Co. v. Reed Equip. Co., Inc.*, 381 So. 2d 45, 49 n.3 (Ala. 1980)). On the other hand, enumerated obligations like the examination-under-oath requirement and duty to provide documentation of the loss are specific and, accordingly, more susceptible to objective proof—the insured either took the required action or he didn't. *See id.* Here, State Farm did not move for summary judgment because the Pittmans were generally uncooperative; the insurer did so because the couple refused to satisfy a specific duty provided for in their insurance contract. Indeed, the Pittmans have admitted as much. Therefore, because Alabama law does not require State Farm to prove prejudice, and since the Pittmans have admitted to breaching their end of the contract, no reasonable

juror could find in their favor. Summary judgment is, accordingly, due to be granted.

## VI. CONCLUSION

The Pittman's failure to submit the banking and credit information reasonably requested by State Farm or to sign an authorization form allowing the insurer to gather the information amounts to a breach of a strict condition precedent to coverage. As a result, it is hereby ORDERED that State Farm's Motion for Summary Judgment (Doc. # 21) is GRANTED. An appropriate final judgment will be entered.

Done this the 21st day of June, 2012.

/s/ Mark E. Fuller

UNITED STATES DISTRICT JUDGE